IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Catherine Zaborowski and | ) | |
| Simone Jackson, individually | ) | |
| and on behalf of a class, | ) | |
| | ) | |
| *Plaintiffs,* | ) | No. 08 CV 6946 |
| -vs- | ) | |
| | ) | |
| Sheriff of Cook County and | ) | *(Judge St. Eve)* |
| Cook County, Illinois, | ) | |
| | ) | |
| *Defendants.* | ) | |

# MOTION FOR CLASS CERTIFICATION

Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs Catherine Zaborowski and Simone Jackson, by counsel, move the Court to order that this case be maintained as a class action on behalf of:

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

Pursuant to Rule 23(C)(4), plaintiffs request that the case be maintained as a class action solely to adjudicate the legality of the Sheriff's shackling policy, and that all questions of damages for unnamed members of the class be reserved to individual damage actions.

.

## I.   Facts

Each year, more than 30 women give birth while in the custody of the Sheriff of Cook County.[1]

In 1998, the Sheriff adopted a policy mandating that all pregnant women in his custody be shackled during labor and during recovery following labor.[2] The Sheriff's shackling policy requires a Deputy Sheriff to bind one leg and one arm of the pregnant detainee to her hospital bed. (Exhibit 2 at 56:4-6.) The policy also requires an armed Deputy Sheriff to remain with the pregnant detainee during labor and delivery. (Exhibit 2 at 56:14-17.)

In *May v. Sheahan,* 226 F.3d 876 (7th Cir. 2000), the Seventh Circuit held that the Sheriff's policy requiring that all hospital detainees be shackled to their beds was "plainly excessive" as applied to an AIDS patient. *Id.* at 884. The Court reaffirmed this settled law in *Hart v. Sheahan,* 396 F.3d 887 (7th Cir. 2005), when it quoted from *May* that "the use of bodily restraints constitutes punishment in the constitu-

---

[1] This is an estimate based on discovery in this case. Defendants have not as yet fully responded to discovery seeking information about the precise number of births.

[2] The Sheriff's spokesperson is quoted in AP news reports that "[t]he measure was enacted after a woman in 1998 jumped out of the hospital window, ripping her stitches, and bleeding to death." (Plaintiffs' Exhibit 1.) Plaintiffs do not believe that this sad event involved childbirth.

tional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *Id.* at 892. The question presented in this case is whether the use of bodily restraints on a pregnant woman during labor, delivery, or recovery following delivery is "rationally related to a legitimate non-punitive government purpose." *Id.*

Plaintiffs Catherine Zaborowski and Simone Jackson were pregnant when processed into the jail. (Amended Complaint, ¶5.) Jackson went into labor on May 3, 2008 and was taken to Stroger Hospital to deliver her child. (Amended Complaint, ¶13.) At the hospital, deputy sheriffs shackled Jackson hand and foot to a hospital bed. (Amended Complaint, ¶14.) Jackson remained shackled while she was in labor (Amended Complaint, ¶15) and was unshackled for ten minutes during delivery. (Plaintiffs' Exhibit 5.)

Jackson remained at the hospital for four days following delivery; throughout this recovery period, she continued to be shackled hand and foot to the hospital bed and was not allowed to use the toilet or to get up from the bed to walk. (Amended Complaint, ¶16.) The experiences of plaintiff Zaborowski were similar.

Zaborowski went into labor on August 29, 2008 and was taken to Stroger Hospital to deliver her child. (Amended Complaint, ¶7.) There,

deputy sheriffs shackled Zaborowski hand and foot to a hospital bed. (Amended Complaint, ¶8.) Zaborowski remained shackled for about eleven hours while she was in labor. (Amended Complaint, ¶9.) Immediately before actual delivery of the child, the attending physician requested the deputy sheriff to unshackle Zaborowski's foot. (Amended Complaint, ¶10.) The deputy complied with this request and Zaborowski was shackled to the bed by one arm when she delivered her child. *Id.*

Zaborowski remained at the hospital until the evening of the day after delivery. (Amended Complaint, ¶12.) During this period, she was shackled hand and foot to the hospital bed and not permitted to use the toilet or to get up from the bed to walk. *Id.*

Plaintiffs were shackled because of defendant Dart's official policy, as admitted at a Rule 30(b)(6) deposition by Superintendent Holmes. (Exhibit 2.)

Holmes stated that the policy allows for the removal of shackles during actual delivery of the child. (Exhibit 2 at 118:7-24.) Holmes may be misinformed about the actual policy: the experience of plaintiff Zaborowski suggests that the policy is to retain the shackle on one arm during delivery. (Amended Complaint, ¶12.)

A Rule 23(b)(3) class action is the appropriate vehicle to adjudicate the legality of the shackling policy. *Arreola v. Godinez,* 546 F.3d

788, 798 (7th Cir. 2008). Plaintiffs show below that the proposed class satisfies each of the requirements of Rule 23(a) and that certification is appropriate under Rule 23(b)(3).

## II.    The Proposed Class Satisfied Rule 23(a) and (b)(3)

This Court recently analyzed the standards of Rule 23 in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* 256 F.R.D. 586 (N.D.Ill. 2009) and *Harris v. Best Buy Co., Inc.,* 254 F.R.D. 82 (N.D.Ill. 2008): The proponent of class certification must show that the proposed class satisfies each of the requirements of Rule 23(a) and that the proposed class satisfies one of the subsections of Rule 23(b). This case satisfies each of these requirements.

### A. Numerosity

Plaintiff asks the Court to allow this case to proceed for:

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

Plaintiffs have requested defendants to produce information about the precise number of childbirths on and after December 4, 2006; while defendants have not as yet fully complied with this request, plaintiffs' counsel estimate from the information available that each year, more than 30 women give birth while in the custody of the Sheriff

of Cook County. Thus, counsel estimate that there are at least 75 women in the proposed class.

In *Cotton v. Asset Acceptance, LLC,* No. 07-C-5005 (N.D.Ill. June 26, 2008, Exhibit 3), this Court endorsed the rule of thumb that "a class of at least forty members is sufficient to satisfy the numerosity requirement." (Exhibit 3 at 4.) Plaintiffs expect defendants to agree that the proposed class meets this benchmark; plaintiffs anticipate that defendants will not dispute numerosity.

### B. Commonality

The commonality requirement of Rule 23(a) is satisfied when a defendant has "engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998); *Harris v. Best Buy Co., Inc.,* 254 F.R.D. 82, 87 (N.D.Ill. 2008). This requirement is satisfied in this case, where the class claim arises from defendants' shackling policy.

The common question in this case is whether the use of bodily restraints on a pregnant woman during labor, delivery, or recovery following delivery is "rationally related to a legitimate non-punitive government purpose," as required by *May v. Sheahan,* 226 F.3d 876, 884 (7th Cir. 2000). This question is "common to all potential class

members," *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008), and satisfies the commonality requirement of Rule 23(a).

### C. Typicality

"A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Keele v. Wexler*, 149 F.3d 589, 595 (1998); *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983).

In this case, the class claim arises from the shackling policy that defendants applied to the named plaintiffs. Plaintiffs' claim thus satisfies the typicality requirement of Rule 23. *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008).

### D. Adequacy of Representation

Defendants cannot dispute that competent attorneys represent the proposed class.[3] Nor can defendants argue that either of the named plaintiffs has any interest at odds with that of the proposed class. Defendants may argue, however, that the named plaintiffs cannot ade-

---

[3] Plaintiff's attorneys are class counsel in several cases challenging various practices at the jail, including *Jackson v. Sheriff,* 06 CV 493 (challenge to STD testing); *Phipps v. Sheriff,* No. 07 CV 3998 (challenge to ADA compliance at jail for wheelchair bound detainees); *Parish v. Sheriff,* 07 CV 4369 (challenge to administration of prescription medication at jail); *Streeter v. Sheriff,* No. 08 CV 732 (challenge to return from court strip search policy).

quately represent the class because of their criminal history. This argument is wholly without merit: "Several courts have certified or have approved the certification of classes of prisoner and detainee plaintiffs. [citations omitted] If defendants were correct, there would be no such thing as a class action in the prison or jail context. In any event, defendants have failed to provide any basis to believe that the named plaintiffs' criminal histories differentiate them from other class members or make their interests different from those of the class as a whole." *Parish v. Sheriff, supra,* Exhibit 10 at 9.

### E.   Rule 23(b)(3): Predominance and Superiority

Rule 23(b)(3) requires the Court to find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The "predominant question" in this case is whether the use of bodily restraints on a pregnant woman during labor, delivery, or recovery following delivery is "rationally related to a legitimate non-punitive government purpose," as required by *May v. Sheahan,* 226 F.3d 876, 884 (7th Cir. 2000). This claim does not turn on individual issues. *See, e.g., Parish v. Sheriff,* Exhibit 4 at 9.

In *Mejdrech v. Met-Coil Systems Corp.,* 319 F.3d 910 (7th Cir. 2003), the Seventh Circuit endorsed Rule 23(b)(3) class actions when, as in this case, "there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings." *Id.* at 911. As in *Mejdrech,* "it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *Id.*

The Seventh Circuit recently reaffirmed this view in *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008). *Arreola* teaches that in evaluating requests for class certification under Rule 23(b)(3), the district court must consider the provision of Rule 23(c)(1)(B) authorizing the class treatment of "claims" as well as "issues." *Id.* at 800. Thus, the possibility that the amount of damages might vary among individual class members is not a basis for refusing to allow a case to proceed as a class action.

Plaintiffs acknowledge that each class member should receive a separate determination of damages. Accordingly, plaintiffs request, pursuant to Rule 23(c)(4), that the case be maintained as a class action solely to adjudicate the legality of the Sheriff's shackling policy, leaving

-9-

all questions of damages for unnamed members to be resolved in individual actions.

## III.  Conclusion

For the reasons above stated, plaintiffs request that the Court order that this case be maintained as a class action for:

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

Respectfully submitted,

/s/ <u>Kenneth N. Flaxman</u>

Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200

Thomas G. Morrissey.
10249 S Western Ave
Chicago, Illinois 60643
(773) 233-7900

*Attorneys for Plaintiff*

**Exhibit 1**





June 12, 2009

# Ex-inmate sues, says was chained to bed in labor

A former Cook County Jail inmate has sued the county Sheriff's office, saying she was handcuffed to her hospital bed until just before she gave birth.

Marilu Morales was eight months pregnant in April 2008 when she was jailed for possession of controlled substances.

In a lawsuit filed Thursday in federal court, Morales says that when she was in labor at Stroger Hospital, a Sheriff's deputy shackled her hand and foot to her bed and unchained her at a doctor's request shortly before she gave birth. She says the deputy put the shackles back on after the baby was born.

Morales is seeking $200,000 in damages.

Sheriff's department spokesman Steve Patterson said the deputy followed department policy and that his actions conformed to state law.

The policy requires all pregnant detainees to be handcuffed to the bed until they are in labor and then, when the baby has been delivered, to be handcuffed again.

The measure was enacted after a woman in 1998 jumped out of the hospital window, ripping her stitches, and bleeding to death, he said.

Morales' attorney Tom Morrissey said the explicitly states that women may not be handcuffed on the way to the hospital or at all during labor.

He said the discrepancy is over the definition of "labor," and that the state interprets it as "right before the baby is born." Morrissey said he plans to ask the judge for class action status so other women can be included as plaintiffs.

"When a woman is in labor, she is in no condition to get up and flee," Morrissey said.

Patterson said neither the department nor the state statute define labor, but he "won't get into a debate" about when the handcuffs should be removed.

_____

Information from: Chicago Tribune, http://www.chicagotribune.com

Plaintiff's Exhibit 1           Page 1

**Exhibit 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CATHERINE ZABOROWSKI and  )
SIMONE JACKSON,           )
                         )
        Plaintiffs,       )
                         )
        v.                ) No. 08 C 6946
                         )
SHERIFF OF COOK COUNTY    )
and COOK COUNTY, ILLINOIS,)
                         )
        Defendants.       )


        The deposition of MICHAEL C. HOLMES, II,

designated 30(b)(6) representative, called by the

Plaintiffs for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before KATHLEEN M. DUFFEE, a Notary

Public within and for the County of Cook, State of

Illinois, a Certified Shorthand Reporter and Registered

Professional Reporter of said state, taken at 500 Daley

Center, Chicago, Illinois, on the 21st day of May, A.D.

2009 at 9:43 a.m.

2

1   PRESENT:

2           THOMAS G. MORRISSEY, LTD.,
            10249 South Western Avenue
3           Chicago, Illinois 60643
            (773) 233-7900, by:
4           THOMAS G. MORRISSEY, ESQUIRE,

5               appeared on behalf of the Plaintiffs;

6
            ANITA ALVAREZ, STATE'S ATTORNEY OF
7               COOK COUNTY, ILLINOIS,
            500 Daley Center
8           Chicago, Illinois 60602
            (312) 603-5440, by:
9           PATRICK S. SMITH, ESQUIRE,

10              appeared on behalf of the Defendants.

11

12  ALSO PRESENT:

13          Ms. Lindsey Shapiro

14

15

16

17

18

19

20

21

22

23

24  REPORTED BY:  KATHLEEN M. DUFFEE, CSR, RPR


            TOOMEY REPORTING    (312) 853-0648

3

```
 1                    I N D E X

 2   WITNESS                    EXAMINATION

 3   MICHAEL C. HOLMES, II

 4        By Mr. Morrissey            5, 107

 5        By Mr. Smith              104, 121

 6

 7

 8                  E X H I B I T S

 9   NUMBER                       MARKED

10   Plaintiff's Exhibit No. 1        4

11        No. 2                      39

12        No. 3                      39

13        No. 4                      42

14        Group No. 5                84

15        No. 6                      97

16

17

18

19

20

21

22

23

24
```

TOOMEY REPORTING    (312) 853-0648

4

```
 1                        (WHEREUPON, the witness was
 2                        duly sworn.)
 3           MR. MORRISSEY:  This is a Rule 30(b)(6)
 4   Notice of Deposition taken pursuant to notice and
 5   continued by agreement of the parties to today's
 6   date.
 7                 Do you have a copy of that
 8   Rule 30(b)(6)?  I want to make this part of the
 9   record.
10                 The plaintiffs have noticed up a Rule
11   30(b)(6) deposition, and I'm going to mark the
12   notice, which was served back in April of 2009, I'm
13   going to mark that Exhibit No. 1 for the record.
14                        (WHEREUPON, said document was
15                        marked Plaintiff's Exhibit
16                        No. 1, for identification,
17                        as of 05-21-09.)
18           MR. MORRISSEY:  Mr. Smith, has Superintendent
19   Holmes been produced pursuant to this notice that was
20   sent to you?
21           MR. SMITH:  Yes.
22           MR. MORRISSEY:  Okay.
23
24
```

TOOMEY REPORTING    (312) 853-0648

5

1           MICHAEL C. HOLMES, II,

2   called as a witness herein by the Plaintiffs, having

3   been first duly sworn, was examined and testified as

4   follows:

5                      EXAMINATION

6   BY MR. MORRISSEY:

7       Q.  Will you state your full name for the record?

8       A.  Michael Charles Holmes, II.

9       Q.  What is the highest level of formal education

10  you've completed?

11      A.  After my associate's degree, I attended UIC

12  for one year.

13      Q.  Where did you receive your associate's degree?

14      A.  Morton Junior College, Cicero, Illinois.

15      Q.  In what year?

16      A.  '82.

17      Q.  Did you have a major at Morton College?

18      A.  Law enforcement.

19      Q.  And when did you attend U of I?  Is that

20  Circle?

21      A.  Circle, yes, sir.  '83.

22      Q.  And what was your major at U of I?

23      A.  Criminal justice.

24      Q.  Did you complete that program?

            TOOMEY REPORTING   (312) 853-0648

6

1    A.  No, sir.

2    Q.  How many hours of criminal justice did you

3  take at U of I?

4    A.  I don't recall.

5    Q.  What year did you graduate from high school?

6    A.  1980.

7    Q.  What high school?

8    A.  Morton West High School, Berwyn, Illinois.

9    Q.  And from 1980 to the present time, describe

10  every position of law enforcement that you've held.

11    A.  I've worked security at Oak Park Hospital.

12    Q.  And when was that?

13    A.  I believe during my college years, from '80

14  to approximately '83.

15    Q.  And when was your next position in law

16  enforcement?

17    A.  Right after that was Berwyn Police Department

18  as the ordinance enforcer.

19    Q.  Were you a sworn officer for Berwyn's police

20  department?

21    A.  No, sir.

22    Q.  How long did you hold that position?

23    A.  Approximately May of '85.

24    Q.  What was your next position in law

TOOMEY REPORTING    (312) 853-0648

1   enforcement?

2        A.   During that position, I also was a Berwyn

3   auxiliary police officer.

4        Q.   Were you a sworn auxiliary police officer?

5        A.   Yes, sir.

6        Q.   For what period were you an auxiliary police

7   officer?

8        A.   Approximately the same, from '83 to '85.

9        Q.   What was your next position in law

10  enforcement?

11       A.   I began with the Cook County Department of

12  Corrections May of '85.

13       Q.   Did you receive any training in the academy

14  when you joined the Cook County Sheriff's Office?

15       A.   Yes, sir.

16       Q.   And what academy did you attend?

17       A.   At the time, the academy was held at the

18  CCDOC, Division 6, and it was the State's

19  Correctional Training Academy.

20       Q.   Now, how long was the training program at

21  the academy?

22       A.   Twelve weeks.

23       Q.   During those 12 weeks, did they cover external

24  security for the Cook County Jail?


                TOOMEY REPORTING    (312) 853-0648

8

1        A.  Yes, sir.

2        Q.  In particular, did they cover issues

3   regarding guarding detainees that were hospitalized?

4        A.  Yes, sir.

5        Q.  At that time what did you learn in the

6   academy in regards to retraining detainees that were

7   hospitalized?

8        A.  At that time the protocol was to:  if you

9   were sitting on a detainee at a hospital, they were

10   to be handcuffed one extremity and the other to the

11   secure part of the hospital bed, and also leg-shackled

12   the opposite leg, and the other shackle to a secure

13   part of the bed.

14        Q.  So both legs were shackled in 1985 out of the

15   academy's training?

16        A.  Just one.

17        Q.  Just one.  In 1985 under the training you

18   received at the academy, in addition to one leg being

19   shackled was either hand shackled?

20        A.  Yes, sir.

21        Q.  And which hand was that?

22        A.  The opposite from the leg that was shackled.

23        Q.  In addition to the one arm and one leg being

24   shackled, was there a shackle around the midsection


TOOMEY REPORTING    (312) 853-0648

9

1   of a patient?

2        A.  No, sir.

3        Q.  Was there what's commonly called now a

4   blue box that accompanied the shackle to the leg or

5   to the arm --

6        A.  No, sir.

7        Q.  -- in 1985?

8              And during your training in 1985 at the

9   academy -- strike that.

10             Do you know what is considered a

11  high-risk designee?

12       A.  No, sir.

13       Q.  In 1985 were all detainees, under the

14  training you received at the academy, required to be

15  shackled one leg to the bed and one arm to the leg

16  while hospitalized?

17       A.  It was one, one leg to the bed and one arm

18  to the bed.

19       Q.  And that was for all hospitalized detainees?

20       A.  Yes, sir.

21       Q.  That included women that were in labor;

22  correct?

23       A.  No, sir.

24       Q.  Did it include elderly detainees?

Plaintiffs' Exhibit 2

1      A.  I'm sorry?

2      Q.  Did it include elderly detainees?

3      A.  Yes.

4      Q.  Did it include paralyzed detainees?

5          MR. SMITH:  I'm going to object to foundation.

6  When are we talking about?

7  BY MR. MORRISSEY:

8      Q.  We're talking about 1985 when you received

9  training at the jail.

10     A.  Yes, sir.

11     Q.  And in 1958 in the training that you received

12  when you became a correctional officer, was there any

13  rule or regulation in 1985 that excluded women that

14  were hospitalized who were in labor?

15     A.  I don't recall.

16     Q.  In 1985 in the academy, was there any oral

17  instruction given by any anybody teaching at the

18  academy that pregnant women who were in labor were

19  not to be shackled while hospitalized?

20     A.  I don't recall.

21     Q.  In 1985 was there a policy at the Cook County

22  Jail that women that were pregnant and in labor who

23  were hospitalized were not to be shackled?

24         MR. SMITH:  Objection, asked and answered.

1   He said he didn't know.

2         MR. MORRISSEY:  No, he didn't.

3         MR. SMITH:  Yeah, he did.

4         MR. MORRISSEY:  No.  No.

5         MR. SMITH:  Yes, he did.

6   BY MR. MORRISSEY:

7     Q.  You can answer.

8     A.  I don't recall.

9     Q.  After attending the academy, what was your

10  first position at the Cook County Department of

11  Corrections?

12    A.  I was a correctional officer assigned to

13  the periodic imprisonment unit.

14    Q.  For what period of time did you hold that

15  position?

16    A.  Approximately three years.

17    Q.  What division at that time was that

18  considered?

19    A.  Division 7.

20    Q.  So that would take us to about 1988?

21    A.  Yes, sir.

22    Q.  In 1988 did your position change at the

23  Department of Corrections?

24    A.  Yes, sir.

TOOMEY REPORTING    (312) 853-0648

1      Q.   And what was your new position?

2      A.   Still as an officer, I was assigned to the

3   External Operations unit.

4      Q.   Was John Maw (phonetic) at that time in

5   charge of External Operations?

6      A.   My immediate supervisor?

7      Q.   No.  I'm wondering if he was the

8   Superintendent of External Operations in 1988.

9          MR. SMITH:  I'm going to object.  It goes

10   beyond the scope of the notice.

11   BY MR. MORRISSEY:

12      Q.   If you recall.

13      A.   I'm sorry?

14      Q.   If you recall whether or not John Maw was

15   the Superintendent in 1988.

16      A.   I don't recall.

17      Q.   Who was your immediate supervisor in 1988?

18          MR. SMITH:  I'm going to object again.  It's

19   outside of the scope.

20   BY MR. MORRISSEY:

21      Q.   You may answer.

22      A.   There were two chiefs that I reported to:

23   Chief Hartsfield and Chief Curtis.

24      Q.   Kurtovich?

TOOMEY REPORTING    (312) 853-0648

13

1     A.   Curtis.

2     Q.   In 1988 were you assigned to guard inmates

3   incarcerated, inmates that were hospitalized?

4     A.   Periodically, yes.

5     Q.   And what hospital facilities were you

6   assigned to?

7     A.   Basically, Stroger Hospital.

8     Q.   Which was previously called Cook County?

9     A.   Yes, sir.

10     Q.   The old Cook County Hospital?

11     A.   Yes, sir.

12     Q.   And what period of time were you assigned as

13   an officer for the Department of Corrections in

14   External Operations?

15     A.   Approximately two years.

16     Q.   So between 1988 and 1990 was there a policy

17   in practice in regards to shackling hospitalized

18   detainees?

19         MR. SMITH:   I'm going to object.   The notice

20   of questions, the Rider on the 30(b)(6) is clear

21   that the time limitation is December 4, 2006, to

22   present.   And if I knew you were going to start

23   asking questions from the mid-ages, I would have

24   certainly made the appropriate response.


                TOOMEY REPORTING    (312) 853-0648

                                                              14

1               I'm not going to sit here and object

2    to every question that you ask that is prior to

3    December 4th.  You're the one that sent out the

4    Rider and the areas of the questions you wish to ask

5    the Superintendent.

6               MR. MORRISSEY:  I'm asking him about his

7    experience as a 30(b)(6) designated person in

8    guarding hospitalized detainees.  So I just want to

9    know what was the policy when he was a foot soldier,

10   when he was an officer.

11              MR. SMITH:  I'm going to object, but you can

12   answer if you remember.

13   BY THE WITNESS:

14       A.  I don't recall.

15   BY MR. MORRISSEY:

16       Q.  In 1990 did your position change at the Cook

17   County Department of Corrections?

18       A.  Yes, sir.

19       Q.  And what was your new position?

20       A.  I was assigned to the Receiving room.

21       Q.  And did your title change?

22       A.  No, sir.

23       Q.  You were still a correctional officer?

24       A.  Yes, sir.


                 TOOMEY REPORTING    (312) 853-0648

1     Q.  How long did you work as an officer in the

2  RCDC?

3     A.  Approximately one year.

4     Q.  In 1991 what was your new position?

5     A.  I was promoted to sergeant.

6     Q.  And did the place you worked or were

7  assigned change when you became a sergeant?

8     A.  No, sir.

9     Q.  You remained in the RCDC?

10    A.  Yes, sir.

11    Q.  For what period of time were you a sergeant

12  in the RCDC?

13    A.  Until the -- about two and a half years.

14    Q.  In approximately 1993 or 1994 did you change

15  positions?

16    A.  Yes, sir.

17    Q.  Did your title change?

18    A.  Yes, sir.

19    Q.  What was your new title?

20    A.  I was promoted to lieutenant.

21    Q.  And what was your new assignment?

22    A.  Division 6.

23    Q.  And what were your duties as a lieutenant in

24  Division 6?

Plaintiffs' Exhibit 2

16

```
 1      A.  Basically overseeing the shift that I was
 2  assigned to, the daily shiftly activities of that
 3  particular shift.
 4      Q.  How long did you remain in Division 6?
 5      A.  Approximately a year.
 6      Q.  In 1995 did your title change?
 7      A.  No, sir.
 8      Q.  Did your position change?
 9      A.  Yes, sir.
10      Q.  And what was your new position?
11      A.  Division 5.
12      Q.  For what period of time were you a lieutenant
13  in Division 5?
14      A.  Approximately a year.
15      Q.  What were your responsibilities in
16  Division 5?
17      A.  The same as 6:  oversee the shift activities
18  of the shift I was assigned to.
19      Q.  In 1996 or 1997 did your title change?
20      A.  Yes, sir.
21      Q.  What was your new title?
22      A.  Captain.
23      Q.  Did your assignment change from Division 6 --
24      A.  No, sir.
```

TOOMEY REPORTING    (312) 853-0648

17

```
 1      Q.  -- for Division 5, rather.

 2      A.  No.

 3      Q.  You remained in Division 5 as a captain?

 4      A.  Yes, sir.

 5      Q.  For how long did you remain in Division 5 as

 6  a captain?

 7      A.  Approximately a year.

 8      Q.  Approximately 1998?

 9      A.  Yes, sir.

10      Q.  In 1998 did your title change?

11      A.  Yes, sir.

12      Q.  And what title did you receive?

13      A.  Administrative captain.

14      Q.  And did the unit that you were assigned to

15  change?

16      A.  No, sir.

17      Q.  You remained in Division 5?

18      A.  Yes, sir.

19      Q.  What were your responsibilities as

20  administrative captain?

21      A.  The overall day-to-day operations of

22  Division 5.

23      Q.  How long did you remain as an administrative

24  captain in Division 5?
```

Plaintiffs' Exhibit 2

18

```
 1      A.  The rest of the year.

 2      Q.  So approximately 1999 your title changed or

 3  your position?

 4      A.  Both.

 5      Q.  And what was your title in 1999?

 6      A.  Captain.

 7      Q.  Oh, you were demoted?

 8      A.  Yes, sir.

 9      Q.  Did your pay decrease?

10      A.  No, sir.

11      Q.  Do you know why you lost the rank of

12  administrative captain?

13      A.  No, sir.

14      Q.  Did the division that you were assigned to

15  change?

16      A.  Yes, sir.

17      Q.  And what division were you assigned to?

18      A.  Division 1.

19      Q.  So how long did you remain in Division 1 as

20  a captain?

21      A.  Approximately four months.

22      Q.  And where was your new assignment?

23      A.  Division 2.

24      Q.  As a captain?
```

19

```
 1      A.  Yes, sir.

 2      Q.  During what period were you a captain in

 3  Division 2?

 4      A.  Approximately four months.

 5      Q.  And this was in 2000?

 6      A.  Yes, sir.

 7      Q.  What was your role in Division 2 as a

 8  captain?

 9      A.  Being in charge of the shift and shiftly

10  activities that I was assigned.

11      Q.  Sometime in the year 2000 did you change

12  titles or position?

13      A.  Yes, sir.

14      Q.  And what was your new position?

15      A.  Captain in Division 9.

16      Q.  How long did you remain a captain in 9?

17      A.  Approximately two years.

18      Q.  Until about 2002?

19      A.  Yes, sir.

20      Q.  Okay.  And in 2002 what -- did your title

21  change?

22      A.  Yes, sir.

23      Q.  What was your new title?

24      A.  Administrative captain in Division 6.
```

Plaintiffs' Exhibit 2

20

1       Q.   Did your pay increase?

2       A.   No, sir.

3       Q.   What were your duties as administrative

4    captain in Division 6?

5       A.   Oversaw the day-to-day operations of

6    Division 6.

7       Q.   Okay.  What years were you the

8    administrative captain in Division 6?

9       A.   If I recall correctly, June of '01.

10      Q.   Until when?

11      A.   Approximately January of '02.

12      Q.   In January of '02 did your title change?

13      A.   Yes, sir.

14      Q.   What was your new title?

15      A.   Chief.

16      Q.   Did your pay increase?

17      A.   Yes, sir.

18      Q.   What division were you in?

19      A.   Division 6.

20      Q.   What were your responsibilities as a chief

21   in Division 6?

22      A.   Oversaw the day-to-day operations of

23   Division 6.

24      Q.   How long did you remain as a chief in 6?

21

```
 1      A.   Until approximately November of '02.
 2      Q.   In November of '02, tell me what your title
 3  was.
 4      A.   I'm sorry, sir.  I believe November of '01.
 5      Q.   In November of '01, did your title change
 6  again?
 7      A.   Yes, sir.
 8      Q.   And what was your new title?
 9      A.   Superintendent.
10      Q.   And what division were you made superintendent
11  of?
12      A.   Division 11.
13      Q.   Was that at the time Division 11 opened?
14      A.   No.
15      Q.   How long were you superintendent of Division
16  11?
17      A.   Approximately two and a half years.
18      Q.   When was the start date and when did you
19  change?
20      A.   I believe November of '01 until April of '03.
21      Q.   In April of '03, did your title remain the
22  same?
23      A.   Yes, sir.
24      Q.   Did your position change?
```

TOOMEY REPORTING    (312) 853-0648

1        A.   Yes, sir.

2        Q.   And where were you then assigned?

3        A.   External Operations.

4        Q.   In 2003 what areas were you responsible for

5   as superintendent?

6        A.   All of the exterior posts of the CCDOC, the

7   transportation unit, the outlying hospital units,

8   the K-9 unit, and the sort team.

9        Q.   Now, were there any hospitals that were

10  considered external posts?

11       A.   Yes, sir.

12       Q.   Each of these areas that you described:

13  the sort team, the K-9 unit, transportation unit,

14  and external post, and I believe there was one other

15  that I missed.

16       A.   The actual post, outside post before entering

17  the CCDOC.

18       Q.   Were there five units under the External

19  Operations group?

20       A.   Yes, sir.

21       Q.   Were they called "units" at that time in

22  2003?

23       A.   No, sir.

24       Q.   What were they called to identify those?

1      A.  Divisions.

2      Q.  Divisions.  So there was a K-9 division and

3  a sort division; would that be correct?

4      A.  Yes, sir.

5      Q.  And there would be an external post division?

6      A.  Exact wordage, I don't know.  External

7  Operations was a division, and the entities involved

8  were units.

9      Q.  Was there a unit for external post?

10     A.  Yes, sir.

11     Q.  For what period of time were you the

12  superintendent of External Operations?

13     A.  Until approximately March of the following

14  year.

15     Q.  Between 2003 and 2004 did each of these

16  units that you described as part of External

17  Operations have a unit commander or leader?

18     A.  Yes.

19     Q.  Do you recall who was the unit leader in

20  2003 and 2004 of the external post unit?

21     A.  Director Dennis Andrews.

22     Q.  Is a director at a higher level than a

23  superintendent?

24     A.  Yes, sir.


                TOOMEY REPORTING    (312) 853-0648

24

1      Q.  So I guess my question was misunderstood.

2              External Operations had five units;

3  correct in 2003 or 2004?

4      A.  Yes, sir.

5      Q.  My question was directed to whether each of

6  these units had a supervisor that was responsible

7  for the unit.

8      A.  Yes, sir.

9      Q.  And between 2003 and 2004, who was the unit

10 leader for the external post?

11     A.  There were two chiefs assigned to the

12 division, which was Chief Brown and Chief Turner.

13     Q.  Is that Daniel Brown?

14     A.  No, sir.

15     Q.  What was Mr. Brown's first name?

16     A.  Joseph.

17     Q.  And what was Mr. Turner's name?

18     A.  George.

19     Q.  You mentioned in 2004 -- I'm sorry.  Strike

20 that.

21              Was there a central location where

22 the chiefs of the external post between 2003 and

23 2004 worked at?

24     A.  Yes, sir.


TOOMEY REPORTING    (312) 853-0648

25

1      Q.   Where would that have been?

2      A.   That was Building 5 of the DCSI unit.

3      Q.   And is that located at 27th and California?

4      A.   I don't know the exact address, but it's

5   the 31st Street entrance.

6      Q.   And Chief Brown and Chief Turner in 2003

7   and 2004 would been directly responsible for the

8   correctional officers who were assigned to Cook

9   County or Stroger Hospital; correct?

10      A.   Yes.

11           MR. SMITH:  You know, I'm going to object.

12   Again, we're outside of the scope of this

13   deposition.

14               I don't mind some, you know, simple

15   questions, but you're really dwelling on this phase

16   of questions between 2003 and 2004.

17           MR. MORRISSEY:  I'm trying to get up to that

18   2006 date.

19           MR. SMITH:  Okay.  What happened on June 1st

20   of 2006 then, okay?  How about that question?

21   BY MR. MORRISSEY:

22      Q.   In 2004, your position changed again?

23      A.   Yes, sir.

24      Q.   And in 2004 what was your new position?


TOOMEY REPORTING    (312) 853-0648

26

1     A.   Superintendent of Division 10.

2     Q.   What period were you a superintendent of

3  10?

4     A.   Approximately March of '06.

5     Q.   In March of '06 did your title change?

6     A.   No, sir.

7     Q.   In March of '06 did your position change?

8     A.   Yes, sir.

9     Q.   What was your new position?

10     A.   Superintendent of External Operations.

11     Q.   For what period of time in '06, in March

12  of '06 to the present were you Superintendent of

13  External Operations?

14     A.   Until August of '08.

15     Q.   In March of 2006 what was -- was there an

16  organizational chart for the various units that

17  were in External Operations?

18     A.   Yes, sir.

19     Q.   And were the different groups within

20  External Operations in March of '06 broken down

21  into units?

22     A.   Yes, sir.

23     Q.   All right.  Describe the various units in

24  March of 2006 for the External Operations.

TOOMEY REPORTING    (312) 853-0648

1       A.   K-9 unit, transportation unit, sort unit,

2    External Operations posts, and outlying hospitals.

3       Q.   When you were first superintendent of 2003,

4    is it correct that there was not a unit within the

5    External Operations for outlying hospitals?

6       A.   No, sir.

7       Q.   Is that correct?  In 2003 and 2004 was there

8    a unit within External Operations that was

9    exclusively for outlying hospitals?

10      A.   Yes, sir.

11      Q.   In March of 2006 for what outlying hospitals

12   did External Operations provide security?

13      A.   Any hospital within Cook County.

14      Q.   In March of 2006 through August of 2008 were

15   you -- did you have a particular office where you

16   conducted the External Operations out of?

17      A.   Yes, sir.

18      Q.   Where was that office located?

19      A.   Building 5 of the DCSI unit.

20      Q.   Now, in March of 2006, besides yourself

21   were there other supervisors in the unit of outlying

22   hospitals?

23      A.   Yes, sir.

24      Q.   What were the names of the other supervisors

TOOMEY REPORTING    (312) 853-0648

1   in March of 2006 in order of rank?

2       A.  As far as I can recall, Chief Brown.   I

3   don't recall all the names, but I can give you the

4   commander assignments.

5       Q.  That would be fine.

6       A.  You would have one captain for each shift,

7   which would be three captains.

8       Q.  And the captains at that time were?

9       A.  I don't recall.

10      Q.  And were there also lieutenants assigned to

11  the hospital unit in March of 2006?

12      A.  Yes, sir.

13      Q.  How many lieutenants were assigned in 2006

14  to the hospital unit?

15      A.  They would fall under the captain.  At any

16  time you could have two lieutenants assigned to the

17  Ex Op's unit.

18      Q.  Two lieutenants assigned to the unit for the

19  hospital unit, correct, at any one time?

20      A.  The commander who would be -- excuse me.

21              The commander would be in charge of

22  the outside posts at the CCDOC and also the outlying

23  hospitals.

24      Q.  So the hospital unit included both the

1  hospitals where the detainees were being treated at

2  any one time plus the external post for the jail --

3      A.  Yes, sir.

4      Q.  -- in March of 2006?

5              And there was one commander under you

6  that was in charge of all those areas?

7      A.  Two.

8      Q.  And one was Chief Brown; correct?

9      A.  Yes, sir.

10     Q.  In addition to Chief Brown, there were shift

11  captains; correct?

12     A.  Yes, sir.

13     Q.  And the shift captain may or may not have

14  been lieutenants?  A lieutenant could also be a shift

15  commander?

16     A.  Correct.

17     Q.  And the shift commanders would be responsible

18  not only for the external post of the jail but also

19  the hospital units?

20     A.  Yes, sir.

21     Q.  And then below the captains and the

22  lieutenants, was there any other supervisors for the

23  hospital units?

24     A.  Yes, sir.


TOOMEY REPORTING    (312) 853-0648

1      Q.   What rank would that have been?

2      A.   Sergeant.

3      Q.   On each shift how many sergeants were there

4   in March of 2006?

5      A.   Approximately five.

6      Q.   Were these sergeants located outside of

7   Building 5 when they were assigned the different

8   shifts?

9      A.   No, sir.

10      Q.   They also would be stationed in Division 5?

11      A.   No, sir.

12      Q.   Where would they be stationed?

13      A.   The basement of Division 9 is the radio room.

14      Q.   Now, the captains, the shift captains, and

15   the shift lieutenants, would those also be housed

16   out of Division 9's radio room?

17      A.   Yes, sir.

18      Q.   And the sergeants would be based out of the

19   radio room; correct?

20      A.   Yes, sir.

21      Q.   Now, in March -- and was that true during

22   the entire time from 2006 to 2008, August of 2008,

23   when you were the Superintendent of External

24   Operations, all the supervisors were either based

TOOMEY REPORTING    (312) 853-0648

1   out of Division 5 or the radio room in Division 9?

2       A.   You would also have a supervisor assigned

3   to Stroger Hospital.

4       Q.   Would that be on each shift?

5       A.   Yes, sir.

6       Q.   Was there a room or location in Stroger

7   Hospital between March of 2006 and August of 2008

8   that the supervisor would be assigned?

9       A.   Yes, sir.

10      Q.   What room is that?

11      A.   From '06 until approximately '07, the CCDOC

12  hospital office was located in the Fantus Clinic

13  building at Stroger Hospital.

14      Q.   Was that the old Fantus Clinic building?

15      A.   Yes, sir.

16      Q.   Which was then -- was previously Cook

17  County?

18      A.   Yes, sir.

19      Q.   So the office in between 2006 to 2007 was

20  not in the modern Stroger building?

21      A.   Correct.

22      Q.   And sometime in 2007 the location for the

23  Stroger operation changed?

24      A.   Yes, sir.

32

1    Q.   In what month in 2007?

2    A.   I don't recall.

3    Q.   Where was the location in 2007?

4    A.   The new location is in the main building in

5    an area with the pharmacy department.

6    Q.   Now, you mentioned each shift would have a

7    supervisor at Stroger between 2006 and August of

8    2008; correct?

9    A.   Correct.

10    Q.   What would the title be for that supervisor?

11    A.   I'm sorry.  Can you repeat?

12    Q.   What would the supervisor's rank be that

13    was assigned to Stroger Hospital during each shift?

14    A.   Sergeant.

15    Q.   How many correctional officers in a normal

16    day would be assigned to Stroger between March of

17    2006 and August of 2008?

18    A.   It would vary based on the inmate population.

19    Q.   During that period of time, and that's what

20    I'm asking you about now, between March of 2006 and

21    August of 2008 what was the highest prison -- what

22    was the highest prison hospitalization rate for that

23    period of time?

24         MR. SMITH:  Do you know?


              TOOMEY REPORTING    (312) 853-0648

1          THE WITNESS:  I don't know that.

2   BY MR. MORRISSEY:

3      Q.  At any one time during the period between

4   March of 2006 and August of 2008, what was the

5   greatest number of inmates that were hospitalized

6   at Stroger to the best of your recollection,

7   approximately?

8      A.  Approximately 30.

9      Q.  And if you had 30 hospitalized detainees at

10  any one time at Stroger, how many guards would be

11  assigned then to the Stroger detail?

12     A.  It could have been as high as 60.

13     Q.  On each shift?

14     A.  Yes, sir.

15     Q.  Now, in addition to John Stroger Hospital,

16  were correctional officers assigned to Mt. Sinai

17  Hospital?

18     A.  Yes, sir.

19     Q.  Was there a regular detail to Mt. Sinai

20  Hospital from the CCDOC?

21     A.  No, sir.

22     Q.  On an average day during that period of time,

23  how many guards would be assigned to the Mt. Sinai

24  Hospital?

TOOMEY REPORTING    (312) 853-0648

1      A.   Again, it would vary on if any inmate was

2   being treated at Mt. Sinai Hospital.

3      Q.   On a day-to-day basis was there a

4   superintendent that was always responsible for

5   inmates at Mt. Sinai Hospital?

6      A.   If they were being housed there, yes.

7      Q.   To your knowledge, did pregnant women who

8   were in labor get sent to Mt. Sinai Hospital?

9           MR. SMITH:  I'm sorry?

10          MR. MORRISSEY:  To his knowledge, were

11   pregnant women that were in labor sent from the

12   CCDOC to Mt. Sinai Hospital.

13   BY THE WITNESS:

14      A.   I don't recall.

15   BY MR. MORRISSEY:

16      Q.   Do you know if pregnant women who were in

17   labor were sent to any other hospital besides

18   Stroger during the period from March of 2006 to the

19   time you left in August of 2008?

20      A.   Yes.

21      Q.   What other hospitals in addition to Stroger

22   were pregnant women sent to?

23      A.   I don't recall.

24      Q.   Was there any special training given to the

1  guards who were assigned to the hospital unit during

2  the period from March 2006 to August of 2008 to your

3  knowledge?

4      A.  I'm sorry, sir?

5          MR. MORRISSEY:  Can you repeat the question?

6                          (WHEREUPON, the record was read

7                          by the reporter as requested.)

8  BY THE WITNESS:

9      A.  No, sir.

10  BY MR. MORRISSEY:

11     Q.  Prior to 2006, do you know if there was any

12  special training -- let me correct that.

13          Prior to 2006, do you know whether or

14  not the guards that were assigned to the hospital

15  unit under External Operations were given any

16  different training than the correctional officers

17  that were assigned to the CCDOC?

18         MR. SMITH:  Objection, beyond the scope.

19  BY MR. MORRISSEY:

20     Q.  You may answer.

21     A.  No, sir.

22     Q.  Do you know whether or not from March of

23  2006 to the present whether there have been any

24  special in-house training programs for guards that

Plaintiffs' Exhibit 2

36

1   are assigned to the hospital unit?

2        A.   No, sir.

3        Q.   From March of 2006 to the present, are

4   there any General Orders or Departmental Orders that

5   specifically apply to External Operations?

6        A.   Yes, sir.

7        Q.   Are the General Orders -- what are the

8   nature of these orders?

9             Are they called General Orders or

10  Departmental Directives or Memorandums?  Can you

11  explain?

12       A.   Within the unit itself, they have what is

13  called a standing -- I'm sorry, Standard Operating

14  Procedure.

15       Q.   Who was responsible for issuing the

16  Standard Operating Procedures?

17       A.   They are authorized by the Assistant

18  Executive Director of Operations.

19       Q.   Were any -- these are written documents,

20  correct, special operating procedures?

21       A.   Yes.

22       Q.   Standard Operating Procedures, they're

23  written documents?

24       A.   Yes.


                TOOMEY REPORTING   (312) 853-0648

37

1      Q.  From March of 2006 to the present, what

2   Assistant Executive Director has been in charge of

3   the External Operations?

4      A.  I can go from present back to -- I don't

5   have the exact date.  Uhm, Assistant Director

6   Gilberto Romero.

7      Q.  For what period was Assistant Executive

8   Director Romero in charge of External Operations?

9      A.  Again, from present back to -- I don't

10   recall.

11      Q.  Who preceded Director Romero?

12      A.  Assistant Executive Director Dennis Andrews.

13      Q.  During what period of time was Director

14   Andrews responsible for External Operations?

15      A.  I can't give you definite dates.

16      Q.  Was it during the period from 2006 to 2009,

17   sometime in that period?

18      A.  Yes, sir.

19      Q.  Is Dennis Andrews still with the Department?

20      A.  Yes, sir.

21      Q.  Would the Standard Operating Procedures also

22   be reviewed by the Executive Director to your

23   knowledge?

24      A.  Not to my knowledge.  I'm sorry.  If I can --


                  TOOMEY REPORTING    (312) 853-0648

38

1    I don't know.

2        Q.  Do you know if the Standard Operating

3    Procedures would be reviewed by the Sheriff of

4    Cook County, for External Operations?

5        A.  I don't know.

6        Q.  Were there any Standard Operating Procedures

7    in effect for hospitalized detainees during the

8    period from March of 2006 to the present?

9        A.  Yes, sir.

10       Q.  What Standard Operating Procedures were in

11   effect in regards to the policies and procedures for

12   hospitalized detainees during that period?

13              We're talking about March 2006 to the

14   present.

15       A.  There is a Standard Operating Procedure

16   itself for any detainees housed at any hospital

17   within Cook County.

18       Q.  I'm showing you what is going to be marked

19   as Plaintiff's Exhibit No. 2, Policy No. 32,

20   effective date October 2008, related to General

21   Order 9.44.

22              At the time that you came into the

23   unit in 2006 -- well, take a look at that document

24   for a moment first.


                TOOMEY REPORTING    (312) 853-0648

39

```
 1                      (WHEREUPON, said document was
 2                      marked Plaintiff's Exhibit
 3                      No. 2, for identification,
 4                      as of 05-21-09.)
 5   BY MR. MORRISSEY:
 6       Q.  Do you recognize that document, which is
 7   Policy 32 issued October of 2008?
 8       A.  No, sir.
 9           MR. MORRISSEY:  I'm showing you what is
10   going to be marked as Exhibit No. 3.
11                      (WHEREUPON, said document was
12                      marked Plaintiff's Exhibit
13                      No. 3, for identification,
14                      as of 05-21-09.)
15   BY MR. MORRISSEY:
16       Q.  It's Policy No. EO-32, effective date
17   July 25, 2006, related to G.O. 12.2.
18               Do you recognize that document?
19       A.  Yes, sir.
20       Q.  When that document was issued, did you sign
21   that order?
22       A.  Yes, sir.
23       Q.  Do you know who approved the order?  Your
24   superintendent at that time was Dennis Andrews?
```

40

1      A.   Assistant Director.

2      Q.   Okay.   Assistant Director Andrews, do you

3  know if he approved that document, Exhibit 3?

4      A.   I don't recall.

5      Q.   Other than Exhibit 3, were there any other

6  written documents in regards to hospital policies

7  and procedures that were in effect in March -- in

8  the year 2006 up to the time you left in 2008?

9      A.   Not that I recall.

10      Q.   Was there a document that existed prior to

11  July of 2006 in regards to the hospital policies and

12  procedures?

13      A.   Yes, sir.

14      Q.   Do you know whether or not that document

15  would still exist?

16           MR. SMITH:   I'm going to object.   It's

17  outside of the scope.

18  BY THE WITNESS:

19      A.   No, sir.

20  BY MR. MORRISSEY:

21      Q.   Any other -- and was -- how are the -- how

22  was Exhibit 3 -- how do -- strike that.

23              Did the correctional officers and

24  supervisors that were assigned to the External


             TOOMEY REPORTING    (312) 853-0648

1   Operations receive a copy of Exhibit 3?

2       A.  Yes, sir.

3       Q.  How would they have received a copy of

4   Exhibit 3?

5       A.  They are handed out the SOP and sign for

6   that they've received a copy.

7       Q.  Now, other than Exhibit 3, were there any

8   other written policies or procedures for correctional

9   officers and supervisors that were assigned to the

10  hospital unit of External Operations?

11              THE WITNESS:  I'm sorry.  Can you read that?

12                      (WHEREUPON, the record was read

13                      by the reporter as requested.)

14              MR. SMITH:  I'm going to object.  He already

15  answered no.

16  BY THE WITNESS:

17      A.  No, sir.

18  BY MR. MORRISSEY:

19      Q.  Were there any written memos that were

20  drafted and given to supervisors and correctional

21  officers assigned to the hospital unit between

22  March 2006 to August of 2008 that you're aware of?

23      A.  I don't recall.

24      Q.  Are there any reports that are prepared

TOOMEY REPORTING   (312) 853-0648

1   by officers that are assigned to the hospital unit

2   during their course of duty on each day?

3       A.  Yes, sir.

4       Q.  What types of reports are prepared by

5   correctional officers that are detailed to the

6   hospital unit during their shift?

7       A.  Not recalling every report, there's a

8   basic attendance report of officers on duty.

9   There is a report of inmates that are housed to

10  outlying hospitals throughout Cook County as far as

11  I can recall.

12      Q.  Okay.  Showing you what will be marked as

13  Exhibit No. 4, it's a document entitled Cook County

14  Sheriff/Department of Corrections External

15  Operations Daily Detainee Hospitalization Checklist.

16                      (WHEREUPON, said document was

17                      marked Plaintiff's Exhibit

18                      No. 4, for identification,

19                      as of 05-21-09.)

20  BY MR. MORRISSEY:

21      Q.  Looking at Exhibit No. 4, do you recognize

22  that document?

23      A.  Yes, sir.

24      Q.  What is that document?

TOOMEY REPORTING    (312) 853-0648

1        A.   It's a sheet that stays at the room

2    assigned that the inmate is at, with the officer

3    providing security over that inmate.

4        Q.   Is this prepared on a shift-by-shift basis?

5        A.   It's prepared when an inmate arrives at a

6    hospital.

7        Q.   For each day that an inmate is housed in a

8    hospital room, is there just one sheet checklist

9    prepared for that inmate?

10       A.   The daily checklist is one sheet for a

11   24-hour period.

12       Q.   Is there any spot on that report for each

13   of the guards during that 24-hour period that is

14   assigned to guard a hospital detainee?

15       A.   Yes, sir.

16       Q.   Where is that physically on this form?

17       A.   The lower part of the sheet, there's three

18   boxes with the different shifts of the officer

19   assigned for that inmate.

20       Q.   What is the purpose of this form?

21       A.   The purpose of the form is for the officer

22   to record any type of activity for the inmate per

23   that shift.

24       Q.   Is there a spot on this form for the name of

TOOMEY REPORTING    (312) 853-0648

44

1    the supervisor at the hospital?

2        A.   Yes, sir.

3        Q.   Where is that on this form?  What box is

4    that?

5        A.   The last box is at the bottom of the page.

6        Q.   The supervisor would be a sergeant; correct?

7        A.   It could be any rank of a supervisor.

8        Q.   Now, are there any rules or regulations

9    that require that a supervisor make a check of a

10   detainee during a shift?

11       A.   Yes, sir.

12       Q.   How frequently do supervisors have to check

13   the status of a detainee who is hospitalized?

14       A.   At least once a shift.

15       Q.   What is the reason for that?

16       A.   It's the supervisor's responsibility to

17   check both the officer is performing his function

18   as well as that the inmate is secured properly

19   according to SOPs.

20       Q.   Is this an official report prepared for the

21   Sheriff of Cook County?

22              Let me  rephrase the question.

23           MR. SMITH:  Do you know the question?

24           MR. MORRISSEY:  Let me rephrase.


                TOOMEY REPORTING    (312) 853-0648

1    BY MR. MORRISSEY:

2        Q.  Is this a business report that's prepared

3    by the supervisors and correctional officers on a

4    daily basis for all three shifts in which a

5    hospital detainee is housed?

6                Do you understand the question?

7        A.  No, sir.

8        Q.  Is this a form that your correctional

9    officers and supervisors are required to prepare

10   each day under you as the Superintendent of

11   External Operations?

12       A.  Yes, sir.

13       Q.  Are these forms kept by you or other

14   supervisors on a regular basis?

15       A.  Yes, sir.

16       Q.  Where are they maintained?

17       A.  In a storage area at the CCDOC.

18       Q.  For what period of time are these documents

19   stored at the CCDOC?

20       A.  There's a procedure of documents that are

21   kept on site at the CCDOC and all others that are

22   kept at 23rd and Rockwell, referred to as the

23   warehouse.

24       Q.  Do you know how long they are stored at the

TOOMEY REPORTING    (312) 853-0648

46

1    CCDOC before they are sent to the warehouse?

2            MR. SMITH:  If you know.

3    BY THE WITNESS:

4        A.  I don't know.

5    BY MR. MORRISSEY:

6        Q.  On this form is there a place, is there an

7    indication whether the detainee who is hospitalized

8    is handcuffed?

9            MR. SMITH:  I'm sorry, Tom.  I didn't hear

10   that.

11           MR. MORRISSEY:  Would you read that back?

12                         (WHEREUPON, the record was read

13                          by the reporter as requested.)

14   BY THE WITNESS:

15       A.  Yes, sir.

16   BY MR. MORRISSEY:

17       Q.  Where is that?

18       A.  The top quarter of the page has three boxes

19   for if handcuffs were removed for meals or any other

20   reason.

21       Q.  Is it important -- was it your policy and

22   the Department's policy for a correctional officer

23   assigned to guard a hospitalized detainee to make

24   a note every time the handcuffs were removed?


                    TOOMEY REPORTING    (312) 853-0648

47

1      A.  Yes, sir.

2      Q.  And was the officer required to report that

3  on the form which is designated as Plaintiff's

4  Exhibit No. 4?

5      A.  Yes, sir.

6      Q.  Looking at Exhibit No. 3, Roman numeral III,

7  is there a definition of high-risk inmates?

8      A.  Yes, sir.

9      Q.  Was it the policy and practice at the Cook

10  County Department of Corrections to consider all

11  detainees who are transported, housed, or otherwise

12  located outside of the CCDOC complex to be

13  considered high-risk inmates?

14      A.  Yes, sir.

15      Q.  Would that include inmates that were

16  hospitalized?

17      A.  Yes, sir.

18      Q.  Why were all detainees that were

19  hospitalized at -- hospitalized under the custody

20  of the Cook County Sheriff considered high-risk

21  inmates?

22      A.  Leaving from the secure facility at the

23  CCDOC, you've now placed inmates in the general

24  public which has heightened the classification of

TOOMEY REPORTING    (312) 853-0648

48

1    the inmate.

2        Q.  From the time you were the external

3    director in March of 2006 until the time you left,

4    was it the policy and practice of the Cook County

5    Sheriff to have a guard assigned to each

6    hospitalized detainee?

7        A.  Yes, sir.

8        Q.  Would the guard be present in the room of

9    each hospitalized detainee?

10       A.  Yes, sir.

11       Q.  Would the guard be armed?

12       A.  Yes, sir.

13       Q.  At Stroger Hospital, are more than one

14   patient assigned to a room?

15       A.  Yes, sir.

16       Q.  Are patients that are under the custody of

17   the Cook County Sheriff assigned to particular

18   floors or rooms at Stroger Hospital?

19       A.  No, sir.

20       Q.  Could a person that's under the custody and

21   control of the Cook County Sheriff as an inmate be

22   assigned to a room with a patient that is not in the

23   custody of the Sheriff?

24       A.  At a time there was.


                TOOMEY REPORTING    (312) 853-0648

1     Q.  Has that practice or policy changed to your

2  knowledge?

3     A.  Yes, sir.

4     Q.  When did that practice and policy change?

5     A.  I don't recall exactly the date.

6     Q.  Was it during the time you were External

7  Operations Superintendent?

8     A.  Yes, sir.

9     Q.  What was the change in policy?

10     A.  The change in policy that was made was that

11  inmates assigned to hospitals were either roomed

12  together, housed alone -- if this is the same -- or

13  placed in a single room.

14     Q.  Do you know whether that was in effect

15  during the period of time from December 4, 2006, to

16  the present?

17     A.  I don't recall.

18     Q.  Was there a written statement or policy that

19  was issued that required hospitalized detainees to be

20  assigned to individual rooms?

21          MR. SMITH:  Do you know?

22          THE WITNESS:  I don't know.

23  BY MR. MORRISSEY:

24     Q.  To your knowledge, who would have -- do you

TOOMEY REPORTING    (312) 853-0648

50

 1   know who was responsible for creating that policy

 2   of just assigning hospitalized detainees to single

 3   rooms at Stroger?

 4       A.  Myself.

 5       Q.  Do you know why you effectuated the policy

 6   of just assigning hospitalized detainees to their

 7   own room?

 8       A.  It was my recollection, to protecting the

 9   citizens, staff of Cook County, and the employees

10   at Cook County Hospital to be more safeguarded by

11   placing the inmates in a more isolated, secured

12   area.

13       Q.  Was there any reason or any cause for your

14   change in the policy of isolating hospitalized

15   inmates?

16       A.  Again, my belief, removing any inmate from

17   the confines of the CCDOC is a more heightened risk

18   of possible unusual occurrence with the general

19   public.

20       Q.  When you were -- during the period of time

21   of December 4, 2006, to the present, was there a

22   policy and practice of shackling hospitalized

23   detainees?

24       A.  Yes, sir.

TOOMEY REPORTING    (312) 853-0648

1      Q.  Did that include older detainees?

2      A.  Yes, sir.

3      Q.  Did it include paralyzed detainees?

4      A.  Yes, sir.

5      Q.  Did it include detainees that were

6   pregnant?

7      A.  Yes, sir.

8      Q.  Did it include detainees that were in

9   labor?

10     A.  No, sir.

11     Q.  How were hospitalized detainees shackled

12   from December of 2006 to the present?

13         MR. SMITH:  In general?

14         MR. MORRISSEY:  Yes.

15         MR. SMITH:  Any type of inmate?

16         MR. MORRISSEY:  Right.

17   BY MR. MORRISSEY:

18     Q.  Was there a practice or policy from December

19   of 2006 to the present in regards to how inmates

20   were shackled that were hospitalized?

21     A.  I can answer yes until August of '08 when I

22   left the unit.

23         MR. SMITH:  And that's what his question is.

24         THE WITNESS:  Okay.


                 TOOMEY REPORTING   (312) 853-0648

52

1          MR. SMITH:  Until August of '08.

2          THE WITNESS:  Yes, sir.

3    BY MR. MORRISSEY:

4      Q.  What was the manner in which they were

5    shackled during that period of time?

6      A.  The restraints protocol was a leg shackle

7    on one leg and the other end of the shackle secured

8    to a secure portion of the bed, and the use of a

9    handcuff with a -- it's referred to as a "blue box"

10   over it with a belly chain, and that is attached to

11   the opposite end of the inmate's arm and to the

12   secure part of the bed frame.

13     Q.  Now, can you describe what a belly chain

14   is?

15     A.  A belly chain is a waist chain that the

16   handcuffs and blue box attach to the waist of a

17   detainee.

18     Q.  What is a blue box?

19     A.  A blue box is a device that protects the

20   locking mechanism of the handcuffs that cannot be

21   reached to alter the locking mechanism.

22     Q.  Does that have a way of electronically

23   monitoring a detainee, the blue box?

24     A.  No, sir.


                TOOMEY REPORTING    (312) 853-0648

1      Q.   The waist chain, or belly chain, does that

2  surround the person's waist?

3      A.   Yes, sir.

4      Q.   What is the purpose for the waist chain?

5      A.   Again, in transporting an inmate from the

6  CCDOC complex, it is again a restraint safeguarding

7  the staff and the general public from an unusual

8  occurrence that would be caused by the inmate.

9      Q.   Does that waist chain remain on the

10 hospitalized detainees when they're in their beds?

11     A.   Not on the inmate, but it's from the

12 handcuffs to the bed frame.

13     Q.   How is this policy and practice of shackling

14 hospitalized detainees conveyed to the guards that

15 are assigned to hospitals?

16     A.   Through the Standard Operating Procedure and

17 at roll calls.

18     Q.   Is this a difference in the External

19 Operations between the classification of "active

20 labor" and "labor"?

21     A.   I don't recall.

22     Q.   Have you ever heard the term "active labor"?

23     A.   Yes, sir.

24     Q.   And what do you understand active labor to

TOOMEY REPORTING    (312) 853-0648

1  mean?

2      A.  An individual is in the process of delivering

3  a baby.

4      Q.  What do you mean by "the process of

5  delivering a baby"?

6      A.  The beginning of the, repeating again, the

7  person beginning to -- the baby from leaving the

8  womb to entering the world.

9      Q.  So that would be right before the delivery

10  of the baby, you would consider active labor?

11      A.  I don't know.

12      Q.  Well, you just described the period when

13  the baby is leaving the womb and entering the world

14  as active labor; is that correct?

15      A.  Yes, sir.

16      Q.  How do you describe "labor"?

17      A.  To my knowledge, labor would also be the

18  same.

19      Q.  During the period between -- what is the

20  penological reason for classifying all detainees

21  as high-risk inmates?

22      A.  Inmates from outside the CCDOC complex?

23      Q.  Right.

24      A.  Again, it would be the lesser security of

TOOMEY REPORTING    (312) 853-0648

1    the confines of the CCDOC moving an inmate into the

2    area reached by the general public or staff members,

3    wherever that inmate is.

4        Q.  What was the penological reason for

5    shackling all detainees who were hospitalized at

6    Stroger Hospital?

7           MR. SMITH:  Well, I'm going to object.  He's

8    already answered several times.

9           MR. MORRISSEY:  I'm asking in particular in

10   regards to the reason why hospitalized detainees

11   were shackled.  What is the penological reason for

12   shackling them?

13          MR. SMITH:  Tom, he's already answered it.

14   He said that once you're outside of the confines of

15   the jail --

16          MR. MORRISSEY:  No, he didn't.

17          MR. SMITH:  -- it's for security reasons.

18          MR. MORRISSEY:  No.  He answered why

19   they're considered high risk.  I'm asking him now

20   the follow-up question why, what the penological

21   reason was for shackling detainees that are

22   hospitalized.

23          MR. SMITH:  Do you understand that question?

24          THE WITNESS:  No, sir.


                    TOOMEY REPORTING    (312) 853-0648

1   BY MR. MORRISSEY:

2       Q.  Okay.  You've described the process in

3   which detainees that are hospitalized are shackled.

4   Their leg and their arm are shackled to a bed;

5   correct?

6       A.  Correct.

7       Q.  I'm asking you to provide the penological

8   reason why that is done.

9           MR. SMITH:  Do you understand the meaning

10  behind or definition of "penological"?

11          THE WITNESS:  No, sir.

12          MR. SMITH:  You have to rephrase it.

13  BY MR. MORRISSEY:

14      Q.  All hospitalized detainees that are assigned

15  to a room have an armed guard in the room with them;

16  correct?

17      A.  Correct.

18      Q.  And that's for security reasons; correct?

19      A.  Correct.

20      Q.  Why are all hospitalized detainees required

21  to be shackled if there's a security guard -- if

22  there's a correctional officer who is armed that's

23  assigned inside the room with the detainee?

24              What correctional reason is there to

TOOMEY REPORTING    (312) 853-0648

1    provide the shackling?

2         MR. SMITH:  He's already answered.

3         MR. MORRISSEY:  No, he hasn't.

4         MR. SMITH:  His answer stands.

5    BY MR. MORRISSEY:

6      Q.  You can answer.

7         MR. SMITH:  For extra security outside the

8    compound.

9         MR. MORRISSEY:  He can answer it.  You don't

10   need to answer it.

11   BY MR. MORRISSEY:

12     Q.  Can you answer it?

13     A.  Again, it would be for an inmate leaving the

14   secure confines of the CCDOC entering an area of the

15   general public, uhm, being in the custody of the

16   Sheriff, the officer is taking all precautions to

17   protect, again, the staff, general public, and the

18   officer's safety themselves.

19     Q.  Is that in order to prevent the inmate from

20   fleeing, that a person that's in a hospital bed with

21   an armed guard would also have to be shackled?

22     A.  It could be, yes.

23     Q.  Any other reasons?

24     A.  Yes, sir.

58

1      Q.   What other reasons?

2      A.   Again, preventing harm to the officer,

3    staff, anyone that would be in close proximity

4    of that detainee that is now not confined at

5    the CCDOC.

6      Q.   Is it your position that all women that were

7    in labor from either Division 3, that came either

8    from Division 3 -- strike that.

9              As the head of External Operations,

10   were you aware of a program called the MOM's program?

11     A.   Yes, sir.

12     Q.   What is the MOM's program?

13     A.   All I can -- my knowledge of the Mom's

14   program is, it's a program that has to do with

15   pregnant females that are remanded to the custody

16   of the Sheriff, in helping them deal with their

17   pregnancy.

18     Q.   Do you know in 2006 what person within the

19   Sheriff's Office was in charge of the MOM's program?

20     A.   No, sir.

21     Q.   As head of External Operations, were you

22   responsible for guarding the women that were assigned

23   to the MOM's program off the CCDOC campus?

24     A.   Yes, sir.

1      Q.  Do you know what unit was responsible

2   within the External Operations for monitoring the

3   women that were assigned to the MOM's program?

4      A.  If the individual was at any hospital

5   within Cook County, it would be the hospital unit.

6      Q.  Do you know that the women that were

7   assigned to the MOM's program were housed at

8   Haymarket?

9      A.  No, sir.

10      Q.  Within your External Operations, were you

11   responsible for providing security for the women

12   that were housed off campus, off the CCDOC jail

13   complex?

14          MR. SMITH:  Objection, form of the question.

15   Where off campus?

16          MR. MORRISSEY:  Well, at the Haymarket

17   Center.

18   BY MR. MORRISSEY:

19      Q.  Was your unit in charge of providing

20   security at the Haymarket Center for women detainees

21   in the MOM's program?

22      A.  No, sir.

23      Q.  Do you know a person by the name of

24   McDermott who works for the Sheriff?

60

 1      A.  I've heard the name, yes, sir.

 2      Q.  Do you know if he's in charge of the women's

 3  program at the Department of Corrections?

 4      A.  No, sir.

 5      Q.  Do you know a Ms. Jones who works for the

 6  Sheriff?

 7      A.  No, sir.

 8      Q.  Do you know a Director Black who works for

 9  the Sheriff?

10      A.  Yes, sir.

11      Q.  What's Director Black's first name?

12      A.  I believe it's Jennifer.

13      Q.  Is she assigned to the MOM's program to your

14  knowledge?

15      A.  To my knowledge, yes.

16      Q.  Do you remember where her office is?

17      A.  No, sir.

18      Q.  Do you know a Kimberly Proffitt?

19      A.  I'm sorry?

20      Q.  A Kimberly Proffitt?

21      A.  No, sir.

22      Q.  Do you know a Laurie Turner or a Laurie

23  Jones?

24      A.  No, sir.


              TOOMEY REPORTING    (312) 853-0648

1      Q.   Do you know what Director Black's position

2    is with the Sheriff?

3      A.   No, sir.

4      Q.   Do you have personal knowledge that women

5    that were assigned to Division 3 at times were

6    pregnant?

7      A.   Yes, sir.

8      Q.   Was your unit, External Operations, at any

9    point in time responsible for transporting women

10   that were assigned to Division 3 who went into

11   labor either to Stroger or another hospital?

12     A.   Yes, sir.

13     Q.   During what period of time did External

14   Operations have a role in transporting women who

15   were pregnant in Division 3 to areas hospitals?

16     A.   Anytime that a doctor from Cermak Hospital

17   notified the External Operations radio room that a

18   female had to be transported to an outlying

19   hospital.

20     Q.   Would the radio communication -- what level

21   within Cermak Health Services would relay that

22   information, what type of person at Cermak Health

23   Services would relay that information to External

24   Operations?

TOOMEY REPORTING    (312) 853-0648

62

1      A.  I'm not sure.

2      Q.  Within your External Operations, you

3    mentioned that the radio room would receive calls

4    from Cermak for transportation?

5      A.  Yes, sir.

6      Q.  And were there correctional officers

7    assigned to the radio room?

8      A.  Yes, sir.

9      Q.  Were there logs maintained by the radio

10   operator for calls from Cermak Health Services?

11     A.  There's a leg kept of the movements of a

12   detainee from area to an outlying hospital.

13     Q.  What is that log called?

14     A.  Movement Log.

15     Q.  Are those Movement Logs kept in the regular

16   course of business?

17     A.  Yes, sir.

18     Q.  How long are they kept?

19     A.  Again, they're kept on site for up to a year

20   and then moved over to our warehouse at 23rd and

21   Laflin.

22     Q.  Is it easy for you to request the logbook

23   from 2007 if you did as a superintendent?

24     A.  Yes, sir.


                TOOMEY REPORTING    (312) 853-0648

1     Q.  How long would it take you if you as a

2  superintendent requested a Movement logbook to be

3  brought to your office for the year 2007?

4          MR. SMITH:  I'm going to object to that

5  question.

6  BY MR. MORRISSEY:

7     Q.  You can answer.

8          MR. SMITH:  He doesn't know how long it will

9  take.

10          MR. MORRISSEY:  Well, I'm asking.

11          MR. SMITH:  How can he --

12          MR. MORRISSEY:  I'm asking him.

13          MR. SMITH:  -- possibly know how long it's

14  going to take another person?

15          MR. MORRISSEY:  I'm asking him.

16          MR. SMITH:  Approximately.

17  BY THE WITNESS:

18     A.  Approximately three days.

19  BY MR. MORRISSEY:

20     Q.  What information is contained in the Movement

21  logs?

22     A.  To the best of my recollection, the inmate's

23  name, number -- ID number, I'm sorry, bond amount,

24  next court date.


                TOOMEY REPORTING    (312) 853-0648

1      Q.  Is the condition of the detainees being

2  moved to the hospital get reported on the Movement

3  Log?

4      A.  If reported by Cermak.

5      Q.  So Cermak, if the call from Cermak to the

6  radio operator was that Mary Jones needs to be

7  transported to Stroger Hospital because she's in

8  labor, that would be put on the Movement Log?

9      A.  Possibly, yes.

10      Q.  Are there different modes of transportation

11  for inmates that are moved from the jail to the

12  hospital by External Operations?

13      A.  Yes, sir.

14      Q.  What different means of transporting

15  detainees from the jail to the hospital are

16  available?

17      A.  By squad car, ATI ambulance, Chicago Fire

18  ambulance.

19      Q.  What is an ATI ambulance?

20      A.  To my recollection, it's an ambulance that

21  provides service to the County of transporting

22  detainees to an outlying hospital.

23      Q.  How many ATI ambulances are at your disposal

24  as Superintendent of External Operations?

TOOMEY REPORTING    (312) 853-0648

1      A.  I don't know.

2      Q.  Do officers from External Operations drive

3   the ATI ambulances?

4      A.  No, sir.

5      Q.  Who is used to drive the ambulances?

6      A.  People employed by ATI.

7      Q.  That's a private company?

8      A.  Yes, sir.

9      Q.  If a detainee from Cook County Jail is

10   transported to the hospital by an ATI ambulance, are

11   correctional officers from External Operations, do

12   they accompany them?

13      A.  Yes, sir.

14      Q.  Are the detainees shackled when they're

15   transported by ambulance, the ATI ambulance to

16   the hospital?

17      A.  Yes, sir.

18      Q.  By shackled, you mean they're leg- and

19   hand-shackled?

20      A.  Yes, sir.

21      Q.  And there's a waist band on them?

22      A.  Yes, sir.

23      Q.  During the period of time that you were

24   External Operations Superintendent, were there any

TOOMEY REPORTING    (312) 853-0648

1   exceptions for inmates that were transported from

2   the jail to the hospital?

3       A.   Yes, sir.

4       Q.   What exceptions were there?

5       A.   Any inmate being moved outside the normal

6   protocol, such as a woman in labor.  You also had

7   inmates missing limbs.  That required a different

8   kind of restraint.

9       Q.   How would the correctional officer know that

10  the woman was in labor?

11      A.   If it was relayed to us by Cermak Hospital.

12      Q.   So would that also include -- when detainees

13  were transported by Chicago Fire ambulance from the

14  jail to the hospital, would correctional officers

15  accompany the detainees?

16      A.   Yes, sir.

17      Q.   And would all detainees transported from the

18  jail to a hospital by the Chicago Fire Department

19  ambulance be shackled?

20          MR. SMITH:  Objection.  He already answered

21  the question.

22          MR. MORRISSEY:  He answered about ATI

23  ambulances.

24          MR. SMITH:  It's the same question.


                    TOOMEY REPORTING    (312) 853-0648

67

1   BY MR. MORRISSEY:

2       Q.  You may answer.

3       A.  Yes, sir.

4       Q.  Were there any exceptions for people that

5   were transported from the jail to the hospital by

6   Chicago Fire ambulances or by squad cars?

7       A.  Yes, sir.

8       Q.  What exceptions were there?

9       A.  If fire staff was informed of a prisoner, a

10  female in labor or any inmate with missing limbs

11  that would cause for a different way to restrain.

12      Q.  Were there any records that are maintained

13  by the transportation officers that transported

14  inmates from the jail to the hospital, were there

15  any records maintained by those officers?

16      A.  Yes, sir.

17      Q.  What records are maintained by the

18  transportation officers?

19      A.  There's a shiftly record of any movements

20  in that officer's squad car of anybody being

21  transported.

22      Q.  So when there's a transportation from the

23  jail to a hospital, there's a record maintained;

24  correct?

TOOMEY REPORTING    (312) 853-0648

68

1      A.   Correct.

2      Q.   And does that record indicate whether or

3   not the detainee that's being transported from the

4   jail to a hospital is placed in shackles?

5      A.   Yes, sir.

6      Q.   And on the form there's an indication

7   whether the person is shackled or not?

8      A.   Yes, sir.

9      Q.   If the form does not indicate that the

10   person was not shackled, is it your assumption as

11   the Superintendent of External Operations that the

12   detainees was shackled?

13          MR. SMITH:   Objection.

14   BY MR. MORRISSEY:

15      Q.   Do you understand the question?

16      A.   No, sir.

17      Q.   You mentioned that on the form prepared by

18   the transportation officers for inmates being

19   transported from the jail to the hospital, there is

20   a place on that form to indicate that the person was

21   shackled; correct?

22      A.   Correct.

23      Q.   On that form, is it a box or is there a

24   notation that has to be made by the officer?

TOOMEY REPORTING    (312) 853-0648

69

1      A.  I don't recall.

2      Q.  Do you review those forms or did you review

3  them as the Superintendent of External Operations?

4      A.  No, sir.

5      Q.  Did you personally transport detainees from

6  the jail to the hospital during the period of time

7  you were the superintendent?

8      A.  Yes, sir.

9      Q.  On how many occasions?

10      A.  To my recollection, one.

11      Q.  Was that person pregnant?

12      A.  No, sir.

13      Q.  Did you personally transport any women from

14  the jail, when you were superintendent, to a hospital

15  during the time she was in labor?

16      A.  No, sir.

17      Q.  Did you ever discuss with any of your

18  transportation officers whether or not women that

19  went into labor and were transported by the

20  transportation unit to the hospital, whether those

21  woman were shackled?

22          THE WITNESS:  I'm sorry.  Can you repeat?

23                      (WHEREUPON, the record was read

24                      by the reporter as requested.)


TOOMEY REPORTING    (312) 853-0648

1  BY THE WITNESS:

2      A.  No, sir.

3  BY MR. MORRISSEY:

4      Q.  Did you ever, during the time you were the

5  Superintendent of External Operations, ever discuss

6  with any officer or supervisor that transported a

7  woman from Division 3 to a hospital, who was in

8  labor, whether or not the woman was shackled or

9  not?

10     A.  No, sir.

11     Q.  Do you have any knowledge in regards to how

12 women that were in the MOM's program were transported

13 from the MOM's program to the hospital when they went

14 into labor?

15     A.  No, sir.

16     Q.  Did you ever discuss with any supervisor or

17 officer within the External Operations how women that

18 were in the MOM's program were transported from the

19 MOM's program to the hospital after they went into

20 labor?

21     A.  No, sir.

22     Q.  During the period of time when you were the

23 External Operations Superintendent, from March to

24 October of 2008, did you ever personally guard a

TOOMEY REPORTING    (312) 853-0648

1   woman that was in labor in any of the area

2   hospitals?

3       A.  No, sir.

4       Q.  During the period of time when you were

5   Superintendent of External Operations, did you ever

6   come into the room of a woman that was in labor and

7   hospitalized?

8       A.  No, sir.

9       Q.  Would it be correct to say that you have no

10  personal knowledge whether or not women that were

11  hospitalized and in labor during the period of time

12  from March of 2006 to the time you left in August of

13  2008, whether or not they were shackled while they

14  were in labor in the hospital?

15          THE WITNESS:  I'm sorry.

16                  (WHEREUPON, the record was read

17                   by the reporter as requested.)

18  BY THE WITNESS:

19      A.  I have no personal knowledge.

20  BY MR. MORRISSEY:

21      Q.  Did you ever discipline a correctional

22  officer under your command during the period of

23  time from March of 2006 to August of 2008 for not

24  shackling a woman who was in labor?

TOOMEY REPORTING    (312) 853-0648

72

1      A.   To my recollection, no.

2      Q.   Did you ever discipline a correctional

3  officer or become aware that a correctional officer

4  was disciplined from March of 2006 to August of 2008

5  that shackled a woman who was in labor either being

6  delivered to a hospital or while in labor and

7  hospitalized?

8      A.   To my recollection, no.

9      Q.   During the period of time that you were

10 the External Operations Superintendent, did you ever

11 review any of the External Operations Daily Detainee

12 Hospitalization Checklist, which had previously been

13 marked as Exhibit 4, for hospitalized women that

14 were in labor?

15     A.   I don't recall.

16     Q.   Do you have any recollection of reviewing a

17 checklist prepared on a daily basis for women that

18 were hospitalized while in labor?

19     A.   No, sir.

20     Q.   During the period of time that you were

21 Superintendent of External Operations, did you ever

22 talk with the correctional officers that were

23 assigned to guard women that were hospitalized who

24 were detainees who were also in labor?


TOOMEY REPORTING    (312) 853-0648

73

1      A.   To my recollection, no.

2      Q.   During the time that you were Superintendent

3   of External Operations, did you ever talk with any

4   of the supervisors that were responsible for women

5   that were hospitalized and in labor and who were

6   under the custody of the Cook County Sheriff?

7           THE WITNESS:   Please.

8                      (WHEREUPON, the record was read

9                      by the reporter as requested.)

10  BY THE WITNESS:

11     A.   Yes.

12  BY MR. MORRISSEY:

13     Q.   During the time you were Superintendent of

14  External Operations, did you ever discuss with your

15  supervisor whether or not women that were in custody

16  and in labor were shackled while they were in the

17  hospital or being transported to the hospital?

18          MR. SMITH:   Objection, foundation.

19  BY MR. MORRISSEY:

20     Q.   During the time you were superintendent.

21     A.   To my recollection, no, sir.

22     Q.   Other than what's been marked as Plaintiff's

23  Exhibit No. 3 (indicating), which is your hospital

24  policy and procedure, did you ever instruct any of

TOOMEY REPORTING    (312) 853-0648

1   the guards that were responsible for securing women

2   who were hospitalized and in labor in regards to

3   whether or not these women should be shackled?

4       A.  No, sir.

5       Q.  Did you ever instruct your supervisors that

6   were assigned to the hospitals in regards to whether

7   or not females that were shackled -- strike that.

8           Did you ever provide any instruction,

9   oral instruction to the supervisors at the

10  hospital under your command in regards to whether

11  women in labor should be shackled or not?

12      A.  No, sir.

13      Q.  Do you have personal knowledge whether your

14  supervisors ever instructed the correctional

15  officers under them whether or not women in labor

16  should be shackled or not --

17          MR. SMITH:  Objection --

18  BY MR. MORRISSEY:

19      Q.  -- who are hospitalized?

20          MR. SMITH:  -- to what other people know.

21          MR. MORRISSEY:  Let me rephrase the question.

22  BY MR. MORRISSEY:

23      Q.  In your presence, did any supervisor to

24  your knowledge ever provide any instruction to the

TOOMEY REPORTING   (312) 853-0648

75

1   correctional officers in regards to whether inmates

2   that were pregnant and in labor and hospitalized

3   were to be shackled or not?

4          MR. SMITH:  Objection, foundation.

5   BY THE WITNESS:

6      A.  No, sir.

7          MR. MORRISSEY: Let's take a break.

8                        (WHEREUPON, a recess was had

9                        from 11:35 a.m. to 11:50 a.m.)

10  BY MR. MORRISSEY:

11     Q.  As head of the External Operations or at

12  least former head of the External Operations, are

13  you aware of a system called CIMIS?

14     A.  Yes, sir.

15     Q.  Is there any information contained on CIMIS

16  whether or not a women is pregnant or not?

17     A.  To my recollection, no, sir.

18     Q.  Is there any information that's contained

19  on CIMIS to indicate whether or not a person is

20  hospitalized off the campus of the CCDOC?

21     A.  Yes, sir.

22     Q.  What information is contained in CIMIS

23  which would reflect that a person is hospitalized

24  and a detainee in Cook County Hospital?

TOOMEY REPORTING    (312) 853-0648

76

1      A.  His housing status would show that he's

2  assigned to a hospital.

3      Q.  What is the code for being assigned to a

4  hospital in CIMIS?

5      A.  15-HP.

6      Q.  Would it be possible to determine whether

7  a woman during the period of time that she was

8  incarcerated was assigned to the hospital?

9      A.  Yes, sir.

10      Q.  And that could be derived from CIMIS system;

11  correct?

12      A.  Yes, sir.

13      Q.  Now, from December '06 until you left,

14  December 6th -- December 4, 2006, to the time that

15  you left in August of 2008, what was your written

16  policy in regards to women that are in shackles --

17  strike that.  Let me rephrase it.

18          From 2006, December 4, 2006 to August

19  of 2008, what was the formal written policy of the

20  External Operations in regards to whether women who

21  in handcuffs -- women who were in labor were

22  handcuffed when they were transported to a hospital?

23          MR. SMITH:  Do you understand the question?

24          THE WITNESS:  Could you repeat it, please?

TOOMEY REPORTING    (312) 853-0648

77

 1                         (WHEREUPON, the record was read

 2                         by the reporter as requested.)

 3   BY MR. MORRISSEY:

 4       Q.  Do you understand the question?

 5       A.  No, sir.

 6       Q.  Okay.  From the time you were in charge with

 7   External Operations until you left, what was the

 8   formal written policy in regards to whether or not

 9   women who were transported to a hospital while they

10   were in labor were handcuffed?

11           MR. SMITH:  That's the exact same thing you

12   said before.

13               Do you understand the question?

14   BY MR. MORRISSEY:

15       Q.  Do you understand the question?

16       A.  No, sir.

17       Q.  During the period from December of 2006 to

18   August of 2008, what was the formal written policy

19   in regards to transporting women to the hospital

20   who were in labor?

21           MR. SMITH:  Well, I'm just going to object

22   to foundation.  Are you referring to from the jail

23   or MOM's?  Can you clarify that, please?

24           MR. MORRISSEY:  Well, I'm asking in either

                    TOOMEY REPORTING    (312) 853-0648

1  sense.

2          MR. SMITH:  There's two --

3          MR. MORRISSEY:  Is there a difference?

4  Well, I'll ask it.

5          MR. SMITH:  I think it would be two

6  different questions, yeah.

7          MR. MORRISSEY:  All right.

8  BY MR. MORRISSEY:

9     Q.  First of all, for women that were in

10  Division 3 that went into labor and were transported

11  to the hospital, what was the written formal policy

12  in regards to whether they were shackled during the

13  period of time from December of 2006 to August of

14  2008?

15     A.  No leg irons, handcuffs, or waist chains

16  shall be used on a female inmate who is in labor.

17     Q.  What was the formal written policy for

18  women that came from Division 3 once they were

19  hospitalized in either Stroger or some other

20  hospital who were in labor during that same time

21  period?

22     A.  The same policy would stand in effect.

23     Q.  That they shouldn't be shackled?

24     A.  While in labor, yes, sir.


TOOMEY REPORTING    (312) 853-0648

79

1      Q.  What was the formal written policy during

2   that same time period for women who were assigned

3   to the MOM's program and were transported to a

4   hospital while in labor?

5      A.  That didn't fall under External Operations'

6   transport.

7      Q.  What was the formal written policy in

8   regards to women who were assigned to the MOM's

9   program that were hospitalized while in labor?

10     A.  The same protocol that's in effect.

11     Q.  Which is what?

12     A.  No leg irons, handcuffs, or waist chains

13   shall be used on a female while in labor.

14     Q.  Why was that the written policy of the

15   External Operations for both people that were in

16   Division 3 and the MOM's program when they were in

17   labor?

18     A.  To my recollection, that's from the State

19   statute that was put out.

20     Q.  Okay.  Now, you previously testified that

21   you had no personal knowledge whether or not women

22   that were transported from Division 3 to a hospital

23   while in labor were shackled; correct?

24     A.  No, sir.


                TOOMEY REPORTING    (312) 853-0648

1          MR. SMITH:  Objection.  I don't think he has

2     ever testified to this.

3     BY MR. MORRISSEY:

4          Q.  You can answer.

5          A.  No, sir.

6          Q.  Pardon?

7          A.  No.

8          Q.  You have no personal knowledge?

9          A.  I testified to the question when I was in

10    training or an officer in External Operations of no

11    knowledge.

12         Q.  Okay.  When you were Superintendent of

13    External Operations, you had no personal knowledge

14    whether or not women from Division 3 that were in

15    labor were transported in shackles or not?

16         A.  Correct.

17         Q.  And you previously testified that you never

18    discussed with any transport officer whether or not

19    women coming from Division 3 who were in labor to a

20    hospital were in shackles or not; correct?

21         A.  Correct.

22         Q.  And you had testified that you never

23    discussed with any supervisor from External

24    Operations whether or not women who left Division 3

TOOMEY REPORTING    (312) 853-0648

81

1   in labor to be transported to a hospital were

2   shackled or not; correct?

3          MR. SMITH:  Objection.  He said he did, and

4   now --

5          MR. MORRISSEY:  I'm asking.

6          MR. SMITH:  He already said he did.

7          MR. MORRISSEY:  No.  I'm asking him right now.

8          MR. SMITH:  Well, then asked and answered.

9          MR. MORRISSEY:  He didn't answer that.

10          MR. SMITH:  Yes, he did.

11          MR. MORRISSEY:  Let him answer the question.

12   BY THE WITNESS:

13      A.  Correct.

14   BY MR. MORRISSEY:

15      Q.  So you have no personal knowledge -- I'm

16   sorry.

17              You never discussed with a supervisor

18   during the time you were External Operations

19   supervisor whether or not women coming from

20   Division 3 who were in labor to a hospital were

21   shackled?

22      A.  Correct.

23      Q.  And it's correct that in regards to women

24   that were hospitalized who were originally in

TOOMEY REPORTING   (312) 853-0648

1   Division 3 and were hospitalized because they were

2   in labor, you have no personal knowledge whether or

3   not they were shackled or not while they were in

4   labor in the hospital; correct?

5        A.   Correct.

6        Q.   And you never talked with or discussed with

7   any of the correctional guards that provided security

8   for the women that were in labor in Division 3,

9   whether or not those women were shackled or not at a

10  hospital?

11       A.   Correct.

12       Q.   And the same would be true in regards to

13  supervisors that supervised the guards that

14  monitored the women that were in labor from

15  Division 3 in a hospital, whether or not they were

16  shackled or not; correct?

17            You never discussed that with their

18  supervisors; correct?

19            MR. SMITH:  Objection, asked and answered.

20  BY MR. MORRISSEY:

21       Q.   You can answer that.

22            MR. SMITH:  Well, he already answered it.

23  He talked to the supervisors but not the

24  correctional officers.


                    TOOMEY REPORTING    (312) 853-0648

1          MR. MORRISSEY:  No, I don't think he

2    talked about that.  I think you're misstating the

3    testimony.

4          MR. SMITH:  I'm not misstating.

5          MR. MORRISSEY:  I'll ask him.  Let me ask

6    him the question.

7    BY MR. MORRISSEY:

8      Q.  During the time you were External Operations

9    supervisor, did you ever discuss with a supervisor

10   from either Stroger or from any of the other

11   outlying hospitals whether or not women that were

12   in labor in either the MOM's program or Division 3,

13   whether or not they were shackled when they were in

14   the hospital?

15          THE WITNESS:  Can you repeat?

16                    (WHEREUPON, the record was read

17                     by the reporter as requested.)

18   BY THE WITNESS:

19     A.  No, sir.

20          MR. MORRISSEY:  I'm showing you what is being

21   marked as Group Exhibit No. 5.  It's for a Simione

22   Jackson.  It's a ten-page group exhibit, and I am

23   going to mark each page 1 through 10, for

24   identification purposes, and some of them have

TOOMEY REPORTING    (312) 853-0648

84

1  writing on the backside.

2                          (WHEREUPON, said document was

3                          marked Plaintiff's Group

4                          Exhibit No. 5, for

5                          identification, as of 05-21-09.)

6  BY MR. MORRISSEY:

7     Q.  Showing you what has been marked as

8  Plaintiff's Exhibit No. 5, do you have those documents

9  in front of you?

10    A.  No, sir.

11       MR. MORRISSEY:  Do you have those documents?

12 It's the ones for Simione.

13                          (WHEREUPON, a discussion was had

14                          off the record.)

15 BY MR. MORRISSEY:

16    Q.  Showing you what has been marked as Group

17 Exhibit No. 5, Group Exhibit 5 has ten pages.

18       MR. SMITH:  What is this?

19       MR. MORRISSEY:  Is that mine?

20       MS. SHAPIRO:  That's an extra copy.

21       MR. SMITH:  Okay.  This is 5.

22 BY MR. MORRISSEY:

23    Q.  Have you had an opportunity to look at those

24 documents?


                 TOOMEY REPORTING   (312) 853-0648

85

1       A.  No, sir.

2       Q.  Do you want to take a few moments and look at

3   them?

4           MR. MORRISSEY:  I'll go out and see if --

5           MR. SMITH:  Yes, he would like to look at

6   these.

7                       (WHEREUPON, a recess was had

8                        from 12:06 p.m. to 12:08 p.m.)

9   BY MR. MORRISSEY:

10      Q.  Group Exhibit No. 5 was tendered by the

11  defendants this morning with regard to Simione

12  Jackson.  I'd ask you to take a look as what has

13  been marked as page 2 of Simione Jackson's

14  documents.

15              Do you see that document?

16      A.  Yes, sir.

17      Q.  Is this a standard document that's maintained

18  in the regular course of business of the External

19  Operations at Cook County Jail?

20      A.  Yes, sir.

21      Q.  There is a date of May 2, 2008, on it;

22  correct?

23      A.  Yes, sir.

24      Q.  Does this indicate what time Simione Jackson --


                TOOMEY REPORTING   (312) 853-0648

1   on what shift Simione Jackson came into the hospital,

2   Stroger Hospital?

3            MR. SMITH:  Do you mind if I help him out

4   with times?

5            MR. MORRISSEY:  No.  That's fine.

6   BY MR. MORRISSEY:

7      Q.  Referring to the bottom section of page 2,

8   it says there's a shift 11 to 7.  That would be the

9   May 2, 2008, shift from 11:00 p.m. to 7:00 a.m. in

10  the morning?

11     A.  Yes, sir.

12     Q.  And it indicates an Officer Jackson was on

13  duty?

14     A.  Yes, sir.

15     Q.  Okay.  Do you know an Officer Jackson?

16     A.  To my recollection, no.

17     Q.  That would indicate that Simione Jackson was

18  present at the hospital at some point during that

19  shift; correct?

20     A.  Yes, sir.

21     Q.  And it also indicates the two subsequent

22  shifts:  a K. Pemberton?

23     A.  Yes.

24     Q.  Do you know Officer Pemberton?

1      A.  Yes, sir.

2      Q.  What's his or her fist name?

3      A.  Hers.  Uh, Kimberly.

4      Q.  Kimberly.  She would be the officer assigned

5   during the 7:00 a.m. to 3:00 p.m. shift?

6      A.  Yes, sir.

7      Q.  And then there's an Officer Fleming.  Do you

8   know Office Fleming?

9      A.  Yes, sir.

10     Q.  Is that a male or a female?

11     A.  Female.

12     Q.  What's Fleming's first name?

13     A.  I believe Tabitha.

14     Q.  Now, handcuffs, there's no notation under --

15  there's a notation under Handcuffs have been

16  removed during the following meals, and there's a

17  notation N.P.O.  What does "N.P.O." stand for?

18     A.  I'm not sure, sir.

19     Q.  Is there any other indication on page 2

20  that Ms. Simione was not handcuffed on May 2, 2008?

21         MR. SMITH:  The back of page 1?

22         MR. MORRISSEY:  Actually, on the front page.

23         MR. SMITH:  Oh, still?

24         MR. MORRISSEY:  The front side of page 2.


                TOOMEY REPORTING    (312) 853-0648

1  BY THE WITNESS:

2     A.  No, sir.

3  BY MR. MORRISSEY:

4     Q.  So as the Superintendent of External

5  Operations, by just looking at the front of page 2

6  you would assume that Ms. Jackson was handcuffed and

7  shackled to a bed?

8        MR. SMITH:  I object to that characterization.

9        MR. MORRISSEY:  Well, I'm just asking him.

10  BY THE WITNESS:

11     A.  I couldn't answer yes or no, sir.

12  BY MR. MORRISSEY:

13     Q.  Why not?

14     A.  In the boxes where it's titled Handcuffs

15  have been removed, there is a three-letter

16  abbreviation which I don't know what the officer is

17  saying.

18     Q.  The N.P.O.?

19     A.  Correct.

20     Q.  Okay.  Turning --

21        MR. SMITH:  N.P.O. --

22  BY MR. MORRISSEY:

23     Q.  You don't know what "N.P.O." stands for?

24     A.  No, sir.

1      Q.   Okay.  Turning over on the opposite side,

2   there's some notations on the opposite side;

3   correct?

4      A.   Yes, sir.

5      Q.   Do you know a Sergeant Roldan?

6      A.   Yes, sir.

7      Q.   Who is Sergeant Roldan?

8      A.   A 7:00 to 3:00 shift sergeant supervisor.

9      Q.   Now, would Sergeant Roldan be responsible

10   for carrying out the policies and practices of

11   External Operations on May 2, 2008?

12      A.   Yes, sir.

13      Q.   Now, at 7:00 a.m. in the morning there's a

14   notation.  Who would have made those notations on

15   the 7:00 to 3:00 shift on May 2, 2008?

16      A.   Officers Pemberton.

17      Q.   And is there a notation at 7:00 a.m. in the

18   morning?

19      A.   Yes, sir.

20      Q.   And what does that notation say?

21      A.   Per Sergeant Roldan, this inmate has been

22   shackled and handcuffed.  MOM's program.

23      Q.   Okay.  Would officer Kimberly Pemberton as a

24   correctional officer have to follow the instructions

TOOMEY REPORTING    (312) 853-0648

90

1   of her sergeant?

2        A.   Yes, sir.

3        Q.   There is another notation at 10:00 o'clock.

4   Can you read that?

5        A.   Yes, sir.

6        Q.   Can you read that for the record?

7        A.   All is quiet with no movement.

8        Q.   And, again, that would have been a notation

9   by Officer Kim Pemberton?

10       A.   Yes, sir.

11       Q.   Does an officer have to make a notation if

12  the officer is at lunch?

13       A.   Should, yes, sir.

14       Q.   And on front side of page 2, does it

15  indicate the name of the relief officer for when

16  Officer Pemberton took lunch?

17       A.   Yes, sir.

18       Q.   What's the name of that officer?

19       A.   P. Walker.

20       Q.   Do you know a P. Walker?

21       A.   I know of female Pamela Walker, yes, sir.

22       Q.   And she was, when you were Superintendent,

23  she was assigned to External Operations?

24       A.   Yes, sir.

TOOMEY REPORTING    (312) 853-0648

91

1     Q.  Do you know a Sergeant Johnson?

2     A.  Yes, sir.

3     Q.  Who is Sergeant Johnson?

4     A.  3:00 to 11:00 shift supervisor.

5     Q.  Would Officer Pemberton have to follow a

6  command by Sergeant Johnson?

7     A.  Yes, sir.

8     Q.  She would be -- Sergeant Johnson would be

9  Officer Kimberly's supervisor; correct?

10    A.  No, sir.

11    Q.  She would -- Sergeant Johnson was a

12 supervisor at Stroger Hospital; correct?

13    A.  Yes, sir.

14    Q.  And an officer has to follow the commands of

15 a supervisor; correct?

16    A.  Yes, sir.

17    Q.  And at 5:00 p.m. in the evening, is there a

18 notation "per" at 5:00 p.m. in the evening?

19    A.  Yes, sir.

20    Q.  And at 5:00 p.m. in the evening, what officer

21 would have been on duty?

22    A.  Officer Fleming.

23    Q.  And was this 5:00 p.m. notation made by

24 Officer Fleming?

TOOMEY REPORTING    (312) 853-0648

92

1      A.  I can't say.

2      Q.  On a daily -- on an External Operations'

3  Daily Detainee Hospitalization Checklist, is it

4  normal and customary at times for correctional

5  officers filling out that form to have handwritten

6  notes?

7      A.  Yes.

8      Q.  Other than the correctional officers

9  assigned to guard a particular detainee, on an

10  External Operations' Daily Detainee Hospitalization

11  Checklist would any other individual make a notation

12  on that report?

13      A.  If anybody else was assigned to that inmate.

14      Q.  So as the executive -- as the Superintendent

15  of External Operations, you would assume that the

16  notation that was made at 5:00 p.m. on May 2, 2008,

17  was made either by Officer Fleming or an officer

18  assigned to guard Simione Jackson; correct?

19      A.  Yes, sir.

20      Q.  And is there a notation at 5:00 p.m. on

21  May 2, 2008?

22      A.  Yes, sir.

23      Q.  And what is the notation?

24      A.  Per Sergeant Johnson, inmate is shackled and

TOOMEY REPORTING    (312) 853-0648

93

1   handcuffed.  MOM's program.

2       Q.  So as of Superintendent of External

3   Operations, would this document indicate to you

4   that Simione Jackson was shackled pursuant to

5   Sergeant Johnson's instructions?

6       A.  Yes, sir.

7       Q.  And Sergeant Johnson as a supervisor in

8   External Operations has the responsibility of

9   carrying out the External Operations' policies and

10  procedures?

11      A.  Yes, sir.

12      Q.  Now, there's a notation at 2014.  Can you

13  read that notation?

14      A.  Yes, sir.

15      Q.  What does the notation say?

16      A.  Patient is in active labor.  Doctor issued

17  order for shackles to be removed.  Notified Sergeant

18  Johnson.

19      Q.  Now, from that document, does it reflect to

20  you that Sergeant Johnson was a supervisor at

21  Stroger Hospital on the 3:00 to 11:00 shift on May 2,

22  2008?

23      A.  Correct.

24      Q.  And this notation, would that indicate to

TOOMEY REPORTING    (312) 853-0648

1  you that the correctional officer that was guarding

2  Simione Jackson had notified her supervisor that a

3  doctor had issued an order that the shackles should

4  be removed?

5      A.  Yes, sir.

6      Q.  Now, under the policies and practices of

7  External Operations, can a doctor issue an order in

8  regards to a patient?

9      A.  Yes, sir.

10     Q.  Under what circumstances?

11     A.  I don't understand.

12     Q.  Under what circumstances can a doctor give

13 an order to a correctional officer that's assigned

14 to guard a hospitalized detainee?

15         MR. SMITH:  Do you understand the question?

16         THE WITNESS:  No.

17         MR. SMITH:  Can you rephrase it, please?

18         MR. MORRISSEY:  Sure.

19 BY MR. MORRISSEY:

20     Q.  If on May 2, 2008, a doctor requested that

21 the shackles be removed from Simione Jackson, what

22 was the responsibility of the correctional officer

23 assigned to Simione Jackson under the general

24 practice and procedures?


                TOOMEY REPORTING    (312) 853-0648

95

1      A.  To remove the restraints.

2      Q.  Was the correctional officer also required

3  to contact her immediate supervisor?

4      A.  Yes, sir.

5      Q.  Is there any other report that would been

6  prepared by Officer Fleming for Sergeant Johnson to

7  reflect that the shackles were removed?

8      A.  No, sir.

9      Q.  At 2014 Officer Fleming notes that

10  Ms. Jackson is in active labor.  Do you as the

11  superintendent know what active labor is?

12      A.  Yes.

13      Q.  What would you consider active labor to be?

14      A.  That a woman is beginning the process of

15  delivering a baby.

16      Q.  Was there a practice of removing the shackles

17  from a pregnant woman who is in labor once she went

18  into what's called "active labor" in the process of

19  actually delivering a baby?

20      A.  Yes.

21      Q.  And would the doctor determine whether or not

22  a shackled pregnant woman is in active labor?  Would

23  the doctor make that call?

24      A.  Can you repeat?

1       Q.   Yeah.

2                You said that there was a practice for

3    a women that is in labor, who went into what now is

4    called "active labor," for the guards that were

5    providing security for her to remove the shackles

6    once the woman went into active labor; correct?

7       A.   Correct.

8       Q.   Was that after a doctor told the guard that

9    now the woman is just about ready to deliver the

10   baby and is in active labor?

11      A.   Yes, sir.

12      Q.   So the practice for a woman that was

13   preactive labor and hospitalized was to have her

14   shackled while she was hospitalized?

15      A.   I don't understand the question.

16      Q.   All right.  If a woman from either Division 3

17   or the MOM's program went to the hospital between

18   2006, December of 2006 to August of 2008 and was in

19   labor, is it correct that the practice was to have

20   her shackled up to the point that a doctor told the

21   correctional officer or supervisor that the woman now

22   is in active labor and is about to deliver the baby?

23           MR. SMITH:   Objection, asked and answered.

24           MR. MORRISSEY:   He hasn't answered.


                TOOMEY REPORTING    (312) 853-0648

```
 1          MR. SMITH:  He already said yes.

 2          MR. MORRISSEY:  I'm asking.

 3   BY THE WITNESS:

 4      A.  Yes, sir.

 5          MR. MORRISSEY:  Let me take one more moment

 6   to look at this.

 7              I'm going to mark the pages for

 8   Catherine Zaborowski.

 9                      (WHEREUPON, said document was

10                      marked Plaintiff's Group

11                      Exhibit No. 6, for

12                      identification, as of 05-21-09.)

13          MR. MORRISSEY: I'll show you what has been

14   marked Plaintiff's Exhibit No. 6.  It's a group

15   exhibit containing eight pages.

16              I'd ask you to take a few moments, and

17   maybe you can look at it before I'm going to ask you

18   some questions.

19          MR. SMITH:  Okay.  Make sure you tell her

20   not to leave.  She's wanted.

21          MR. MORRISSEY:  She's wanted?

22          MR. SMITH:  Yeah.

23          MR. MORRISSEY:  For what?

24          MR. SMITH:  Huh?
```

1          MR. MORRISSEY:  For what?

2          MR. SMITH:  She missed a court date.

3          MR. MORRISSEY:  Well, you're not going to

4    arrest her.

5          MR. SMITH:  Oh, yes, I am.

6          MR. MORRISSEY:  No, you're not.

7          MR. SMITH:  I'll take care of the baby.

8    Don't worry.

9          MR. MORRISSEY:  No, don't do that.

10          MR. SMITH:  Well, I have to.

11          MR. MORRISSEY:  Don't do that.  That would

12   be bad.

13          MR. SMITH:  I'm a sworn officer of the court.

14          MR. MORRISSEY:  Let me present her.  All

15   right?  Don't do that to her.  All right?  I'm asking.

16               What did she miss?

17          MR. SMITH:  She missed a court date.

18          MR. MORRISSEY:  Well, let's make arrangements.

19   I mean, you can't take her from the baby.  Who's

20   going to take the baby?  Are you going to handle the

21   baby this afternoon?

22                    (WHEREUPON, a discussion was

23                     had off the record.)

24          MR. SMITH:  Let's move on.


                TOOMEY REPORTING   (312) 853-0648

1         MR. MORRISSEY:  I'm looking at the documents

2    that have been marked as Exhibit No. 6.  I believe

3    we're probably missing the document from August 29th.

4    There probably was an additional document from

5    August 29th that we don't have with us.

6         MR. SMITH:  We copied -- we actually brought

7    the originals down here, and we copied right from

8    the originals.

9         MR. MORRISSEY:  Do we have the original here?

10         MR. MORRISSEY:  And then we returned the

11    originals to the Sheriff's Office.  So you're saying

12    you're missing what?

13         MR. MORRISSEY:  Well, it appears that she

14    went from -- she arrived at the hospital on the 29th.

15         MR. SMITH:  Yeah?

16         MR. MORRISSEY:  So we don't know what

17    happened on the 29th before her baby was delivered.

18              The first document that we have is for

19    August 30, 2008.

20         MR. SMITH:  August 30th, right.

21         MR. MORRISSEY:  And she apparently delivered --

22    she went in the hospital, at least my records

23    indicate, on August 29th.

24         MR. SMITH:  How accurate are your records,


                    TOOMEY REPORTING    (312) 853-0648

1  though?

2        MR. MORRISSEY:  It's the complaint.

3        MR. SMITH:  It looks like she -- this looks

4  like she just got here on the 30th.

5                        (WHEREUPON, a discussion was had

6                         off the record.)

7        MR. SMITH:  Before we get too excited, can

8  we make sure that the 29th was in fact the date she

9  went in?

10       MR. MORRISSEY:  Okay.

11       MR. SMITH:  I mean, it could be that she

12  wasn't taken the 29th.

13       MR. MORRISSEY:  Well, people usually aren't

14  mistaken about when their children are born.  I

15  remember when my children were born.  I could tell

16  you the minute and the hour when we went to the

17  hospital.

18       MR. SMITH:  That may not be the case here,

19  Mr. Morrissey.

20  BY MR. MORRISSEY:

21    Q.  Do you know whether there was any difference

22  in regards to the shackling of women that came to

23  the hospital in labor from Division 3 or came from

24  the MOM's program once they arrived at the hospital?

 1          MR. SMITH:  At what point?

 2   BY MR. MORRISSEY:

 3      Q.  All right.  During the period of time you

 4   were the Superintendent of the External Operations,

 5   are you aware -- was there any difference for a

 6   hospitalized woman in labor whether or not they

 7   came from Division 3 or the MOM's program?

 8      A.  No, sir.

 9      Q.  Do you know what was the practice and/or

10   policy of restraining pregnant women assigned to the

11   Sheriff's MOM's program after October of 2008?

12      A.  No, sir.

13          MR. SMITH:  Excuse me, Tom.

14          MR. MORRISSEY:  Yes?

15          MR. SMITH:  I've got to say again that the

16   notes and everything we have here is that she got

17   to the hospital on the 30th, and she delivered on

18   the 30th.

19   BY MR. MORRISSEY:

20      Q.  Well, let me ask you a question.

21              In August of 2008, do you know whether

22   or not women if the MOM's program were transported

23   by counselors from Haymarket to a hospital when

24   they were in labor?


                TOOMEY REPORTING    (312) 853-0648

102

1      A.  No, sir.

2      Q.  Do you know whether or not counselors from

3  Haymarket or the MOM's program stayed with women

4  who were in labor once they arrived at the hospital

5  until they were relieved by somebody from External

6  Operations?

7      A.  No, sir.

8          MR. SMITH:  Now, we're talking prior to

9  October of '08; right?

10         MR. MORRISSEY:  Right.

11         MR. SMITH:  Okay.  Just so we know.

12         MR. MORRISSEY:  So we don't know whether or

13  not the plaintiff Zaborowski was at the hospital on

14  August 29, 2008, based upon the records that are in

15  front of us right now?

16         MR. SMITH:  I agree.

17         MR. MORRISSEY:  Okay.

18         MS. SHAPIRO:  I've looked through the

19  documents.

20         MR. SMITH:  Off the record for one second.

21                     (WHEREUPON, a discussion was had

22                     off the record.)

23  BY MR. MORRISSEY:

24      Q.  Do you know whether or not there was any


              TOOMEY REPORTING    (312) 853-0648

1   change in regards to shackling women after August of

2   2008 who were hospitalized while in labor?

3       A.  No, sir.

4       Q.  Do you know who would have knowledge in

5   regards to whether or not there was any change in

6   the practice and procedure of the Sheriff in regards

7   to shackling women that were in labor after the time

8   you left as Superintendent of External Operations?

9           MR. SMITH:  Again, for clarification as it

10  relates to inmates that are in the MOM's program?

11          MR. MORRISSEY:  Either program, either in

12  the MOM's program or in Division 3.

13          MR. SMITH:  Because the --

14          MR. MORRISSEY:  Well, I'm just asking.

15          MR. SMITH:  I mean, the lion's share, or

16  majority, are all from the MOM's program, not from

17  the jail.

18          MR. MORRISSEY:  I'm asking.

19          THE WITNESS:  Can you read that back for me,

20  please?

21                          (WHEREUPON, the record was read

22                          by the reporter as requested.)

23  BY THE WITNESS:

24      A.  No, sir.


                TOOMEY REPORTING    (312) 853-0648

1   BY MR. MORRISSEY:

2      Q.  When you were Superintendent, and I may have

3   asked you this, was there any difference in regards

4   to shackling women who were hospitalized in labor

5   who came either from the MOM's program or Division 3

6   of the jail?

7      A.  No, sir.

8           MR. MORRISSEY:  I'm going to continue this

9   deposition with the understanding that you'll

10  produce somebody that has knowledge after August of

11  2008 in regards to the shackling of women who were

12  in labor who were hospitalized up to the present.

13              I have no nothing further.

14           MR. SMITH:  I have a couple of questions.

15                        EXAMINATION

16  BY MR. SMITH:

17     Q.  Superintendent Hickerson took over your spot;

18  correct?

19     A.  Yes, sir.

20     Q.  He, in fact, started doing what you had been

21  doing for the last two and a half years; correct?

22     A.  Correct.

23     Q.  Okay.  And where did you move on to?

24     A.  I went to Division 4.

TOOMEY REPORTING    (312) 853-0648

1      Q.   Okay.   And didn't you work with

2   Superintendent Hickerson on the new General Order

3   that was issued in October of '08?

4      A.   I don't recall.

5      Q.   Don't you -- do you remember looking at the

6   procedure and trying to change the way the Sheriff

7   watched pregnant females that had been enrolled

8   already in the MOM's program?

9      A.   Yes, sir.

10     Q.   And why is that?

11          MR. MORRISSEY:   Can I hear that question back

12   again?

13                         (WHEREUPON, the record was read

14                          by the reporter as requested.)

15          MR. MORRISSEY:   Can we have some foundation

16   for that question?

17   BY MR. SMITH:

18     Q.   Before Superintendent Hickerson took over,

19   you met with him, correct, approximately in August

20   of '08?

21     A.   Correct.

22     Q.   And, again, did you have a discussion or

23   discussions regarding manpower and better ways to

24   use the External Op Sheriff officers?


                 TOOMEY REPORTING    (312) 853-0648

1     A.  Yes, sir.

2     Q.  And isn't it true that you and

3   Superintendent Hickerson thought that it would be

4   more feasible to just have the counselors for MOM's

5   watch the pregnant inmates as opposed to a Sheriff

6   deputy?

7     A.  Yes, sir.

8     Q.  And to your knowledge, is that the

9   procedure --

10        MR. MORRISSEY:  I'm going to have an

11   objection throughout this as to the leading nature of

12   it, but you can continue.

13        MR. SMITH:  All right.

14   BY MR. SMITH:

15     Q.  And to your knowledge, after October 1st or

16   thereafter, to your knowledge, is it the sole

17   responsibility of the counselors from Haymarket MOM's

18   to watch over the pregnant inmates?

19     A.  Yes, sir.

20     Q.  So that's been abandoned, the use of Sheriff

21   deputies; correct?

22     A.  Correct.

23     Q.  And, again, to your knowledge that would be

24   a cost-cutting decision?


                 TOOMEY REPORTING    (312) 853-0648

1      A.  Yes, sir.

2          MR. SMITH:  All right.  I don't have any more

3  questions.

4          MR. MORRISSEY:  I have a few questions.

5                    FURTHER EXAMINATION

6  BY MR. MORRISSEY:

7      Q.  Where did you have this conversation with

8  Superintendent Hickerson in August of 2008?

9      A.  I don't recall, sir.

10     Q.  Other than yourself, was anybody else

11 present during that conversation?

12     A.  I don't recall.

13     Q.  Do you know whether -- was the discussion

14 solely about providing External Operations guards

15 for women that were in labor at the hospital?

16     A.  I don't recall.

17     Q.  Do you know whether or not executive --

18 Assistant Executive Director Dennis Andrews was

19 present during the conversation?

20     A.  I don't recall, sir.

21     Q.  Do you know whether or not Assistant

22 Executive Director Andrews was notified in regards

23 to this change in the procedure whereby women that

24 were assigned to the MOM's program were no longer


                TOOMEY REPORTING    (312) 853-0648

1  going to be monitored by correctional officers?

2      A.  Assistant Director Andrews was not -- did not

3  hold that rank at that time anymore.

4      Q.  And when you were relieved in External

5  Operations in August of 2008, who was the person that

6  was the direct supervisor of the Superintendent of

7  External Operations?

8      A.  Assistant Director Gilberto Romero.

9      Q.  When did Assistant Director Romero become

10  responsible for External Operations to your

11  knowledge?

12      A.  I don't recall.

13      Q.  Was Superintendent -- was Executive Director

14  Romero advised that as of October 1, 2008,

15  correctional officers were no longer going to guard

16  women assigned to the MOM's program?

17      A.  I don't know.

18      Q.  Do you have personal knowledge after you

19  left in August of 2008 whether or not guards were

20  still assigned to women who were in labor and

21  involved with the Sheriff's MOM's program?

22          MR. SMITH:  Objection.  He already said no.

23          MR. MORRISSEY:  I'm asking him.

24          MR. SMITH:  Why can't --

TOOMEY REPORTING    (312) 853-0648

1        MR. MORRISSEY:  I'm just asking him.

2   BY THE WITNESS:

3        A.  No, sir.

4   BY MR. MORRISSEY:

5        Q.  Okay.  How did you become aware in October

6   of 2008 that External Operations was no longer

7   providing security for women assigned to the MOM's

8   program who were in labor at a hospital?

9        A.  I don't recall.

10       Q.  In August of 2008 when you had this

11   discussion with Superintendent Hickerson about

12   shackling and guarding women who were in labor at

13   the hospital, did you make a distinction between

14   women who were assigned to the MOM's program and

15   women who came to a hospital from the jail?

16       MR. SMITH:  Do you understand that question?

17       THE WITNESS:  No, sir.

18   BY MR. MORRISSEY:

19       Q.  Who brought up the issue of whether or not

20   guards should continue to monitor women who were

21   assigned to the MOM's program?

22       A.  I don't recall.

23       Q.  As a superintendent of External Operations

24   in August of 2008, did you feel that women assigned


TOOMEY REPORTING    (312) 853-0648

1   to the MOM's program were less of a security risk

2   than women who came to a hospital in labor from

3   Division 3?

4       A.  Yes.

5       Q.  In August of 2008 what was your understanding

6   in regards to women that are assigned to the MOM's

7   program?

8           MR. SMITH:  As to what?

9           MR. MORRISSEY:  As to their security risk.

10  BY THE WITNESS:

11      A.  That they were under the MOM's program of the

12  women's furlough and they carried less security risk

13  than the inmates that were housed and confined at

14  the CCDOC.

15  BY MR. MORRISSEY:

16      Q.  Did you believe in August of 2008 that there

17  was less of a penological reason for having a guard

18  assigned to a woman who was in labor at the hospital

19  from the MOM's program than a person who came from

20  CCDOC?

21          MR. SMITH:  Do you understand the question?

22          THE WITNESS:  No.

23          MR. MORRISSEY:  Read back the question.

24          MR. SMITH:  Can you rephrase it?

TOOMEY REPORTING    (312) 853-0648

1           MR. MORRISSEY:  All right.

2    BY MR. MORRISSEY:

3        Q.  As the Superintendent of External Operations,

4    did you believe that there was less of a security

5    risk or a penological risk for not having a woman

6    from the MOM's program guarded by a correctional

7    officer than somebody that was at the jail, coming

8    from the jail?

9           MR. SMITH:  Can you explain to him what your

10   meaning of "penological risk" is?  I think that's

11   the problem here.

12   BY MR. MORRISSEY:

13       Q.  Do you have a problem with the word

14   "penological"?

15       A.  Yes, sir.

16       Q.  By "penological," I mean whether there is

17   a security reason as a Superintendent of External

18   Operations for having a woman in the MOM's program

19   to have a correctional officer present while that

20   woman is hospitalized in labor?

21           THE WITNESS:  Can you repeat the question,

22   please?

23                       (WHEREUPON, the record was read

24                        by the reporter as requested.)


             TOOMEY REPORTING    (312) 853-0648

```
 1          THE WITNESS:  I'm still not understanding,
 2   sir.
 3   BY MR. MORRISSEY:
 4      Q.  And what don't you understand about the
 5   question?
 6          MR. SMITH:  Penological risk, as stated, is
 7   a reasonable security purpose as opposed to a purpose
 8   that would be for punishment.  That's what he's
 9   trying to --
10          MR. MORRISSEY:  No, no, I'm not asking him
11   that.
12   BY MR. MORRISSEY:
13      Q.  My question is:  If you have a woman that
14   initially was assigned to the MOM's program and then
15   she goes in the hospital in labor, is there a
16   security reason for having a guard, an armed guard
17   present at the bedside?
18      A.  Yes.
19      Q.  And what is that reason?
20          MR. SMITH:  I think he's asked and answered
21   this --
22          MR. MORRISSEY:  I'm just asking.
23          MR. SMITH:  -- a hundred difference ways.
24          MR. MORRISSEY:  I'm asking the reason.
```

TOOMEY REPORTING    (312) 853-0648

1          THE WITNESS:  Can we repeat it?

2          MR. MORRISSEY:  Let me ask this.

3          MR. SMITH:  They're more of a danger.

4          MR. MORRISSEY:  Let me ask a follow-up

5     question.

6     BY MR. MORRISSEY:

7          Q.  Did you agree in August of 2008 that it

8     would be all right not to have an armed guard

9     present for a women who is assigned to the MOM's

10    program and who is hospitalized in labor?

11         A.  Yes.

12         Q.  Why did you come to that conclusion?

13         A.  Due to the detainee being housed from not

14    within the confines of the CCDOC, she became -- she

15    was less of a risk to all.

16         Q.  Therefore, it was your opinion in August of

17    2008 that having an armed guard present with a woman

18    from the MOM's program who is in labor was not

19    necessary?

20         A.  Correct.

21         Q.  Why then prior to August of 2008 was it

22    necessary for a woman who was assigned to the MOM's

23    program and who was in labor to not only have an

24    armed guard at her bedside but also to have the

TOOMEY REPORTING    (312) 853-0648

114

1    woman shackled?

2        A.   That was the protocol.

3        Q.   By "protocol," what do you mean?

4            MR. SMITH:  The policy.

5    BY MR. MORRISSEY:

6        Q.   By protocol, do you mean that prior to

7    August of 2008 it was the policy to have a woman

8    who was assigned to the MOM's program to be shackled

9    and have an armed guard present while she was in

10   labor in a hospital?

11           THE WITNESS:  Can you repeat it?

12           MR. SMITH:  You don't need to repeat it.

13   You've asked him this a hundred different ways.

14           MR. MORRISSEY:  Well, I'm just asking.

15           MR. SMITH:  They changed, they changed the

16   policy, but prior to August of '08 the policy was

17   different.  Even though they were from the MOM's

18   program, they still had armed guards there.

19   BY MR. MORRISSEY:

20       Q.   And the women shackled who were in the MOM's

21   program; correct?

22           MR. SMITH:  Yes.

23   BY THE WITNESS:

24       A.   Yes.


                TOOMEY REPORTING   (312) 853-0648

1  BY MR. MORRISSEY:

2     Q.  Okay.  In August of 2008 you were aware

3  that there was a State law that said women that are

4  in labor are not to be shackled who are incarcerated;

5  correct?

6     A.  Correct.

7     Q.  Was the decision to follow the practice and

8  procedure made by your supervisors then, to have

9  women who were in labor and hospitalized shackled?

10          Do you understand the question?

11    A.  No, sir.

12    Q.  Okay.  The policy in August of 2008 was to

13  have women in the MOM's program who were in labor

14  shackled while in the hospital; correct?

15    A.  No, sir.

16        MR. SMITH:  What's that?

17        MR. MORRISSEY:  Pardon?

18        MR. MORRISSEY:  That's directly contrary to

19  what we agreed to.

20        MR. SMITH:  Yeah.  He misunderstood your

21  question.  That's all.

22        MR. MORRISSEY:  Okay.  Can you state --

23        MR. SMITH:  Everybody prior to August of '08

24  that was outside the confines, more particularly in

116

1    a hospital, were cuffed, were shackled?

2          THE WITNESS:  Yes, sir.

3    BY MR. MORRISSEY:

4        Q.  Including women in labor?

5        A.  No, sir.

6          MR. SMITH:  Not in labor.  Not in labor.  As

7    soon as the doctor says that she's going into labor,

8    active labor, he testified ten different ways --

9          MR. MORRISSEY:  I'm sorry.

10         MR. SMITH:  -- they took the shackles off.

11         MR. MORRISSEY:  Okay, okay.  I'm sorry.

12   BY MR. MORRISSEY:

13       Q.  Where we have this conflict is the definition

14   right before a doctor says the person is going to

15   deliver the baby then was considered active labor,

16   correct, and the shackles came off?

17       A.  Yes, sir.

18       Q.  Okay.  Prior to that, when the women were

19   not in active labor but in labor, all women whether

20   or not they were from the jail or from the MOM's

21   program were in shackles; correct?

22       A.  No, sir.

23         MR. SMITH:  You're getting -- you're making

24   him define "labor."  What you're trying to do is tie

TOOMEY REPORTING    (312) 853-0648

1   him down to the word in a definition of labor.   Okay?

2          MR. MORRISSEY:   Okay.

3          MR. SMITH:   And there are a number of

4   different reasons why you have to go to the hospital.

5   You could be in pre-labor, okay, and that's the

6   reason what he's trying to explain to you.

7          MR. SMITH:   Okay, okay.

8          MR. SMITH:   But the correctional

9   officers that are watching over the inmates, either

10  from MOM's -- and mostly they are from MOM's, are

11  not medical personnel.

12                  They are correctional officers.   They

13  have to take the advice and consent from the medical

14  personnel when to put the shackles on and when to

15  take them off.

16  BY MR. MORRISSEY:

17     Q.   The decision -- when women left either the

18  jail or the MOM's program and were pregnant, the

19  practice and the policy of the Sheriff was to

20  follow the same protocol for all inmates that are

21  hospitalized:   to have them shackled once they

22  reached the hospital; correct?

23          MR. SMITH:   If they're not in labor.

24          MR. MORRISSEY:   No, no.   I'm just --

Plaintiffs' Exhibit 2

118

1   BY THE WITNESS:

2       A.  Correct.  If they're not in labor.

3   BY MR. MORRISSEY:

4       Q.  All right.  You as a correctional officer

5   are not a medical person; correct?

6       A.  Correct.

7       Q.  So the policy and practice was that until a

8   doctor told a correctional officer or a supervisor

9   that the woman was about to deliver the baby, at

10  that time the correctional officer would remove the

11  shackles from a pregnant woman who is hospitalized;

12  correct?

13      A.  Correct.

14      Q.  And that was the policy and practice that

15  was followed in regards to pregnant women that were

16  brought to the hospital prior to August of 2008?

17      A.  Correct.

18      Q.  So that if a woman in 2008 was pregnant

19  either from MOM's or from the jail and she went to

20  the hospital, she would be shackled; correct?

21      A.  Correct.

22      Q.  Until such time that a doctor said the woman

23  is about to deliver the baby; correct?

24      A.  Correct.


                TOOMEY REPORTING    (312) 853-0648

 1          MR. SMITH:  Or words to that effect.

 2     BY MR. MORRISSEY:

 3          Q.  All right.  Now, in August of 2008 a decision

 4     was made by you and Superintendent Hickerson that in

 5     the future not only would women who are in the MOM's

 6     program not have a guard present with them once they

 7     were hospitalized, correct, but also those women

 8     would not be restrained with shackles once they

 9     arrived at the hospital; correct?

10               Do you understand the question?

11          A.  No, sir.

12          Q.  Okay.  You as the then-current Superintendent

13     of External Operations in August of 2008 met with

14     Superintendent Hickerson; correct?

15          A.  Correct.

16          Q.  And the two of you along with Assistant

17     Director Romero agreed that in the future that women

18     assigned to the MOM's program once they arrived at

19     the hospital would not be under a correctional

20     officer's supervision; correct?

21          MR. SMITH:  There's no Assistant Director

22     Romero.  He was not involved in the decision making.

23     He was just informed of it.  You're making it sound

24     like he was part of the decision.


                 TOOMEY REPORTING    (312) 853-0648

1          MR. MORRISSEY:  Okay.  Let me rephrase the

2   question then.

3   BY MR. MORRISSEY:

4      Q.  In August of 2008 for women that were from

5   the MOM's program, you and Superintendent Hickerson

6   agreed that External Operations would no longer

7   provide security for those women when they were

8   hospitalized; correct?

9          MR. SMITH:  From the MOM's program.

10         MR. MORRISSEY:  From the MOM's program.

11   BY THE WITNESS:

12     A.  Correct.

13   BY MR. MORRISSEY:

14     Q.  Would it be correct that in regards to women

15   assigned to Division 3 who were pregnant but came to

16   the jail after August of 2008, the same protocol was

17   and is being followed in regards to continuing to

18   have External Operations' officers monitor them while

19   they were in the hospital?

20     A.  Yes.

21         MR. SMITH:  Yes.  There's no one else to

22   watch them.

23   BY MR. MORRISSEY:

24     Q.  And is it also true that after August of

TOOMEY REPORTING    (312) 853-0648

1    2008 in regards to women that came to the hospital

2    from Division 3 and who were pregnant, those women

3    remained shackled until a doctor told the

4    correctional officer guarding the woman that the

5    woman is about to deliver a baby?

6        A.  Yes, sir.

7            MR. MORRISSEY:  I have nothing further.

8            MR. SMITH:  Okay.  I have just a few

9    questions to clarify this.  Believe me, a few.

10                       FURTHER EXAMINATION

11   BY MR. SMITH:

12       Q.  You know that when a person is arrested and

13   is pregnant, they have an option to go into the MOM's

14   program; correct?

15       A.  Correct.

16       Q.  Okay.  And generally they go over a series

17   of questions, and they agree --

18           MR. MORRISSEY:  Again, I'm going to object to

19   the leading question.

20           MR. SMITH:  Then object.

21           MR. MORRISSEY:  All right.

22           MR. SMITH:  Fine.

23           MR. MORRISSEY:  It is a continuation

24   objection.

TOOMEY REPORTING    (312) 853-0648

```
 1   BY MR. SMITH:

 2       Q.   Okay.  And then if they agree to cooperate

 3   and comply with these conditions, they are then

 4   shipped from the compound to the MOM's program;

 5   correct?

 6       A.   Yes, sir.

 7       Q.   And then when that mother, that inmate is

 8   ready to have a baby, you know that a counselor

 9   takes the inmate from MOM's to the hospital?

10           MR. MORRISSEY:  Again, objection to form.

11   BY MR. SMITH:

12       Q.   Correct?

13       A.   Correct.

14       Q.   So you have a body from MOM's there watching

15   the MOM's inmate; correct?

16       A.   Correct.

17       Q.   Now, the difference with a person from

18   Division 3 is, there's nobody.  There's no MOM's

19   program.  There's no counselor.  It's just her going

20   by herself to the hospital.  Therefore, External Ops

21   still has to watch that person?

22       A.   Correct.

23           MR. SMITH:  I don't have anything more.

24           MR. MORRISSEY:  I don't have anything further
```

TOOMEY REPORTING    (312) 853-0648

123

1    questions.  Okay.  Thanks a lot.

2              All right.  For the record, my client,

3    Ms. Zaborowski, came down at the request of the

4    State's Attorney for a deposition today.  Her

5    deposition was scheduled for 11:30.

6              Unfortunately, the deposition of

7    Superintendent Holmes ran over to 1:00 o'clock now,

8    and Mr. Smith has an engagement this afternoon that

9    he can't break.

10             So by agreement of the parties, we're

11   going to continue her deposition.  Hopefully, she

12   won't have to be deposed.

13        MR. SMITH:  Hopefully, but we know that we

14   just went too long with the first deponent, and we

15   have court next week.

16             Let me talk to you, though, before.

17        MR. MORRISSEY:  I want to talk to you.

18                  (WHEREUPON, the deposition was

19                  adjourned as indicated herein.)

20

21

22

23

24


              TOOMEY REPORTING    (312) 853-0648

**Exhibit 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLEVE COTTON, III and DARRYL T. SCOTT, individually and on behalf of the class defined herein, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 5005 |
| v. | ) ) | |
| ASSERT ACCEPTANCE, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Cleve Cotton, III and Darryl T. Scott bring the present one-count First Amended Complaint against Defendant Asset Acceptance, LLC ("Asset Acceptance"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1601, *et seq.* Before the Court is Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. For the following reasons, the Court, in its discretion, grants Plaintiffs' Rule 23 motion.

## BACKGROUND

In their First Amended Complaint, Plaintiffs allege that Asset Acceptance is engaged in the business of purchasing charged-off consumer debts, including telecommunications debts, and enforcing the debts against consumers. (R. 8-1, First Am. Compl. ¶ 9.) On February 26, 2007, Asset Acceptance filed a lawsuit against Cotton in the Circuit Court of Cook County to collect a debt for personal telecommunications services. (*Id.* ¶ 14.) The state court entered a default judgment of $2,373.00 against Cotton in June 2007. (*Id.*) On or about June 18, 2007, Asset

Acceptance filed a lawsuit against Scott in the Circuit Court of Cook County to collect a debt for personal telecommunications services.  (*Id.* ¶ 15.)  Asset Acceptance filed these state court lawsuits as an assignee of AT&T, a telecommunications company regulated by the Federal Communications Commission.  (*Id.* ¶ 16.)

Plaintiffs further allege that the charges for which recovery was sought in their state court lawsuits were more than two years old and that the applicable statute of limitations to an action for the recovery of charges by a telecommunications carrier regulated by the Federal Communications Commission is two years pursuant to 47 U.S.C. § 415.  (*Id.* ¶¶ 17, 18.) Plaintiffs also allege that Asset Acceptance regularly files and threatens to file lawsuits on federally-regulated telecommunications debts that are more than two years old at the time of the filing.  (*Id.* ¶ 22.)  Furthermore, Plaintiffs contend that Asset Acceptance engages in a pattern and practice of filing lawsuits on time-barred debts of modest amounts knowing that the persons sued could not retain counsel to defend such suits except by paying an amount comparable to that sought in the lawsuits.  (*Id.* ¶ 26.)  Plaintiffs thus maintain that Asset Acceptance's conduct constitutes both a deceptive and unfair collection practice in violation of the FDCPA.  (*Id.* ¶ 28.)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 23(a) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed.R.Civ.P. 23(a); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006).

2

Failure to meet any of these Rule 23(a) requirements precludes class certification. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Oshana*, 472 F.3d at 513. Here, Plaintiffs request certification of the proposed class pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *see also Amchem Prods.*, 521 U.S. at 615. Under Rule 23(b)(3), members of a certified class may opt out and pursue their claims individually. *See In re Allstate Ins. Co.,* 400 F.3d 505, 508 (7th Cir. 2005).

The party seeking class certification has the burden of establishing that certification is proper. *See Oshana,* 472 F.3d at 513; *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993). In determining whether a party has carried that burden, a court need not accept all of the complaint's allegations as true. *See Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Rather, in deciding whether to certify a class, the court "should make whatever factual and legal inquiries [that] are necessary under Rule 23." *Id.* at 676. Finally, district courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 345, 99 S.Ct. 2326, 2334, 60 L.Ed.2d 931 (1979); *Payton v. County of Carroll,* 473 F.3d 845, 847 (7th Cir. 2007).

## ANALYSIS

Plaintiffs define the class they seek to certify as follows:

3

> The class consists of (a) all individuals (b) against whom defendant Asset
> Acceptance, LLC filed a lawsuit in Illinois, Wisconsin or Indiana (c) to collect a
> debt for cellular or other federally regulated telecommunications services (d)
> where any of the telecommunications charges antedated the filing of the lawsuit
> by two years, (e) which lawsuit was pending at any time during a period
> beginning one year prior to the filing of this action and ending 20 days after the
> filing of this action.

(*Id.* ¶ 32.)

## I.   Federal Rule of Civil Procedure 23(a)

### A.        Numerosity

To satisfy the numerosity requirement under Rule 23(a)(1), Plaintiffs must show that the

number of members in the proposed class is so large that joinder would be impracticable.  *See*

*Pruitt v. City of Chicago, Ill.,* 472 F.3d 925, 926 (7th Cir. 2006).  Although there is no bright-line

rule for numerosity, a class of at least forty members is sufficient to satisfy the numerosity

requirement.  *See id.*; *Hinman v. M &M Rental Ctr., Inc.,* 545 F.Supp.2d 802, 805 (N.D. Ill.

2008).  Because Plaintiffs point to evidence that there are approximately 7,900 individuals who

may fit the class definition, Plaintiffs have met the numerosity requirement under Rule 23(a)(1).

### B.        Commonality

Rule 23(a)(2) requires that Plaintiffs prove the existence of questions of fact or law

common to the proposed class.  *See Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir.

2002) (class must be reasonably homogeneous); *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.

1998).  "A common nucleus of operative fact is usually enough to satisfy the commonality

requirement of Rule 23(a)(2)."  *Keele,* 149 F.3d at 594.  A common nucleus of fact exists when a

defendant has "engaged in standardized conduct towards members of the proposed class."  *Id.*

Plaintiffs contend that the common nucleus of operative fact is that Asset Acceptance

brings or threatens to bring lawsuits to collect federally regulated telecommunications debts that

4

are over two years old, and thus are time-barred under the Federal Communications Act

("FCA").  *See* 47 U.S.C. § 415.  Plaintiffs also maintain that Asset Acceptance's conduct gives

rise to two legal questions:  (1) whether the FCA statute of limitations applies; and (2) whether

filing or threatening to file time-barred lawsuits violates the FDCPA.

Asset Acceptance, on the other hand, argues that because many of the proposed class

members' telephone bills contain both state-regulated and federally-regulated services, their

claims are not subject to common facts.  It is well-established, however, that "[t]he fact that there

is some factual variation among the class grievances will not defeat a class action."  *See Rosario*

*v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir. 1992); *see also Keele,* 149 F.3d at 594 ("factual

variations among class members' grievances do not defeat class action.").[1]  Indeed, because

Asset Acceptance's alleged conduct was standardized as to the putative class members and the

class members share factual and legal questions, Plaintiffs have met their burden in establishing

the commonality requirement under Rule 23(a)(2).  *See Keele,* 149 F.3d at 594; *see, e.g.*,

*Cicilline v. Jewel Food Stores, Inc.,* 542 F.Supp.2d 831, 836 (N.D. Ill. 2008).

## C.        Typicality

The typicality and commonality requirements are usually interrelated.  *See Rosario,* 963

F.3d at 1018.   Under Rule 23(a)(3), "the typicality requirement primarily directs the district

court to focus on whether the named representatives' claims have the same essential

characteristics as the claims of the class at large."  *Retired Chicago Police*, 7 F.3d at 596-97; *see*

---

[1]  Asset Acceptance also argues that Plaintiffs' claims cannot be adjudicated on a class-
wide basis because each putative class member's claims hinges on individualized evidence.  The
Court will discuss Asset Acceptance's class-wide proof argument under the predominance
requirement pursuant to Rule 23(b)(3).

5

*also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.").

Here, the issues are plain enough from the pleadings to determine that the named Plaintiffs' interests encompass the putative class members' interests based on Plaintiffs' allegations that Asset Acceptance brings collection actions on telecommunications debts after the federal statute of limitations has run. *See General Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Stokely-Van Camp*, 713 F.2d at 232 (plaintiff's claim typical if it arises from same practice or course of conduct giving rise to other class members' claims). Nevertheless, Asset Acceptance asks the Court to "probe behind the pleadings" in an attempt to show that Plaintiffs' claims have factual differences and that Plaintiffs' claims lack merit. *See Falcon,* 457 U.S. at 160. At this stage of the proceedings, however, the Court will not "delve into the merits of the ultimate issues in the case." *See Cicilline,* 542 F.Supp.2d at 835. Moreover, class members' claims need not be factually identical to satisfy the typicality requirement. *See Brieger v. Tellabs, Inc.,* 245 F.R.D. 345, 350 (N.D. Ill. 2007); *Flanagan v. Allstate Ins. Co.,* 242 F.R.D. 421, 428 (N.D. Ill. 2007).

In short, in pursuing their own claims, Plaintiffs will advance the interests of the proposed class. *See Falcon,* 457 U.S. at 156; *Keeler,* 149 F.3d at 595. Therefore, Plaintiffs have met their burden in establishing the typicality requirement under Rule 23(a)(3).

### D.       Adequacy

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625; *see also Asher v. Baxter Int'l Inc.,* 505 F.3d 736, 737 (7th Cir. 2007) ("Minimum standards of adequacy

6

are the domain of Fed.R.Civ.P. 23(a)(4), which permits a class action only if 'the representative parties will fairly and adequately protect the interests of the class.'"). To establish the adequacy requirement, class representatives must show that (1) their claims are not antagonistic or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represents them. *See Rosario,* 963 F.2d at 1018; *see also Falcon,* 457 U.S. at 156.

Asset Acceptance does not challenge the adequacy of Plaintiffs' counsel. Instead, Asset Acceptance argues that because Scott believes that he does not owe a debt on his telecommunication charges, his claim is antagonistic to the other putative class members' claims. Whether Scott believes he owes the disputed debt does not change the legal theory on which he bases his claim, namely, that Asset Acceptance filed a time-barred claim against him in state court in violation of the FDCPA. Asset Acceptance also argues that Cotton is an inadequate class representative because he wants to remove the state court judgment from his credit record and does not understand the class claims. Not only does Asset Acceptance's argument misstate Cotton's deposition testimony, but Cotton's alleged misunderstanding of his claim does not defeat class certification. *See Murray v. New Cingular Wireless Servs., Inc.,* 232 F.R.D. 295, 300 (N.D. Ill. 2005) ("It is well established that a named plaintiff's lack of knowledge and understanding of the case is insufficient to deny class certification, unless his ignorance unduly impacts his ability to vigorously prosecute the action.") (internal citation omitted). Asset Acceptance gives no other relevant reason for denying class certification based on the adequacy requirement. Because there are no inconsistencies between Plaintiffs' claims and the class members' claims, Plaintiffs have established the adequacy requirement under Rule 23(a)(4). *See Uhl v. Thoroughbred Tech. & Telecomm., Inc.,* 309 F.3d 978, 985 (7th Cir. 2002).

7

## II.   Federal Rule of Civil Procedure 23(b)(3)

Under Rule 23(b)(3), the Court must determine whether (1) the questions of fact or law

common to the class members predominate over questions affecting only the individual class

members, and (2) a class action is superior to other available methods of adjudicating plaintiffs'

claims.  *See Amchem Prods.,* 521 U.S. at 615; *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012,

1019 (7th Cir. 2002).  The Court first turns to the predominance requirement.

### A.   Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem Prods.,* 521 U.S. at 623.  In other

words, under Rule 23(b)(3), "each member must share common questions of law or fact with the

rest of the class, therefore making class-wide adjudication of the common questions efficient

compared to repetitive individual litigation of the same questions."  *Lemon v. International*

*Union of Operating Eng'g, Local No. 139, AFL-CIO,* 216 F.3d 577, 581 (7th Cir. 2000).  The

existence of factual or legal differences within a class does not foreclose a plaintiff from

establishing predominance.  *See Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.

1980); *see also Radamanovich v. Combined Ins. Co. of Am.,* 216 F.R.D. 424, 435 (N.D. Ill.

2003) ("Although the common issues must predominate the case, it is not necessary that the

plaintiff show them to be exclusive.").

When determining if a plaintiff has met the predominance requirement, district courts

may look beyond the pleadings and determine whether the parties' claims are subject to proof by

common evidence.  *See Radamanovich,* 216 F.R.D. at 43; *see also Falcon,* 457 U.S. at 161.

(courts may "probe behind the pleadings before coming to rest on the certification question").  If

the liability issues are not subject to class-wide proof – but instead require individualized

8

determinations – the class' common issues do not predominate.  *See Radamanovich,* 216 F.R.D. at 435-36; *see also Hyderi v. Washington Mut. Bank,* FA 235 F.R.D. 390, 398 (N.D. Ill. 2006) ("predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis") (citing *Hewitt v. Joyce Beverages of Wis., Inc.,* 721 F.2d 625, 628-29 (7th Cir. 1983)).

Key to Plaintiffs' class definition is the requirement that Asset Acceptance filed a lawsuit against each putative class member "to collect a debt for cellular or other federally regulated telecommunications services."  Based on the class definition, Asset Acceptance argues that Plaintiffs' proposed class depends on factual determinations that will be different for each class member.  Specifically, Asset Acceptance maintains that the potential class members will have telephone bills that contain both federally-regulated interstate charges in which the federal two-year statute of limitations may apply, *see* 47 U.S.C. § 415, and state-regulated intrastate charges in which the state statutes of limitations may apply.  *See* 735 ILCS 5/13-206 (ten-year limitations period for breach of contract claims in Illinois); Wis. Stat. § 893.43 (six-year limitations period for breach of contract claims in Wisconsin); Ind. Code §§ 34-11-2-9, 344-11-2-11 (depending on the nature of the contract, ten or six-year limitations period for breach of contract claims in Indiana).  As such, Asset Acceptance argues that the each of the putative class member's claims and defenses hinges on individualized evidence.

In support of its argument, Asset Acceptance provides the Court with a sampling of 400 files of individuals who potentially meet Plaintiffs' proposed class definition.  (*See* R. 64-1, Ex. A, M. Beach Decl., Ex. 1, Sampling.)  Michael Beach, Asset Acceptance's Assistant Vice President of Legal, explained in his declaration that as part of the discovery in this matter, Asset Acceptance agreed to produce a 5% sampling of the accounts of approximately 7,908 individuals

9

who potentially fall within the putative class defined in Plaintiff's First Amended Complaint.
(*Id.*, M. Beach Decl. ¶ 7.)  The sampling reveals that of the 400 accounts compiled,
approximately 235 include charges for land line services, approximately 52 accounts include
charges for cellular services, and that 113 accounts include charges for both land line and
cellular services.  Accordingly, Asset Acceptance argues that the Court will be required to
conduct an individual inquiry into each of the debtor's bills to determine which debts were time-
barred when Asset Acceptance filed the state court lawsuits.

A review of these documents, however, reveals that identifying members of the proposed
class is not as difficult as Asset Acceptance suggests.  Instead, the process of identifying class
membership and proof of class members' FDCPA claims are ministerial in nature because the
information can be easily extracted from the class members' phone bills.  *Compare Lau v. Arrow
Fin, Servs.,* LLC, 245 F.R.D. 620 (N.D. Ill. 2007) (inquiring into each class member's records to
determine class membership does not preclude class certification) *with Simer v. Rios*, 661 F.2d
655, 669 (7th Cir. 1981) (membership in class depended on individual's state of mind); *Fletcher
v. ZLB Behring LLC,* 245 F.R.D. 328, 332 (N.D. Ill. 2006) (proof of fraud allegations were
plaintiff-specific).  Under the present circumstances, whether an individual fits the definition of
the proposed class, as well as the evidence supporting their FDCPA claims, can be determined
on an objective, class-wide basis, and thus Asset Acceptance's argument that liability questions
are not subject to class-wide proof fails.

B.        Superiority

Finally, the Court must determine whether a class action is superior to other methods for
the adjudication of the proposed class' claims.  *See Szabo,* 249 F.3d at 676.  A class does not
satisfy the superiority requirement if its claims are not governed by the same legal rules.  *See In*

10

*re Bridgestone/Firestone,* 288 F.3d at 1015.  Here, the proposed class' claims concern the same

alleged violations of the FDCPA, namely, whether Asset Acceptance's conduct constitutes an

unfair or deceptive collection practice.  *See* 15 U.S.C. §§ 1692e, 1692f.  In addition, the Seventh

Circuit teaches that class treatment for actions involving thousands of consumer class members

with the same claim are superior to individual actions:

> Rule 23(b)(3) was designed for situations such as this, in which the potential
> recovery is too slight to support individual suits, but injury is substantial in the
> aggregate.  Reliance on federal law avoids the complications that can plague
> multi-state classes under state law, and society may gain from the deterrent effect
> of financial awards.

*Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006) (internal citations

omitted); *see also Cicilline,* 542 F.Supp.2d at 838 ("Class certification is usually considered a

superior method of adjudicating claims involving standardized conduct.").  The Court's

conclusion that a class action is superior to individual lawsuits under the circumstances is also

supported by "the policy at the very core of the class action mechanism[,]" which "is to

overcome the problem that small recoveries do not provide the incentive for any individual to

bring a solo action prosecuting his or her rights."  *Mace v. Van Ru Credit Corp.,* 109 F.3d 338,

344 (7th Cir. 1997).  Plaintiffs have thus established superiority under Rule 23(b)(3).

11

## <u>CONCLUSION</u>

For these reasons, the Court grants Plaintiff's Motion For Class Certification pursuant to

Federal Rule of Civil Procedure 23.

**Dated:**  June 26, 2008

ENTERED

**AMY J. ST. EVE**
**United States District Judge**

12

**Exhibit 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL PARISH, CURTIS L. OATS,<br>LEILA KHOURY, SEAN DRISCOLL, CARLA<br>LOFTON, ROY CLEAVES, LISA BROWN,<br>DAN TAYLOR, DEAN MILLER, KEVIN<br>SANDERS, STACEY CLARK, and<br>CARLOTTE WATSON,**<br><br>        **Plaintiffs,**<br><br>    **vs.**<br><br>**SHERIFF OF COOK COUNTY and<br>COOK COUNTY, ILLINOIS,**<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Case No. 07 4369**<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY,  District Judge:

        Michael Parish and eleven other plaintiffs have sued the Sheriff of Cook County

and Cook County for damages under 42 U.S.C. § 1983.  Plaintiffs allege that the

defendants maintained a policy or practice of deliberate indifference to their serious

medical needs and thus violated their Fourteenth Amendment rights while they were

confined at the Cook County Jail (CCJ).  Plaintiffs have moved to certify a class action

pursuant to Federal Rule of Civil Procedure 23(b)(3).  For the reasons stated below, the

Court grants plaintiffs' motion

### Facts

        The Court takes the following facts from plaintiffs' Second Amended Complaint.

Plaintiffs allege that the defendants have implemented a policy of denying or delaying

necessary prescription medication to detainees at CCJ.  The policy allows medical

technicians to deny various kinds of necessary prescribed medication solely on the basis of a "brief and cursory interview," without inquiring into a detainee's medical history and without consulting a physician.  2nd Am. Compl., ¶¶ A.c., B.c.

Plaintiffs divide their allegations into two general categories:  psychotropic medication and non-psychotropic medication.  Specifically, plaintiffs contend that the defendants' policy allows medical technicians to deny prescribed psychotropic medication to detainees after a short interview.  Instead, these detainees are routinely given anti-depressants, which are less costly than the psychotropic medications.  Several of the plaintiffs reported suffering behavioral problems while on anti-depressants that they had not experienced while taking their prescribed psychotropic medication.

With respect to detainees who have been prescribed non-psychotropic medication, plaintiffs allege that medical histories are taken in overcrowded areas with little privacy.  They also allege that the defendants' policy allows medical technicians to discontinue prescribed medications required to prevent serious injury or death.  The policy also prohibits physicians at the jail from prescribing medication for chronic pain.  Finally, plaintiffs allege that there is no speedy or efficient procedure that allows a detainee to see a physician after a medical technician has denied any form of medication.

Parish alleges that he was transferred to the jail on September 27, 2005 from the Illinois Department of Corrections, where he had received psychotropic medication on a regular basis.  Although he arrived at the jail with the medication, the medical technician concluded that Parish should no longer receive the psychotropic medication.  Parish tried to obtain the medication for nine months.  After an unsuccessful suicide attempt,

2

Parish was finally prescribed the medication.  Parish was released in 2006 but returned to the CCJ in 2007.  Although Parish informed the medical technician of his need for psychotropic mediation, the medical technician again denied him the medication.  Parish tried repeatedly to see a physician.  Only after another unsuccessful suicide attempt was he finally permitted to see a physician who prescribed psychotropic medication.

The remaining plaintiffs all allege that at their intake interviews , they informed medical technicians of their condition and their prescribed medications.  Nevertheless, the medical technicians denied them medications prescribed for conditions including mental illness, severe chronic pain, enlarged prostate, heart disease, acid reflux, congestive heart failure, asthma, hepatitis C, and a surgical wound.  As a result, the plaintiffs suffered a variety of adverse consequences, including behavioral problems, severe pain, and an infection requiring hospitalization.

Plaintiffs filed suit in August 2007.  They contend that defendants implemented a policy or practice at the CCJ of denying necessary prescribed medication in a manner that constitutes deliberate indifference to their serious medical needs, in violation of their Fourteenth Amendment rights.  Plaintiffs have moved the Court to certify, under Federal Rule of Civil Procedure 23(b)(3), a class of "all persons confined at the Cook County Jail on and after August 3, 2005 who provided notice that he or she had been taking prescription medication for a serious health need and who was not provided with appropriate medication within 24 hours thereafter."

## Discussion

The Court may certify a case as a class action if the party seeking certification demonstrates that it has met all the requirements of Rule 23(a) and one of the

3

requirements of 23(b).  Under Rule 23(a), the party must prove that the class is so

numerous that joinder of all members is impracticable; there are questions of law or fact

common to the proposed class; the class representatives' claims are typical of the

claims of the class; and the representatives will fairly and adequately represent the

interests of the class.  Fed. R. Civ. P. 23(a)(1)-(4).  In this case, plaintiffs seek

certification under Rule 23(b)(3).  To succeed, they must show that "questions of law or

fact common to the members of the class predominate over any questions affecting

individual members, and a class action is superior to other available methods for the fair

and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

Plaintiffs bear "the burden of demonstrating that certification is appropriate."

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).  The

Court need not rely solely on the allegations in plaintiffs' complaint in assessing whether

to certify a class, but instead "should make whatever factual and legal inquiries are

required under Rule 23."  *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76 (7th

Cir. 2001).

A.      **Numerosity**

Rule 23(a)(1) requires that a class be so numerous that joinder of all its members

is impracticable.  Courts may not rely on conclusory allegations as to the size of a class

or the impracticability of joinder, *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.

1989), and may require that a plaintiff prove class size through affidavits or other

evidence.  *Szabo*, 249 F.3d at 676.  The plaintiff need not, however, specify the exact

number of persons in the class.  *Marcial*, 880 F.2d at 957.

4

In this case, the proposed class consists of detainees who requested but were denied necessary prescribed medications while confined at CCJ on or after August 3, 2005. Plaintiffs first based their claim of numerosity on allegations that they had uncovered over 300 additional detainees who filed grievances concerning the denial of prescription medication. Defendants pointed out that there was no evidence that the grievances included people who were similarly situated to plaintiffs.

The Court requested that the plaintiffs submit additional evidence of numerosity. Plaintiffs submitted over 180 affidavits executed by putative class members, an excerpt of a report by the court-appointed monitor in *Duran v. Sheahan*, Case No. 74 C 2949 (N.D. Ill.), a 2008 report by the United States Department of Justice on conditions at CCJ, and the depositions of three former CCJ employees.

Defendants attack the affidavits as "cookie-cutter" documents with only "three or four-line complaints" but make no mention of the other evidence offered. Def. Supp. Resp. at 1. Defendants' argument is unavailing. Other courts have accepted similar affidavits to support numerosity. *See, e.g., Jackson v. Sheriff of Cook County*, No. 06 C 0493, 2006 WL 3718041, at *3 n. 7 (N.D. Ill. Dec. 14, 2006) (finding that the fact that fourteen affidavits submitted in support of class certification contained mostly boilerplate text did not diminish their likely veracity). The affidavits are statements made under oath, and defendants have not produced anything suggesting that they are false or untrustworthy. In addition, the reports by the court-appointed monitor and the Department of Justice reflect that numerous detainees have complained that they have been denied prescription medication. The Court finds the affidavits and the other evidence plaintiffs have submitted sufficient to establish the requisite numerosity.

5

**B.      Commonality**

Rule 23(a)(2) requires the existence of questions of law or fact common to the class.  "'A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2).'"  *Keele v. Wexler*, 149 F.3d 589*,* 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  A defendant's pattern of standardized conduct generally is sufficient to constitute a common nucleus of operative facts.  *Id.*

Plaintiffs contend that there are common questions of law and fact with respect to the existence and the constitutionality of the policy.  Defendants argue that determining whether the decision to discontinue particular medications amounts to deliberate indifference requires an individualized inquiry.

Defendants' argument improperly conflates the Rule 23(b)(3) requirement of *predominance* of common issues with the Rule 23(a)(2) requirement of *existence* of common issues.  In any event, defendants appear to have misconstrued plaintiffs' claims.  Plaintiffs' focus, at least for liability purposes, is on the defendants' alleged policy of allowing unqualified personnel to usurp decisions made by medical doctors and other categorical policies, not on the particulars of individualized decisions.  When "defendants have engaged in standardized conduct toward members of the proposed class," the class satisfies Rule 23(a)(2)'s commonality requirement.  *Keele*, 149 F.3d at 594.

In this case, plaintiffs have identified two factual and legal issues common to the class:  whether defendants enforce the alleged policy and whether that policy violates

6

the Fourteenth Amendment.  A common legal theory is generally sufficient to support commonality.  *Id.*  Plaintiffs' claims clearly share the same legal theory and therefore meet the commonality requirement.  *See Arreola v. Godinez*, --- F.3d ---, No. 07-1700, 2008 WL 4553059 (7th Cir. Oct. 14, 2008) (finding that jail detainees' claims challenging the constitutionality of a medical policy met the commonality requirement); *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *5 (N.D. Ill. April 25, 2007) (finding commonality requirement satisfied when detainee class challenged the constitutionality of a blanket strip search policy); *Jackson*, 2006 WL 3718041, at *4 (finding that plaintiffs' challenge to jail's standardized STD testing met the commonality requirement even though factual distinctions between class members existed).

## C.     Typicality

The typicality requirement focuses on "whether the named representatives' claims have the same essential characteristics as the claims of the class at large."  *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).  The representatives' claims are "typical if [they] arise[ ] from the same event or practice or course of conduct that gives rise the claims of the other class members and [their] claims are based on the same legal theory."  *Id.*  Factual distinctions between the representative parties' claims and the class members' claims does not destroy typicality so long as the claims share the same legal theory.  *Id.*

Plaintiffs laid out their own factual allegations and later produced 180 affidavits in support of their claim of typicality.  Again, defendants' arguments focus on predominance rather than typicality.  In essence, they argue that the named plaintiffs'

7

claims vary as to the type of illness complained of and the type of medication at issue. Defendants also contend that medical follow-up differed drastically among the plaintiffs and that these differences destroy typicality.

Between the complaint and the supplemental affidavits, the plaintiffs have met their burden with respect to typicality. Although the affidavits differ with respect to the individual affiants' particular medical needs and prescriptions, each affiant swore that she notified CCJ personnel of her condition and her prescription, and that she either never received the medication or received it days or weeks later. These are precisely the underpinnings of the named plaintiffs' claims. Because the "representatives' claims have the same essential characteristics of the class at large," plaintiffs have satisfied the typicality requirement. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (internal quotation marks and citation omitted).

## D.    Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, the interests of the representative parties must coincide with those of the rest of the class, and class counsel must be prepared and able to prosecute the action effectively. *See Retired Police Ass'n*, 7 F.3d at 598; *Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 950 (N.D. Ill. 2007)**.**

Defendants do not challenge the adequacy of plaintiffs' counsel, nor do they contend plaintiffs' interests are at odds with those of other class members. Instead, defendants focus their objections on the individual plaintiffs' alleged lack of credibility. In

8

support, defendants list the criminal histories of eight plaintiffs, which include convictions for drug possession, robbery, and theft.  Defendants assert that felons cannot be adequate class representatives, but they cite only a Second Circuit decision stating that district courts may consider credibility in adequacy of representation determinations. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2nd Cir. 1998).

This argument is lacking in merit.  Several courts have certified or have approved the certification of classes of prisoner and detainee plaintiffs.  *Arreola*, 2008 WL 4553059, at *8-*11; *Jackson*, 2006 WL 3718041, at *5.  If defendants were correct, there would be no such thing as a class action in the prison or jail context.  In any event, defendants have failed to provide any basis to believe that the named plaintiffs' criminal histories differentiate them from other class members or make their interests different from those of the class as a whole.

**E.     Predominance and superiority**

Rule 23(b)(3) requires the Court to find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Generally, when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation.  *See General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 n.15 (1982) ("Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees."); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.

9

1992) (holding that certification was appropriate when plaintiffs alleged that defendant had "an ongoing scheme to defraud and deceive prospective students").

Plaintiffs challenge what they allege are policies and practices applied to the entire detainee population.  Defendants contend that a class would be unmanageable because there are too many individual issues.  Defendants assert that to determine liability, the Court will have to examine at least nine specific questions, including the relative urgency of each individual's need for medication, whether CCJ personnel were subjectively aware of each individual detainee's serious medical need, and the actual harm suffered by each individual.  They maintain that individual determinations are the only way to resolve a deliberate indifference claim.

As the Court previously noted, plaintiffs' claims focus on the policy of allowing CCJ personnel lacking medical degrees to in effect overrule decisions made by medical doctors regarding their patients' medical needs, as well as other allegedly categorically applied policies.  Plaintiffs' primary contention is that the creation and execution of these policy amounts to deliberate indifference.  In this regard, the individual stories of particular detainees may be illustrative, but they are unlikely to be determinative of the issue of liability.  The predominant issues in the litigation, at least with regard to liability, will be the existence and constitutionality of the defendants' alleged policies.  A class action is the most efficient device for this kind of case because the legality of the policies can be determined in one proceeding.

By contrast, determination of damages for the class members likely will have to be done individually, as the nature and extent of any harm are likely to vary from person to person.  Rule 23, however, provides enough flexibility to deal with that while still

10

certifying a class.  The Court may bifurcate liability and damages trials or appoint a magistrate judge to preside over individual damages proceedings.  *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  As the Seventh Circuit stated earlier this month, "[a]lthough the extent of each class member's damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts."  *Arreola*, 2008 WL 4553059, at *11 (noting that the presence of individual damages issues did not preclude certification of a class where the claim alleged deliberate indifference to the medical needs of jail detainees).  This is precisely such a case.  The core issues, which predominate over all others, are the common issues the Court has previously identified.

### Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for class certification [docket no. 21].  The Court certifies the following class under Rule 23(b)(3):  all persons confined at the Cook County Jail on and after August 3, 2005 who provided notice that he or she had been taking prescription medication for a serious health need and who was not provided with appropriate medication within 24 hours thereafter.  The case is set for a status hearing on November 13, 2008 at 9:30 a.m.  Counsel are directed to confer regarding a proposed form of class notice and to submit a proposal or proposals to the Court by November 10, 2008.

MATTHEW F. KENNELLY
United States District Judge

Date: October 24, 2008

11

**Exhibit 5**

7-3 Shift

0700 Per Sgt. Roldan, this inmate has been shackled + handcuffed. Mom's Program

This inmate is restricted to her bed because her water has broken.

1000 All is quiet w/no movement.

1100 QC Pendelton on lunch.

1320HRS. ERT Officers Lewis + Prusa here.

500 Per. Sgt. Johnson inmate is shackled + handcuffed. MOM's Program

2014 - Patient is in active labor Dr issued order for Shackles to be removed Notified Sgt Johnson.

2300 - Patient is in labor per the Doctor, no Shackle order is present in envelope. Cuffs were removed Patient is in labor.

0030 - Baby Delivered.

00:40 - Transported to 4-south √211

0250 -