IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Catherine Zaborowski and | ) | |
| Simone Jackson, individually and on | ) | |
| behalf of a class, | ) | |
| | ) | |
| *Plaintiffs,* | ) | No. 08 CV 6946 |
| -vs- | ) | |
| | ) | |
| Sheriff of Cook County and Cook | ) | *(Judge St. Eve)* |
| County, Illinois, | ) | |
| | ) | |
| *Defendants.* | ) | |

# PLAINTIFFS' REPLY IN SUPPORT OF
# MOTION FOR CLASS CERTIFICATION

Plaintiffs challenge the Sheriff's "shackling policy" which requires that pregnant women in his custody be shackled during labor and during recovery following childbirth. Plaintiffs contend that this "shackling policy" is unconstitutional. (Amended Complaint, ¶17.) Plaintiffs also contend, in a supplemental state law claim, that the Sheriff's policy violates Illinois law. (Amended Complaint, ¶18.)

Now before the Court is plaintiffs' motion for class certification. Defendants oppose class certification, raising a variety of meritless arguments. Plaintiffs respond to defendants' arguments below and demonstrate that this case should be allowed to proceed as a class action under Rule 23(b)(3) for

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

## I.   Shackling Pregnant Woman during Labor Causes Harm

Defendants claim that "none of the currently named plaintiffs suffered any physical or actual damages" as a result of the shackling policy. (Def.Mem. 11-12.) This is absurd: shackling a pregnant woman during labor causes harm.

The American College of Obstetricians and Gynecologists has concluded that "[t]he practice of shackling an incarcerated woman in labor may not only compromise her health care but is demeaning and unnecessary. . . . Women [who have been shackled during labor] describe the inability to move to allay the pains of labor, the bruising caused by chain belts across the abdomen, and the deeply felt loss of dignity." (Exhibit 1, *infra,* Letter, Ralph Hale, MD to The Rebecca Project for Human Rights, June 12, 2007, available at   http://www.acog.org/departments/underserved/20070612SaarLTR.pdf, visited September 14, 2009.)

Named plaintiff Simone Jackson could not walk to quicken her labor because defendants' shackling policy required that she be shackled to her hospital bed. (Exhibit 2, *infra*, Jackson Dep. 42:17-21.) Defendants' shackling policy thus lengthened the amount of time Jackson spent in labor and thereby increased the amount of her pain. This increase in the amount of pain caused "actual damages" because the unnecessary infliction of pain is actionable under the Due Process Clause of the Fourteenth Amendment

without proof of an "objective" injury. *Edwards v. Snyder,* 478 F.3d 827, 832 (7th Cir. 2007).

## II.   The Class Definition Is Not "Unworkable"

Defendants assert that the proposed class definition is "unworkable" because it includes woman "who will be shackled" during labor. (Def.Mem. 12.) Defendants do not contend that they have abandoned the Sheriff's shackling policy. Nor do defendants deny that they intend to continue to require the shackling of every woman who is transported from the jail to a hospital for childbirth. Thus, the number of woman aggrieved by the shackling policy will continue to grow until the Sheriff abandons this policy. If, as plaintiffs request, the Court allows the case to proceed as a class action, every woman who has been subjected to the shackling policy should be bound by the final judgment.

Defendants are in error in asserting that plaintiffs could seek an injunction to prohibit future use of the shackling policy. (Def.Mem. 12.) The law in this Circuit does not permit plaintiffs to obtain injunctive relief. *Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008) and *Robinson v. City of Chicago*, 868 F.2d 959, 965-68 (7th Cir. 1989) foreclose any attempt by plaintiff to secure injunctive relief, either individually or for a Rule 23(b)(2) class.

Defendants are also mistaken in claiming that it is impossible to identify women aggrieved by the shackling policy. (Def.Mem. 12.) Defendants have to date been able to locate "documents which would reveal the names of

potential class members." (Def.Mem. 13.) These documents – which do not fully satisfy plaintiffs' outstanding discovery requests – identify 49 women (in addition to the five women who are parties to pending lawsuits) who gave birth while in the custody of the Sheriff. The first and last names of these women are set out in Exhibit 3. (The last names are redacted in the public filing of this memorandum.)

### III. The Constitutionality of the Shackling Policy Should Be Decided on a Class Basis

Defendants seek to argue that the constitutionality of the shackling policy must be decided on a case by case basis. (Def.Mem. 5-6.) This argument is without merit because the Sheriff requires correctional officers to apply the shackling policy to all women giving birth who are in the custody of the Sheriff

Plaintiffs allege that defendant Sheriff requires that all pregnant women in his custody be shackled during labor and during recovery following labor. (Amended Complaint, ¶17.) Plaintiffs supported their motion for class certification with the Rule 30(b)(6) deposition of Superintendent Holmes showing that this policy was in effect through at least though August of 2008. (Motion for Class Certification at 2, 4.) Sheriff Dart stated that the policy was still being applied on June 25, 2009, when he publicly acknowledged and defended the policy, explaining that "[a]nytime a detainee is taken outside the jail for medical treatment, he or she becomes an immediate escape risk." (Exhibit 4, *infra*.) Plaintiffs confirmed that defendants continue to apply the

shackling in the Rule 30(b)(6) deposition of deposition of Superintendent Hickerson (taken on July 9, 2009, after plaintiffs filed their class motion).

Superintendent Hickerson testified that the Sheriff has not made any changes in his shackling policy after August of 2008. (Exhibit 5, Hickerson Deposition 33:5-8.) The Sheriff's policy continues to be that when a pregnant woman comes to a hospital for childbirth, "we follow the procedures that we have a Department of Corrections inmate." (Exhibit 5, Hickerson Deposition 41:17-19). As Hickerson explained (Exhibit 5, Hickerson Deposition 43:11-45:7):

> Q: The woman from Division 3 that is pregnant and was brought to the hospital for purposes of childbirth would be shackled in a room, correct?
>
> Hickerson: Correct.
>
> Q: And her leg – one leg would be shackled to the bed, correct?
> A: Yes, sir.
>
> Q: And a hand would be shackled to the bed?
> A: Cuffed to the bed.
>
> Q: Cuffed to the bed?
> A: Yes, sir.
>
> Q: The guard that's sitting in the room, [44] the armed guard that's sitting in the room under the practice and policy of the Sheriff would be required to shackle the female to her bed, correct?
> A: Yes.
>
> Q: The female who was pregnant and at the hospital from Division 3 for purposes of giving birth would remain shackled pursuant to the practice of the Sheriff up until the point there was a direction from a doctor, correct?
> A. Yes.

\*\*\*

Q: For a woman that's in Division 3 that's hospitalized, the guard upon notice or an order -- receiving an order from a doctor would have to contact his or her supervisor in regards to the doctor's order to remove the shackles, correct?

A: [45] Yes.

Q: Only after the guard received approval from his or her supervisor would the guard then remove the shackles from the woman in Division 3 that is hospitalized for purposes of delivering a child?

A: Unless it was an emergency.

Plaintiffs expect to prove that the Sheriff's shackling policy is contrary to *May v. Sheahan,* 226 F.3d 876 (7th Cir. 2000). There, the Seventh Circuit held that "the use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *Id.* at 884. Plaintiffs will support their case with evidence that the Sheriff's policy of shackling a woman while she is in labor, sometimes removing the restraints for the actual delivery and then replacing the shackles immediately after childbirth, is not rationally related to any legitimate non-punitive government purpose and is plainly excessive when an armed correctional officer is bedside during labor and delivery.[1]

---

[1] Defendants are mistaken in stating that this case is about "the constitutionality of the application of a statute to a situation." (Def.Mem. 5.) Plaintiffs are not challenging "the constitutionality of the application of that Illinois statute [730 ILCS 125/17.5] to a particular set of events." (Def.Mem. 2.) Plaintiffs' challenge is to the Sheriff's shackling policy, and not to any statute.

The Rule 30(b)(6) deposition of Superintendent Holmes makes plain that the shackling policy is applied to all hospitalized detainees (Exhibit 2 to Class Motion at 51:3-7); whether a baby is born through a vaginal birth or through cesarean delivery (Def.Mem. 5), is irrelevant. Plaintiffs' challenge to the shackling policy does not turn on whether the birthing mother is shackled hand and foot throughout delivery, or "merely" handcuffed during delivery and then "shackled only before and after delivery." *Id.* Neither the "particulars of when and how each plaintiff was shackled or handcuffed nor the particulars of the whole labor experience" (Def.Mem. 6), has any bearing on plaintiffs' claim that, under *May v. Sheahan, supra,* defendants' policy that all women be shackled during labor and immediately after delivery is unconstitutional.

The Seventh Circuit rejected a defendant's similar attempt to change the focus of a class claim in *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948 (7th Cir. 2006), a consumer credit class action. There, the named plaintiff limited the class claim to statutory damages, declining "to make person-specific arguments" that would have supported compensatory damages. *Id.* at 953. Defendant argued that individual determinations were nonetheless required; the district court agreed and denied class certification. *Id.* at 956. The Court of Appeals reversed, concluding that the legality of defendant's conduct could be resolved from "the four corners of the offer." *Id.* In this case,

the legality of defendants' shackling policy can be resolved from the policy itself, without regard to any "woman-specific argument."

*Murray* was applied by the district court in *Jackson v. Sheriff,* No. 6 CV 493, a case challenging the Sheriff's now abandoned urethral swab policy. There, the Sheriff sought to argue that class certification was improper because the legality of the procedure turned on whether each prisoner had consented to the procedure. *Jackson, supra,* Mem.Op., December 14, 2006, at 8 (attached as Exhibit 6). The district court rejected this argument, accepting plaintiffs' framing of the issue: that "the totality of circumstances at the receiving unit makes it impossible for anyone to give a valid consent to the insertion of the urethral swab." (Exhibit 6 at 8.) The district judge in *Jackson* thus concluded that "[t]his framing of the issue effectively shifts the debate towards questions that are resolvable without delving into an individualized analysis of minor factual discrepancies." *Id.* Plaintiffs in this case have similarly framed the issue to focus on the legality of the policy, irrespective of "minor factual discrepancies."

 Plaintiffs' challenge to the Sheriff's shackling policy in this case has nothing to do with whether a baby was born through a vaginal birth or through cesarean delivery. (Def.Mem. 5.) Nor does plaintiffs' challenge to the shackling policy turn on the type of restraints used. *Id.*

Plaintiffs do not bring this case to transform a ten-thousand dollar claim into a one hundred million dollar claim. (Def.Mem. 11.) Plaintiffs have

expressly requested, pursuant to Rule 23(C)(4) of the Federal Rules of Civil Procedure, that the case be maintained as a class action solely to adjudicate the legality of the Sheriff's shackling policy, and that all questions of damages for unnamed members of the class be reserved to individual damage actions. As the Seventh Circuit wrote in *Mejdrech v. Met-Coil Systems Corp.,* 319 F.3d 910 (7th Cir. 2003), "it makes good sense" to resolve the legality of the shackling policy in "one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *Id.* at 911.

Plaintiffs' challenge to the Sheriff's shackling policy is quite different from the claim of excessive detention before the Seventh Circuit in *Harper v. Sheriff,* No. 08-3413 (September 8, 2009). There, the Court of Appeals disapproved a district court's order allowing a case to proceed as a class action because the Seventh Circuit concluded that whether a person had been subjected to an excessive length of detention could only be determined in an individual basis because what is excessive would "depend on how long each detainee was held after bond was posted and what justifications there might be for the delay on that particular day or for that particular detainee—the time of day, whether the jail was processing an unusually large number of detainees at that time, whether other events occurring at the jail legitimately slowed processing times, whether the detainee's lack of cooperation delayed processing, etc." *Harper,* slip op. 7. There are no individual factors in defen-

dants' shackling policy, which requires shackling of all women who are taken from the Jail to a hospital for childbirth.

Plaintiffs demonstrate below that the Court should overrule defendants' remaining objections to class certification.

## IV.   Numerosity

After plaintiffs filed their opening memorandum, defendants located "documents which would reveal the names of potential class members." (Def.Mem. 13.) Although defendants have yet to produce all of the documents requested by plaintiffs, the documents produced to date identify 49 women who have given birth while in the custody of the Sheriff. These women (with surnames redacted in the public filing), are identified in Exhibit 3, *infra*

Although plaintiffs expect the actual class size to be greater than the 49 persons identified to date, a class of 49 members satisfies the "rule of thumb" for numerosity which this Court endorsed in *Cotton v. Asset Acceptance, LLC,* No. 07-C-5005 (N.D.Ill. June 26, 2008, Exhibit 3 to Class Motion). The Court should reject defendants' challenge to numerosity.

## V.   Commonality

Defendants advance the remarkable claim that "plaintiffs have identified no factual or legal issues common to the class." (Def.Mem. 7.) This contention is without merit: plaintiffs identified the common questions in their motion for class certification (at 6-7):

> The common question in this case is whether the use of bodily
> restraints on a pregnant woman during labor, delivery, or recov-

ery following delivery is "rationally related to a legitimate non-punitive government purpose," as required by *May v. Sheahan,* 226 F.3d 876, 884 (7th Cir. 2000). This question is "common to all potential class members," *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008), and satisfies the commonality requirement of Rule 23(a).

This case presents an overriding common question about the constitutionality of the use of bodily restraints on a pregnant woman during labor, delivery and recovery following delivery.

## VI.   Typicality

Defendants argue that the claims of the two named plaintiffs are not typical of those of the class because "Plaintiffs claim to draw class members from two sources, those in the MOMs program and those originating from Division 3." (Def.Mem. 8.) Defendants do not, however, present any evidence to support their claim that childbirth is different for a woman in the Sheriff's custody who is in the "MOM's program" than for a woman in the Sheriff's custody who is housed in "Division 3."

Defendants assert that the "MOM's program" is a drug rehabilitation program, for which pregnant female detainees are "screened, approved and placed." (Def.Mem. 8.) Defendants claim that those pregnant detainees who are not in the "MOM's program" are held in "Division 3" because "they chose not to participate in MOM's or were ineligible do[sic] to their criminal record." *Id.* Defendants do not, however, contend that the Sheriff's shackling policy is different for women in the "MOM's" program than for women in

"Division 3." Accordingly, the Court should reject defendants' challenge to the typicality requirement.

## VII.    Adequacy

Defendants assert that there is a conflict between the named plaintiffs and the unnamed members of the putative class because "the interests of the remaining class members cannot be identified to any reasonable degree." (Def.Mem. 9.) This is an unusual and meritless objection.

Persons who have been injured by application of an unlawful policy have the identical interest in obtaining a remedy for that injury. Defendants are unable to show any conflict between the named plaintiffs and the unnamed members of the putative class. Nor do defendants question the ability of plaintiffs' attorneys to represent the proposed class. The Court should reject defendants' objections to the adequacy of the class representations tand their attorneys.

## VIII.    Rule 23(b)(3)

Defendants agree than "when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation." (Def.Mem. 10.) Defendants assert in conclusory fashion that the constitutionality of the shackling policy is involves "highly individualized factual analyses." *Id.* Nowhere in their memorandum, however, do defendants seek to identify these "individualized factual analyses." This silence is not surprising: there are no "individual facts" about

whether the shackling policy requires that pregnant woman in the custody of the Sheriff be shackled during labor and during recovery after childbirth.

Defendants fail to acknowledge the superiority of a class action to resolve the legality of the shackling policy in a single proceeding. Defendants point out that there are now four pending cases challenging the shackling policy.[2] (Def.Mem. 2, 5-6.) Absent class certification, a ruling on the merits of the policy in any of the four cases would not be binding on the other three. But when "a class is certified, its members (unless they opt out of the class), and not just the named plaintiff, are bound by the judgment. *Wiesmueller v. Kosobucki,* 513 F.3d 784, 786 (7th Cir. 2008).

---

[2] Plaintiff do not, and will not, "seek to join" the plaintiffs in those three individual cases as class members. On the contrary, plaintiffs oppose defendants' pending motion for reassignment of the three other cases. (Record Item No. 37.)

## IX.  Conclusion

For the reasons above stated and those previously advanced, plaintiffs request that the Court order that this case be maintained as a class action for:

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

Respectfully submitted,

/s/ Kenneth N. Flaxman

Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200

Thomas G. Morrissey.
10249 S Western Ave
Chicago, Illinois 60643
(773) 233-7900

*Attorneys for Plaintiff*

**Exhibit 1**



June 12, 2007

Malika Saada Saar
Executive Director
The Rebecca Project for Human Rights
2309 18th Street, NW, 2nd Floor
Washington, DC 20009

Dear Ms. Saada Saar:

The American College of Obstetricians and Gynecologists (ACOG) is writing this letter in support of federal legislation to prohibit the practice of shackling incarcerated pregnant women in labor. This practice has already been outlawed in Illinois and in California. ACOG's District IX testified in support of the legislation in California: "Physical restraints have interfered with the ability of physicians to safely practice medicine by reducing their ability to assess and evaluate the physical condition of the mother and the fetus, and have similarly made the labor and delivery process more difficult than it needs to be; thus, overall putting the health and lives of the women and unborn children at risk. Typically these inmates have armed guards on-site, which should be more than adequate to protect personnel helping a pregnant, laboring woman or to prevent her from fleeing."

The practice of shackling an incarcerated woman in labor may not only compromise her health care but is demeaning and unnecessary. Most women in correctional facilities are incarcerated for non-violent crimes and are accompanied by guards when they are cared for in medical facilities. Testimonials from incarcerated women who went through labor with shackles confirm the emotional distress and the physical pain caused by the restraints. Women describe the inability to move to allay the pains of labor, the bruising caused by chain belts across the abdomen, and the deeply felt loss of dignity.

The safety of hospital personnel is paramount and for this reason, adequate correctional staff must be available to monitor incarcerated women in labor, both during transport to and from the correctional facility and during the hospital stay. However, the safety of personnel has not been compromised in the years since laws preventing shackling have been instituted in California and Illinois. This safety track record demonstrates the feasibility of preserving the dignity and providing compassionate care of incarcerated laboring women.

ACOG is committed to high quality obstetric care for all women. Incarcerated women in labor constitute a particularly vulnerable population. Preventing the practice of shackling these women is an important step toward assuring humanitarian care and social justice. If you need further assistance as the specifics of this legislation are developed, please do not hesitate to contact staff in our Department of Government Relations. Specifically, you can contact either Lucia DiVenere by phone at 202-863-2510 or via email at ldivenere@acog.org or Tara Straw by phone at 202-863-2512 or via email at tstraw@acog.org.

Sincerely,

*Ralph W. Hale MD*

Ralph Hale, MD
Executive Vice President

cc:      Janet Chapin, RN, MPH, Lucia DiVenere, Lisa Goldstein, MS, Tara Straw, Tara Linh Leaman, JD

**Exhibit 2**

1

1
2        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION

4   CATHERINE ZABOROWSKI and    )
    SIMONE JACKSON,              )
    Individually and on         )
5   behalf of a Class,          )
                                )
6                   Plaintiffs, )
                                )
7            -vs-               ) No. 08 CV 6946
                                )
8   SHERIFF OF COOK COUNTY      )
    and COOK COUNTY,            )
9   ILLINOIS,                   )
                                )
10                  Defendants. )

11

12          The deposition of SIMONE JACKSON

13   called by the Defendants for examination, taken

14   pursuant to the Federal Rules of Civil Procedure

15   of the United States District Courts pertaining

16   to the taking of depositions before MAUREEN A.

17   WOODMAN, a notary public within and for the

18   County of Cook and State of Illinois, at 500

19   Daley Center, Chicago, Illinois, on the 10th day

20   of March, 2009, at the hour of 9:30 o'clock a.m.

21

22

23

24

2

1    PRESENT:

2        THOMAS G. MORRISSEY, LTD.
         BY:  MR. THOMAS G. MORRISSEY
3            10249 South Western Avenue
             Chicago, Illinois  60643,
4
                    on behalf of the Plaintiffs;
5
         ASSISTANT STATE'S ATTORNEY
6        BY:  MR. PATRICK SMITH
             500 Daley Center
7            Chicago, Illinois  60602,

8                   on behalf of the Defendants.

9
     ALSO PRESENT:
10       Ms. Lindsey Shapiro

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                          I N D E X

2    WITNESS                                      PAGE

3    SIMONE JACKSON

4         Examination by Smith .............. 4-76

5

6                 - - - - - - - - - - - - - - - -

7

8

9                       E X H I B I T S

10   DEPOSITION EXHIBIT                          PAGE

11        1 ................................... 4
          2 ................................... 71
12

13

14

15

16

17

18

19

20

21

22

23

24

4

1          MR. SMITH:   Mark this as Exhibit No. 1.

2                              (WHEREUPON, said document

3                              was marked as Jackson

4                              Exhibit No. 1 for

5                              Identification.)

6                              (Witness was duly sworn.)

7                         SIMONE JACKSON,

8     called as a witness herein, after having been

9     first duly sworn, was examined and testified as

10    follows:

11                         EXAMINATION

12    BY MR. SMITH:

13        Q.   Let the record reflect this is the

14    deposition of Simone Jackson taken by agreement.

15                      Please identify yourself, spell

16    your complete name for the benefit of the court

17    reporter.

18        A.   My name is Simone Laverne Jackson.

19    S-I-M-O-N-E.  L-A-V-E-R-N.  J-A-C-K-S-O-N.

20        MR. SMITH:  This deposition is taken in the

21    lawsuit that's been filed by Ms. Jackson and Ms.

22    Zaborowski versus Sheriff of Cook County under

23    case number 086946.

24                      Mr. Morrissey, please identify yourself

5

1    for the record.

2         MR. MORISSEY:  My name is Thomas Morrissey.

3    I represent the plaintiffs.

4         MR. SMITH:  Thank you.

5    BY MR. SMITH:

6         Q.   Ms. Jackson, do you go by any other

7    names?

8         A.   I have.  Sandra Greer.

9         Q.   And any other names?

10        A.   No, sir.

11        Q.   What is your date of birth?

12        A.   My date of birth is December the 1st,

13   ███████

14        Q.   Have you ever used any other date of

15   births?

16        A.   No.

17        Q.   What about your Social Security number?

18        A.   My Social Security number is

19   329-███████

20        Q.   Have you used any other Social Security

21   numbers other than the one you have given the

22   court reporter?

23        A.   No.

24        Q.   Do you have a driver's license?

6

1          A.    I don't drive.

2          Q.    You don't drive?

3          A.    No.

4          Q.    Do you have an Illinois identification

5      card?

6          A.    Yes, I do.

7          Q.    May I see it, please.

8                          (Tendering document.)

9          A.    You need my Social Security card, too?

10         Q.    No.

11         MR. SMITH:  Let the record reflect I have

12     been tendered one Illinois state identification

13     number that reads that ID number 2███████████

14              I'm going to make this as an

15     exhibit, and this exhibit will be identified as

16     Simone Jackson Exhibit 1.  I'm going to leave it

17     right here so we'll make copies for you.  Make

18     sure it's returned to you.

19     BY MR. SMITH:

20         Q.    Where were you born?

21         A.    I was born here in Chicago, Illinois.

22         Q.    What hospital?

23         A.    Michael Reese.

24         Q.    And what is your level of education?

7

1        A.    I received a GED.  I have some college.

2        Q.    Okay.  What kind of college?

3        A.    I went to vocational culinary arts

4    program.  I had my sanitation license from the

5    State of Illinois.

6        Q.    What is that?

7        A.    Sanitation license?

8        Q.    Yes.  I don't know what that means.

9        A.    Okay.  Food sanitation license, that's

10   what I'm trying to say.  Excuse me.

11       Q.    Regarding food, sanitary food?

12       A.    Yes.

13       Q.    And when was that?

14       A.    I received that in 2002.  And I received

15   my GED in 1990.

16       Q.    1990?

17       A.    Uh-huh.

18       Q.    What neighborhood did you grow up in?

19       A.    Bronzeville.

20       Q.    Can you state your history of

21   employment, please, generally?

22       A.    Generally it's food service, temporary

23   jobs.

24       Q.    Let me cut you off to make it easier.

8

1    What was the first job you held?

2         A.    The first job I held was through the

3    Mayor's Office Summer Program.

4         Q.    And that was what year?

5         A.    Like '82, '83.

6         Q.    Okay.  And after that where did you go?

7         A.    I had worked at the Congress Hotel.  I

8    have worked at just various places.  I haven't

9    had a lot of employment through the years,

10   through my years.

11        Q.    You have?

12        A.    I haven't.  I have not.

13        Q.    How about this, how many different jobs

14   have you held from maybe age 18 until present?

15        A.    Maybe six.

16        Q.    And what was the longest job that you

17   held?

18        A.    The longest job I held was at the Navy

19   base at Great Lakes.

20        Q.    And how long was that for?

21        A.    Six months.

22        Q.    Six months?

23        A.    Uh-huh.

24        Q.    Why did you leave that job?

9

```
 1         A.    Mental reasons.

 2         Q.    Are you married?

 3         A.    No, I'm not.

 4         Q.    Do you have any children?

 5         A.    Yes, I have six.

 6         Q.    Six of them.  Okay.  Let's start off

 7    with the oldest.  What's the oldest child's name?

 8         A.    Sebon, S-E-B-O-N, Jackson.  He is 26.

 9         Q.    Sorry.  Who is his father?

10         A.    His father is Larry Redmond.  Allison

11    Porter, she is 21.  Her father is Brian Porter.

12    Marvellis Rubin.  His father is Marvellis Rubin.

13         Q.    How old is he?

14         A.    The father?

15         Q.    The third child.

16         A.    The third child is 19.

17         Q.    Three more to go.

18         A.    I know.

19         Q.    Helping you out, that's all.

20         A.    ████████████, she's 16, and her father's

21    Marveliss Rubin.

22         Q.    Where does she reside at?

23         A.    She resides at ████ East 73rd Street.

24         Q.    With who?
```

10

1         A.   With my mom and sister.  Where am I at?

2    ███████████████.  She is age nine.  Her father is

3    John ████████  And ████████████.  And she is

4    ten months.  And she resides -- you want to know

5    where?  She resides with me at ██████ West Monroe.

6    Also Whisper resides at the same address ██████

7    West Monroe.

8         Q.   And Whisper was the child that was born

9    in Stroger, correct?

10        A.   No.  Trinity.

11        Q.   Okay.  What was the date of her birth?

12        A.   May the 3rd, ██████

13        Q.   Where do you currently reside at again?

14        A.   ██████West Monroe.  Apartment B.

15   Chicago, Illinois.

16        Q.   Okay.  And who lives with you?

17        A.   My mom, my sister.

18        Q.   What's your mom's name?

19        A.   Ruth Pines.  P-I-N-E-S.

20        Q.   And who else?  Your two children?

21        A.   Yes, Whisper and Trinity.  And my sister

22   Memory Pines.  P-I-N-E-S.

23        Q.   Memory?

24        A.   Yes.  Her husband, Vernon.  And her two

11

1    children, Brilliance and Siasabon Pines.

2         Q.    Anybody else?

3         A.    That's it.

4         Q.    And Trinity, who's Trinity's father?

5         A.    Trinity's father is Lusher White.

6         Q.    Lusher with an L?

7         A.    With an L.

8         Q.    And where does he stay?

9         A.    He stay in Evanston, 1810 Darrell.

10        Q.    Does he pay child's support?

11        A.    Yes.

12        Q.    He does.  And is there a pending child

13   support case?

14        A.    Yes, there is.

15        Q.    Do you have any information regarding

16   that?

17        A.    No, not right now.

18        Q.    If I ask for it, will you give it to

19   your attorney?

20        A.    Yes, I will.

21        Q.    How long have you resided at that Monroe

22   residence?

23        A.    Last 18 months.  Prior to me coming home

24   from the Dwight, since January the 27th.

12

1        Q.   And prior to going into Cook County the

2   last time, where did you live at?

3        A.   ████████ East 73rd Street.

4        Q.   Regarding this complaint that you filed,

5   when did you -- what date did you enter the Cook

6   County jail?

7        A.   November the 1st, 2007.

8        Q.   And were you arrested by the CPD?

9        A.   Yes, sir.

10       Q.   And what was the charge?

11       A.   Burglary.

12       Q.   Burglary?

13       A.   Yes, sir.

14       Q.   What was your bond set at, do you

15   remember?

16       A.   I think 20,000.

17       Q.   After receiving a classification, where

18   were you assigned to, what division, three or

19   four?

20       A.   Division three.

21       Q.   Division three?

22       A.   Uh-huh.

23       Q.   And you were pregnant?

24       A.   Yes, I was.

13

1          Q.    Did you know how long you were pregnant,
2     how many months --
3          A.    I was 12 weeks from the time --
4          Q.    Let me finish the question.
5          A.    Excuse me.
6          Q.    How many months?
7          A.    12 weeks.
8          Q.    12 weeks?
9          A.    Yes.
10         Q.    And you were in division three, right?
11         A.    Three.
12         Q.    And you were then transferred, for lack
13    of a better word, to the MOMS program, correct?
14         A.    Yes.  I was offered that.
15         Q.    How long did you stay in division three
16    before you went to the MOMS program?
17         A.    About three weeks.  I left on the 21st
18    of November.
19         Q.    Let me ask you this, prior to giving
20    your deposition, did you have an opportunity to
21    review any material, any documents or anything?
22         A.    Like what?
23         Q.    Your complaint, did you read anything,
24    anything relating to this case?

14

1       A.   No, not really, no.  I already know the

2   case.  I know my complaint.

3       Q.   Okay.  So you have a good command of the

4   facts?

5       A.   So far, yeah.

6       Q.   Okay.

7       A.   To my knowledge.

8       Q.   Have you -- are you on any medication

9   right now?

10      A.   No, I'm not.

11      Q.   And have you had anything to drink --

12  don't me to be offensive or anything.

13      A.   None taken.

14      Q.   Any alcoholic drink in the last 12

15  hours?

16      A.   No, I'm not under the influence of any

17  type of alcohol.

18      Q.   Nothing going to impair your ability to

19  testify?

20      A.   Exactly.

21      Q.   Okay.  Now, tell us about the MOMS

22  program.  Is there a form that you have to fill

23  out or do you have to qualify to get into the

24  MOMS program, other than being pregnant?

15

1      A.    Yes.

2      Q.    What is that?  Tell us, please.

3      A.    To qualify you cannot have any

4  significant bond forfeitures, you can't have any

5  escapes in your background, any violent crimes

6  like homicide or armed robberies, anything of

7  that nature.  Also, of course, you have to be

8  pregnant.

9      Q.    I said that.

10     A.    I know you did.  And your bond have to

11  be a certain amount.  You have to have a bond for

12  one.

13     Q.    It can't be no bond?

14     A.    Right, and it has to be a certain amount

15  of bond.  Can't exceed over like 250,000 or

16  something of that nature, so it's a cap to it.

17     Q.    Okay.  Anything else, any other terms or

18  any --

19     A.    You have to have a -- acknowledge that

20  you have an addiction.  Addiction of chemicals or

21  gambling.

22     Q.    And did you have an addiction?

23     A.    Yes, I did.

24     Q.    What was your drug of choice?

16

1          A.    My drug of choice was heroin.

2          Q.    Heroin?

3          A.    Yes.

4          Q.    And how long had you been on heroin?

5          A.    I have been a user of heroin on and off

6     for the past 20 years.

7          Q.    20 years?

8          A.    Yeah.

9          Q.    Anything else, any other addictions?

10         A.    No.

11         Q.    Did you -- was this a physical form that

12    you had to fill out?

13               I have not had the benefit prior to

14    your deposition of getting a copy of like the

15    application form.  Is that what it's called?  Can

16    you help me out.

17         A.    Yeah.  Well, the initial interview.  I

18    was interviewed for it.

19         Q.    Is it like a one-on-one?

20         A.    A one-on-one.

21         Q.    Do you know whom you interviewed with?

22         A.    No, not personally.  No, I couldn't say

23    the deputy's name, the sheriff's name.

24         Q.    Was it a correctional officer or was it

17

1    a civilian?

2         A.    It was a correctional officer and in

3    uniform.   A Cook County Sheriff.

4         Q.    Okay.   Can I ask you, was it someone

5    that you knew in like division three?

6         A.    No.

7         Q.    But you don't know the person?

8         A.    I don't know the person.   Like I

9    never -- I wasn't constantly in contact with the

10   person that interview me.

11        Q.    Okay.   We already said that.   Okay.

12              And after that interview, what's

13   the next step then?

14        A.    The next step they called my references,

15   called the references that I gave.   I had to give

16   three references of the people who could tell

17   about what -- you know, my addiction, would I

18   benefit from the program, so on and so forth.

19   And they did that.

20              I was told by my mom and my sister

21   and my children's grandmother that they did call

22   them and asked them some questions about me,

23   would I -- you know, would I run, would I benefit

24   from the program.

18

1      Q.    Would I what?

2      A.    Would I escape, run, escape from the

3    program.   That's what I mean.

4              I also signed -- once I was

5    approved I signed an agreement like I was still

6    incarcerated.  I signed an agreement that I was

7    released on sheriff furlough, a furlough, so it

8    was like a bond slip paper with copies, you know.

9    I had a copy and so forth.

10     Q.    The documents that relate to the MOMS

11   program, those documents that you signed, did you

12   keep copies of those?

13     A.    I haven't got them.  I'm sure, yeah.

14   But I also know that they had copies.

15     Q.    If you find something of that nature,

16   you will hand it over to your attorney?

17     A.    Yes.

18     Q.    Okay.  And how long did the procedure

19   take, do you remember?

20     A.    From the time I was approved and left,

21   the day I left?

22     Q.    Yes.

23     A.    Oh, I left about eight, I got into

24   Haymarket 3:00 o'clock that afternoon.  At the

19

1    initial intake it took about maybe --

2        Q.   So it happens all in one day?

3        A.   It happens all in one day.  It takes a

4    whole day.

5        Q.   Okay.  Were there any provisions

6    regarding restrains or shackling or handcuffing

7    in the application form that you may have signed?

8        A.   Not -- no.

9        Q.   You don't remember?

10       A.   I'm pretty sure it wasn't.

11       Q.   Now, how do you get from the compound to

12   the Haymarket?

13       A.   Via a police car, a sheriff car.

14       Q.   And were you shackled?

15       A.   I was handcuffed.

16       Q.   How were you handcuffed, front or back?

17       A.   Front.  Front.

18       Q.   So for the record, it was just -- were

19   you standing there handcuffed on both your left

20   and your right wrists?

21       A.   Yes, sir.

22       Q.   Any other restraints?

23       A.   I also received what they call a home

24   monitoring device that was placed on my ankle.

20

1        Q.    And where was that placed on your ankle,
2    at the jail?
3        A.    No, at the MOMS program.
4        Q.    We're going to get to that.  We're
5    almost there.
6        A.    No problem.
7        Q.    So then you have the handcuffs then.
8    Once you get to Haymarket what's the procedure?
9    What's the intake there?  What do you do?
10       A.    I go in and talk to the staff of
11   Haymarket and they ask me -- they place me in
12   their database and ask me what's my name, what's
13   my Cook County jail number and my emergency
14   contact.  They also at the same time the sheriff
15   is placing me on the monitor and logging me in
16   the system so the bracelet can monitor my
17   whereabouts inside the facility of Haymarket.
18       Q.    Okay.  And the sheriff does that part of
19   it, the ankle bracelet?
20       A.    Yes.
21       Q.    And do you remember who you spoke with
22   at Haymarket during that initial interview?
23       A.    Her name was Diedra.
24       Q.    Diedra?

21

1      A.    Welch.

2      Q.    And how long does that procedure take?

3      A.    About 30, 30 minutes.

4      Q.    And are the ground rules discussed with

5   you?

6      A.    Yeah, ground rules pertaining to

7   Haymarket facility.  They're a unit it in itself,

8   no cussing.  I signed the paper saying I agree to

9   their rules, Haymarket rules, and also the rules

10  of Cook County department.

11     Q.    Okay.  And just generally what were some

12  of the ground rules?

13     A.    No profanity, take a shower daily, be

14  prepared for all meetings.

15     Q.    Meetings?

16     A.    Meetings.  Also if I had any problems,

17  who my counselor was, if I needed any special

18  care like medications, psychiatric care they

19  would provide that, if it was an emergency as far

20  as my pregnancy they will provide medical care

21  immediately, things of that nature.

22     Q.    Now, in division three you were housed

23  in a traditional type cell, correct?

24     A.    Yes.

22

1      Q.    At Haymarket how are you housed?

2      A.    I'm housed in like a bedroom, you know.

3      Q.    Never been there.

4      A.    I'm trying to explain.

5      Q.    Right.

6      A.    Bedroom in your house.  It's like a room

7   like.

8      Q.    How many ladies in each room?

9      A.    It was -- two to a room and sometimes

10   one to a room.  The clients that have one to a

11   room, they were there were they children.  They

12   either had their baby with them or just had they

13   children or child.

14      Q.    I see.  Okay.  And were there any -- how

15   was security run at Haymarket MOMS?

16      A.    24-hour security.

17      Q.    Do you understand my question?

18      A.    Yes.  24-hour security.  Upon entering

19   the building, there is a security guard, you have

20   to show ID.  On the unit that I was in it was a

21   locked unit, so if -- I couldn't get off the

22   elevator -- I mean get on the elevator without a

23   key.  And I couldn't leave out like the exit

24   doors without an alarm sounding very loud.  So it

23

1    was a locked unit.

2         Q.    But are you in any restraints while

3    you're in your room or in the -- is there like a

4    day room, something similar to a day room?

5         A.    Yes, it is.

6         Q.    And at any time are any handcuffs placed

7    on you or leg irons or anything?

8         A.    No, sir.

9         Q.    No?

10        A.    No.

11        Q.    And is the door to the room locked at

12   any time?

13        A.    No locked doors other than the ones that

14   lead you to the street.  Lead you out there.

15        Q.    Okay.

16        A.    Out of the facility.

17        Q.    But your bedroom door, that's open?

18        A.    Yeah, it's open.  You can close it but

19   you can't lock it.

20        Q.    And how long were you there at MOMS?

21        A.    I was there from November 21 to

22   September the -- November the 21st, '07, to

23   September the 23rd, '08.

24        Q.    November 21st of '07 to September of

24

1    '08?

2        A.    Yes.  11 months.

3        Q.    I see.  You came back there?

4        A.    No, I went from the jail to Haymarket.

5    I had my baby.  I stayed there until September

6    the 23rd.  Then I went to sheriff furlough from

7    September the 23rd to November --

8        Q.    I meant after you had your baby?

9        A.    I stayed there.

10       Q.    You went back for the MOMS program?

11       A.    Yeah.

12       Q.    Okay.

13       A.    I was just considering that I never

14   left.  I just went to the hospital.

15       Q.    Okay.  When did you go in labor then?

16             You got there on November 21st and

17   when did you start going into labor?

18       A.    May the 3rd.

19       Q.    So you were there for quite awhile

20   before you even went into labor?

21       A.    Exactly.

22       Q.    Do you know how many -- how long people

23   would normally stay, inmates, just if you knew?

24   Do you know?

25

1      A.   Well, I have one when I first entered

2    the facility a lady there with her child, she had

3    been there a year.

4      Q.   Okay.  All right.  During that time in

5    the mother's program from November 21 until May

6    5th, did you have any problems with any of the

7    staff that you want to testify to?

8      A.   Well, yes.  I have disagreements.  I had

9    attitude problems.

10     Q.   You did?

11     A.   Me, me, myself.  I had an attitude

12   problem.

13     Q.   Were you written up for any type of

14   disciplinary problems where it was written up?

15     A.   Yes.

16     Q.   You did?

17     A.   Yes, yes.

18     Q.   And how many times?

19     A.   About twice.

20     Q.   Twice?

21     A.   Yes, sir.

22     Q.   And as a result of being written up for

23   disciplinary problems, what came of that?  Is

24   there a penalty or punishment?

26

1      A.   Yes, I will receive -- I had to write an

2    essay.  I would have to lose my privilege of

3    ordering food out.

4      Q.   Carry-outs?

5      A.   Carry-outs for a privilege.  I have lost

6    that before.  Things like that.

7      Q.   And did you keep any of these reports or

8    disciplinary tickets I think they're called, do

9    you have any of those with you?

10      A.   No.  But all my reports and things that

11    as far as my treatment in Haymarket file, as far

12    as that, my treatment.

13      Q.   Did you keep any reports or anything

14    from your stay at Cook County Jail or Haymarket,

15    were they all kept at the facility?

16      A.   Yeah, I have kept like group things

17    like -- like if you gave a seminar or something,

18    I would keep that, books they would give us.

19    Things pertaining to my getting better.

20      Q.   Nothing really relevant to the lawsuit?

21      A.   No, nothing relevant to the lawsuit.

22      Q.   Now, on May 5th, let me ask this, when

23    is it determined that you're going into labor I

24    guess?  I mean when is it decided?

27

1        A.     That I'm actually in labor?

2        Q.     Yes.

3        A.     The doctor said when I go to the

4    hospital, when the doctor checked me or the

5    nurse, they say that I'm in labor.

6        Q.     So there's somebody at the MOMS program?

7        A.     Uh-uh.  I have to be transferred to the

8    hospital to truly determine that I am in labor.

9        Q.     I guess -- this may sound silly.  What

10   prompts that?  How do you notify the MOMS people

11   to take you?  What is required?  I mean do they

12   do a check on you, a medical check on you in MOMS

13   to say, well, we better go over this -- you

14   better go over to Stroger?  Or is this by your

15   word only?

16       A.     Basically, yes, it's by my word of -- I

17   don't want to say maybe.  It's by my word and the

18   symptoms that I described to them to say that,

19   okay, we'll make a phone call and call the

20   ambulance.

21       Q.     Symptoms that would be commonplace?

22       A.     With labor, yes.

23       Q.     Okay.  And that's what happened in your

24   case?

28

1      A.   Yes.

2      Q.   Okay.  So then you're taken then to

3   Stroger, correct?

4      A.   Well, not just taken to Stroger.

5   They'll call an ambulance.  The ambulance, they

6   make the decision on what hospital I go to.  It

7   was usually Mount Sinai or Stroger.  I just

8   happened to get Stroger.

9      Q.   Okay.  Tell us then, why don't you tell

10  us in your case back on May 5th what happened

11  that day?

12     A.   May 5th?

13     Q.   Yes, that's the day --

14     MR. MORISSEY:  No, no.  She didn't say that.

15  She said May 3rd.

16     MR. SMITH:  I'm sorry.  I didn't mean to

17  trick you up.  I thought you said May 5th.

18  BY MR. SMITH:

19     Q.   May 3rd.  Okay.

20     A.   Yes.

21     Q.   On May 3rd, tell me about that date.

22     A.   When I went in labor?

23     Q.   Yes.

24     A.   May the 3rd, the day I went in labor, I

29

1     had woke up maybe like 3:00 o'clock in the

2     morning, that early morning part, wasn't feeling

3     good, my back was hurting.  I went to the staff

4     office, told them I was hurting, that I thought I

5     was in labor.

6          Q.   Slow down.

7          A.   Okay.  I went to the office, told them

8     that my back was hurting very bad and I believe I

9     was in labor.  This was my sixth child, so I'm

10    pretty aware about labor.  They told me

11    that -- they had to call the sheriff department

12    and call the director, you know, the things and

13    can I hold on.  So I let them do that.  Took a

14    shower.  Got my bag ready.

15         Q.   Okay.

16         A.   And waited for the ambulance.  The

17    ambulance came.

18         Q.   What time?

19         A.   I'm not sure.

20         Q.   Approximately?

21         A.   Let's say maybe an hour, 30 minutes at

22    the most.

23         Q.   So about 3:30, 4:00?

24         A.   Yes.  The ambulance came.  They asked me

30

1    some questions about me.

2          Q.   Now, were these paramedics?

3          A.   Paramedics, EMTs.

4          Q.   Were they from County or Chicago?

5          A.   I think they private.  I'm not sure.  I

6    guess they from 911 call.

7          Q.   Okay.  So you don't know --

8          A.   I don't know.  I don't know.  So they

9    came.  I went to Cook County.  They let staff

10   know that they were taking me to Cook County.

11         Q.   Tell me about the circumstances of the

12   transportation.  How was it -- how were you

13   transported in the ambulance?

14         A.   On a gurney.

15         Q.   Did they have the gurney in the building

16   in MOMS?  How did they get you from your bedroom,

17   I guess, to the ambulance?

18         A.   They brought the -- they brought they

19   equipment to transport me theirself (sic).

20         Q.   What was that?  What type of device was

21   that?  What kind of equipment?

22         A.   Like a chair.  A chair.

23         Q.   Wheelchair?

24         A.   No, it wasn't a wheelchair.  It was a --

31

1     it was made like a chair.  So I wouldn't say a

2     wheelchair, because it can break down to a bed.

3     It was they device, so whatever they standard

4     device they use.

5         Q.    They put you in that device?

6         A.    They put me in that device.  Strapped me

7     around so I wouldn't fall.  And they got me on

8     the elevator with the Haymarket staff.  Her name

9     was Michelle.  And we proceeded.

10        Q.    Her name was Michelle?

11        A.    Her name was Michelle.  And we proceeded

12    to the ambulance and then to Stroger Hospital.

13        Q.    Other than the straps so you don't fall

14    out, were you put in any type of leg irons or

15    handcuffs or any restraints at all?

16        A.    No.

17        Q.    No?

18        A.    No.

19        Q.    So it was just the restraint that was

20    used by the paramedics, right?

21        A.    Yes.

22        Q.    So then they put you in the back of the

23    ambulance?

24        A.    Yes.

32

1        Q.    Who's back in there with you?

2        A.    The Haymarket staff Michelle.

3        Q.    Is there anyone from the sheriff's

4    office there?

5        A.    No.

6        Q.    Was there anyone from the sheriff's

7    office involved at all in the transportation from

8    your bedroom to the Stroger Hospital?

9        A.    No.

10       Q.    Now, you get to Stroger?

11       A.    I get to Stroger.  I go into the

12   emergency room.  And the staff talks to the lady,

13   tell them I'm in labor.

14       Q.    Michelle?

15       A.    She talks to the lady at the emergency

16   room and tells them I am in labor.  The lady

17   approaches me, asks me how many weeks I am, how

18   do I feel.  Took me in the back because I had to

19   be checked to see if I was dilated or whatever.

20   To see if they'll keep me.

21             So I was proceeded to the back and

22   they checked me.  And they okayed that I was in

23   labor.  Proceeded to take me in the labor and

24   delivery floor.  I was admitted to the labor and

33

1    delivery floor.  Michelle followed me up.

2        Q.   What's Michelle's last name?

3        A.   I'm not sure.

4        Q.   Can you describe her for me?

5        A.   She's an African American female.  She's

6    about 240 pounds.  She worked nights only.  Short

7    hair, very short hair.  That's about it.

8        Q.   Continue then.

9        A.   Okay.  At the time I was admitted to

10   labor and delivery, taken to labor and delivery,

11   and Michelle came with me and she stayed there

12   until the sheriff came.  She said she couldn't

13   leave or go anywhere like get a pop or anything

14   until the sheriff came.

15       Q.   So describe the room that you're put in?

16       A.   The room it's a big size room.  It has a

17   TV.  It has all the monitors and baby stuff, so

18   when you deliver, so it's a really big room.

19       Q.   Was there other -- is there a single

20   room?

21       A.   Yeah, it's a private room.  It's a

22   private room.  Has its own bathroom and stuff.

23                  Like I said, it got all the baby's

24   stuff, monitors, lights and things like that.

34

1      Q.    Okay.  And were you put in any
2  restraints at all, cuffs or --
3      A.    Not by Michelle.
4      Q.    By Michelle?
5      A.    No, not by Michelle.
6      Q.    How long -- I'm sorry, were you going to
7  say something?
8      MR. MORISSEY:  There is no question pending.
9  And I prefer you ask questions and she will
10  answer.
11     MR. SMITH:  That's what I'm doing.  I didn't
12  want to cut her off.  All right?
13     MR. MORISSEY:  There's no question pending.
14  BY MR. SMITH:
15     Q.    Let's start over.
16            How long did Michelle stay before
17  the sheriff got there?
18     A.    I'd say about maybe three hours, maybe.
19     Q.    Three hours?
20     A.    Maybe three hours before the sheriff
21  came.
22     Q.    Now, was medical personnel coming in and
23  out?
24     A.    Yes, yes.  And she introduced herself as

35

1     Santa Maria, my nurse, she introduced, because

2     she was there all through the delivery until she

3     was relieved you know, but I delivered before

4     she -- her shift was over.

5         Q.   What was her name?

6         A.   Santa Maria.

7         Q.   That was her first name?

8         A.   That's what she said her name was.  And

9     that's what I called her.

10        Q.   Was she Hispanic?

11        A.   I think she was Filipin, I think.  I'm

12    not sure what her -- really what her ethnic

13    were -- was.

14        Q.   Who was the correctional officer that

15    came and relieved Michelle?

16        A.   Officer Jackson.

17        Q.   Is that a male or female?

18        A.   Female.

19        Q.   Were they all female?

20        A.   Yes, all of them was female.

21        Q.   And did you know Officer Jackson at all

22    prior to her coming in the room that day?

23        A.   No.

24        Q.   And what happened when she came in?

36

1      A.   She came in with two, I guess her

2   superiors, they had white shirts.   They had the

3   shackles with them in they hands.   And they gave

4   them to her.   And she -- they left.   They talked

5   a minute.

6      Q.   The white shirts left?

7      A.   Right, the white shirts left.   She

8   talked to me, asked me, you know, what I was

9   there for, just general questions, how old was I,

10   was it my first be baby, things like that.

11      Q.   Small talk?

12      A.   Small talk basically.   I'd say about

13   maybe 40 minutes, another officer came, Officer

14   Flemmings.

15      Q.   Did Officer Jackson put any restraints

16   on you?

17      A.   No.

18      Q.   And you said then Officer Flemmings?

19      A.   Flemmings.

20      Q.   And what happened when Officer Flemmings

21   came?

22      A.   Officer Flemmings came to see that I had

23   to be shackled.

24      Q.   She said that?

37

1      A.    She said that.

2      Q.    She told that to Jackson?

3      A.    She told that to Jackson.  Jackson said

4  that she had been working with this unit for some

5  time and at one point they didn't shackle the

6  MOMS program.

7      Q.    Do you know what she meant when she said

8  this unit?

9      A.    What did she meant?  That she had been

10  the person that relieved the -- stand on the

11  ladies that had babies from MOMS.

12      Q.    So were you then shackled?

13      A.    I was then shackled and handcuffed.

14  Shackled at one leg and handcuffed at the other,

15  other arm.

16      Q.    So it's a handcuff on your left arm

17  or -- I mean I'm just saying the opposite?

18      A.    Yeah, yeah, opposite.

19      Q.    Opposite wrist and ankle, right?

20      A.    Correct.

21      Q.    Would you ever be shackled to the same

22  ankle with the -- did you still have the leg

23  bracelet on?

24      A.    Well, she's putting it on.  Flemmings

38

1    putting it on.

2         Q.    Your ankle bracelet?

3         A.    You are talking about the home

4    monitoring thing?

5         Q.    Yes.

6         A.    That never came off.  It never came off.

7         Q.    I mean would they ever have the leg

8    bracelet with the home monitor on it on the same

9    leg?

10        A.    Yeah.

11        Q.    They would?

12        A.    Uh-huh.

13        Q.    And how did that feel after you had the

14   handcuffs on, the shackles on, on the arm and

15   leg?

16        A.    How did it feel?

17        Q.    Yes.  Did you have any complaints or --

18        A.    Yeah, because I'm in labor.  I want to

19   move.  I want to -- yeah.

20        Q.    That's why you're here.  I want to find

21   out about that.

22        A.    No problem.  I have no problem telling

23   you.

24        Q.    Were they too tight?

39

1      A.    No, but I'm in pain so I want to move.

2    I want to caress myself, so it's like I can't do

3    but so much in the bed.  So it felt like being

4    tied down.  Okay.  And then I know I'm in pain

5    and it's very uncomfortable.

6      Q.    Okay.  And was your feeling of

7    uncomfortable, was it right away or did it -- I

8    mean did it happen as soon as they put on the

9    cuffs were you uncomfortable?

10     A.    Yeah, it was uncomfortable because I'm

11   constantly having to use the bathroom.  I have

12   to --

13     Q.    Let's stop there.

14     A.    Okay.

15     Q.    How would you use the bathroom?

16     A.    They had to bring a bedpan.  And if they

17   don't get there fast enough, I'd use it on

18   myself.

19     Q.    Okay.  Was a catheter at all put in?

20     A.    Eventually.

21     Q.    How long were you there before a

22   catheter was put in?

23     A.    I'm going to say about maybe three

24   hours.  Now, that -- with the catheter, I had to

1    get one of the restraints taken off my leg,

2    because I had to sit my legs a certain way for

3    the catheter to come in.  But once they put it in

4    they had put it back on.  Because I had to put my

5    feet together like this.  To get the catheter.

6         Q.   Okay.  And did you communicate that to

7    Officer Flemmings that you were uncomfortable

8    with the handcuffs?

9         A.   Yes, and Officer Jackson.

10        Q.   And what would you say to them?

11        A.   That this -- that I wasn't going

12   nowhere.  I didn't see why I had to be

13   restrained.  I'm in labor.  I have to ask for a

14   bedpan.  They didn't feel like -- the officers

15   felt like it was the nurse's duty to get me a

16   bedpan.  The nurses felt like they didn't have to

17   give me a bedpan because I didn't supposed to be

18   restrained.  That's how they communicating with

19   each other.

20        Q.   Let's talk about that for a while.  Did

21   the nurse that you described --

22        A.   Santa Maria.

23        Q.   Did she say anything to the correctional

24   officers regarding your restraints?

1      A.    Yes.

2      Q.    And what did she say?

3      A.    She said that that wasn't supposed to

4    happen.  That never happened.  She never seen

5    that to happen, that the ladies that was

6    incarcerated be restrained.

7              She also made a call to the

8    captain, the captain on duty or whoever the

9    superior was.

10     Q.    Santa Maria did?

11     A.    Right, for me to get the restraints off.

12   She said she couldn't keep coming back for me to

13   go to the bathroom.  She just couldn't.

14     Q.    And do you know what captain she called?

15     A.    No.

16     Q.    Was the call made from your room?

17     A.    No.

18     Q.    How do you know she called the captain?

19     A.    Because Flemmings and her went out and

20   she said that she had a problem -- Flemmings said

21   she was following orders and if she had a problem

22   call her captain and she will go with her.  So

23   the verbal part was --

24     Q.    Was told to you?

42

1          A.    Was in front of me.  Was spoken in front

2     of me.  But the results was just told at

3     the -- they came back and she said she couldn't

4     take them off.

5          Q.    The captain?

6          A.    No, Santa Maria came back and said they

7     wouldn't take them off.

8          Q.    The captain said no?

9          A.    Right.

10         Q.    Right?

11         A.    Yes, yes.

12         Q.    You made it sound like I was putting

13    words in your mouth.

14         A.    No.

15         Q.    How about doctors, were any doctors in

16    the room?

17         A.    No.  But Santa Maria said that she was

18    calling the attending physician about it, the

19    restraints.  They wanted me to walk to speed up

20    the labor process.  And I couldn't walk because I

21    was restrained.

22         Q.    Okay.  Any doctors come in?

23         A.    They didn't come in to talk to me, no.

24         Q.    And how long were you there then before

43

1    you started having -- the delivery process began?

2        A.    The delivery process, I think I had my

3    baby about 9:00 o'clock on the 3rd.

4        Q.    So you got there about --

5        A.    P.m.    But I came early morning on the

6    third, a.m.

7        Q.    Let me ask you this.  Do you know

8    approximately what time the cuffs were put on

9    you?

10       A.    All I know it was during the 11:00 to

11   7:00 shift.

12       MR. MORISSEY:  The night shift, right?

13       THE WITNESS:  Right, 11:00 p.m. to 7:00 a.m.

14   shift.

15   BY MR. SMITH:

16       Q.    Okay.

17       A.    I left like 3:00 o'clock that morning,

18   something like that.

19       Q.    So sometime before 7:00 a.m.?

20       A.    Exactly.

21       Q.    That's when Flemmings came in?

22       A.    Right.

23       Q.    Was Flemmings actually 7:00 to 3:00?

24       A.    I'm not sure.  She could have been.

44

1          Q.    And then, I'm sorry, I didn't hear the

2     time again when you had your baby?

3          A.    About 9:00.

4          Q.    A.m.?

5          A.    P.m.   9:00 p.m.

6          Q.    And what time did your doctor come in,

7     the doctor that delivered the baby?

8          A.    They prepped me -- I'm not sure.

9     Because I'm in labor.

10         Q.    That's what I'm trying to be very

11    general with it.

12         A.    I know I was prepped.  I'm not sure of

13    the time.  I'm not sure when they actually came

14    in and delivered the baby.  I know they did it,

15    so...

16         Q.    When did they take the shackles off?

17         A.    They didn't.

18         Q.    They didn't?

19         A.    No.

20         Q.    So when you were having the baby, the

21    shackles were still on?

22         A.    Yes.  I know -- that's my testimony.  I

23    know my arm was still shackled for sure, because

24    I'm numb down at the waist.  I'm numb from my

45

1    waist down.

2         Q.   Did you have a --

3         A.   Depidural (sic).

4         Q.   Epidural?

5         A.   Thank you.

6         Q.   When did you get the epidural shot?

7         MR. MORISSEY:  Objection.  She said that she

8    was in labor.  She wasn't conscious of the time

9    actual.  She can answer.  If you know.

10        THE WITNESS:  Well, I don't know the exact

11   time, I don't.  I don't know the exact time of

12   the actual depidural.

13   BY MR. SMITH:

14        Q.   Epidural?

15        A.   Epidural.  And I know I had it.  I know

16   I was prepped.  I know I was put on the thing,

17   but I also am aware that my arm was still

18   shackled, you know, my arm was still cuffed.

19        Q.   Did the doctor ever say something like

20   take the handcuffs off or did you hear him say

21   anything relating to you being shackled?

22        A.   Yeah.

23        Q.   What did you hear the doctor say?

24        A.   I heard them say that -- I know when

46

1    they came to put the epidural that was one part.

2    They asked me do I want the epidural, how I would

3    get it, and they talked about the shackles then,

4    because I have to sit a certain way.  And they

5    said if I sat in this position -- because they

6    talking amongst the sheriff, if they can

7    unshackle me.  If I laid in this position, would

8    I be -- can I still be shackled.  If I laid, took

9    it another position, I would have to be

10   unshackled.  So they made the decision to keep me

11   shackled while I got the epidural.

12       Q.   Did you have to sit up for the epidural?

13       A.   Yeah, I sat up for the epidural.

14       Q.   So you were still restrained both by

15   ankle and wrist?

16       A.   Uh-huh.  And leg.

17       Q.   Now, did you ever hear -- who was the

18   doctor that delivered the baby?

19       A.   I'm not sure.

20       Q.   Can you describe him for me, please?

21       A.   It was all ladies.

22       Q.   Female doctor, too?

23       A.   Yes, female doctor, too.  And there was

24   three of them, three ladies there.

47

1       Q.   Three doctors?

2       A.   I don't know if they was doctors.

3       Q.   Three personnel?

4       A.   Three.

5       Q.   Okay.  All right.

6           And describe the doctor, was she

7  black, white, Hispanic?

8       A.   No, it was like Indians.

9       Q.   The nurses, too?

10      A.   The three ladies that delivered the

11  baby, helped her deliver my baby was like

12  Indians.

13      Q.   Okay.  Do you remember any of their

14  names at all?

15      A.   Not in -- just in that -- no.  I don't

16  even know the doctor's name that delivered my

17  baby.

18      Q.   Did you hear -- listen to my question

19  carefully.  Did you hear any of the Indian

20  medical personnel tell the correctional officers

21  to take the restraints off?

22      A.   No.

23      Q.   Were there any complications?  I trust

24  everything went well for your baby.  It was

48

1    delivered without incident?

2        A.    Yes.

3        Q.    Tell me then what happened next.  What

4    happened after the baby was delivered?

5        A.    After I delivered the baby, I was --

6        Q.    Are you just shackled at that point

7    still just with your ankle?

8        A.    I'm with my ankle.  And like I said, I'm

9    there but I'm aware, I believe I'm aware.  So I'm

10   still shackled.  I'm shackled, because they

11   taken -- they got to transfer me to another bed.

12   And that's how I know I'm shackled.

13       Q.    Why did they do that?

14       A.    I'm not in an actual delivery room when

15   you stay in.  Some rooms are where you can

16   deliver and stay in the same room.  I'm not in

17   that type of room.  So I have to be transported

18   to another room.

19       Q.    Okay.

20       A.    So by that time --

21       Q.    Post delivery?

22       A.    Exactly, post delivery.

23             So they take the handcuffs off, the

24   shackles off and they transfer me to the bed and

49

1    I am wheeled to the next room.

2         Q.   I just want to go back.  And do you

3    remember when they took the leg shackle off you?

4         A.   Yeah.  When they transferred me to the

5    next bed.

6         Q.   I mean before you had the baby, before

7    you delivered the baby.

8         MR. MORISSEY:  Objection.  She didn't say

9    that they took the shackle off.

10        THE WITNESS:  Right, I just said I couldn't

11   feel it no more because I got the epidural.

12   BY MR. SMITH:

13        Q.   I thought you said when they put you in

14   that device, you know --

15        A.   I'm not sure, because I can't feel it.

16   I'm dead.

17        Q.   You don't know if --

18        A.   Right, because I can't feel it now.  And

19   then my focus is mainly on pushing and --

20        Q.   I know.  I know. All right.

21        A.   Well, like I said --

22        Q.   So how long then do you stay in your

23   room after the baby was delivered?

24        A.   After they cleaned me up, let's say

50

1    another hour.  Another hour.  About an hour.

2        Q.    Okay.  And then when they moved you, do

3    you have both shackles on?

4        A.    Yes.

5        Q.    Okay.  And in the other room they put

6    you in, describe that room?

7        A.    It's a smaller room, with just a TV,

8    phone, bed and a bathroom.  It's a private room.

9    It has a desk, couple of chairs in case I get

10   visitors or whoever sits in that room.

11       Q.    And --

12       A.    And I think it's on the same floor.  I

13   don't remember going on the elevator or anything.

14       Q.    Okay.  And what officer was there?  Was

15   it the same two officers or another officer?

16       A.    It was Flemmings that took me to the

17   room.  I went to sleep.  When I woke up it was

18   another officer, Officer Martinez.

19       Q.    Martinez?

20       A.    Yes.

21       Q.    And then you were shackled?

22       A.    Yeah, I'm shackled.  I'm shackled.  I

23   stay shackled.  I don't get unshackled until -- I

24   stayed from the 3rd to the 5th.

51

1        Q.   I don't know that.   That's why I ask the

2   question.

3        A.   No problem.   I stayed from the 3rd to

4   the 5th.   I stay shackled in handcuffs.   I also

5   take care of my baby with the handcuffs and the

6   blue box.   The blue box is a device that going

7   between the chain of the handcuffs.   And that's

8   put on me, too.   So I'm lifting my baby out the

9   crib with my hands, like a puppy.   I'm also being

10  checked by somebody else, like the police

11  is -- the sheriff is put on me and then somebody

12  else in black uniform that come up and check,

13  make sure they locked.   Like a special unit I

14  think you would call them.

15       Q.   Okay.   What were they for?

16       A.   I guess to check the police.

17       Q.   Check the police?

18       A.   Make sure they doing they job.

19       Q.   Okay.

20       MR. MORISSEY:   By police you mean the

21  sheriffs?

22       THE WITNESS:   Yes, yes, that's who I mean.

23  The sheriffs.   Sheriff is doing they jobs.

24  BY MR. SMITH:

52

1      Q.   All right.  And the shackles were just

2    on you the whole time?

3      A.   The whole time.  I also --

4      Q.   It was always opposite, right?

5      A.   Yes.

6      Q.   Leg --

7      A.   No, no.

8      Q.   Wrist and ankle?

9      A.   Wrist and then ankle.  When I had the

10   baby they put the handcuffs on me with the blue

11   box.  So it's heavy.

12     Q.   All right.  So the blue box, that

13   replaced the what?

14     A.   No, it didn't replace anything.  It made

15   it more -- what I'm trying to say I'm handcuffed.

16   Standard handcuff.  The blue box what I'm saying

17   in between that.  So it makes it even heavier.

18     MS. SHAPIRO:  So you can't move your

19   hands --

20     MR. MORISSEY:  Objection, only one person.

21     MS. SHAPIRO:  Sorry.

22     THE WITNESS:  I don't know it's there

23   really, because --

24   BY MR. SMITH:

53

1       Q.    Let's just say you don't know why?

2       A.    Right.  It's blue.  And I guess so you

3   won't -- it's heavy.  So it can be heavy.

4       Q.    How heavy is it?

5       A.    Oh, maybe four or five pounds.

6       Q.    Four or five pounds?

7       A.    With the whole thing, you know, with the

8   whole thing.

9       Q.    How heavy is that blue box?

10      A.    It's heavy.  Because it's in the middle

11  of my wrist, so I have to lift it up.

12      Q.    How much to your best guess, how

13  much --

14      A.    Standard.  It's a standard -- it goes to

15  the width of the handcuff.

16      Q.    Okay.  And what about your ankles, other

17  than the electronic monitoring bracelet, were

18  there any shackles on your ankles?

19      A.    Yes.

20      Q.    How was that?  How did that work?

21      A.    It was one shackle, one cuff with a

22  chain to go around inside the bed railing of the

23  bed and locked to me.

24      Q.    24 hours a day?

54

1      A.   24 hours a day.

2      Q.   So it's your testimony that you were

3  never able to use the bathroom that was in the

4  room?

5      A.   Right.  I never used it.

6      Q.   Never used it?

7      A.   Uh-uh.

8      Q.   What about did you shower?

9      A.   I didn't shower.  I didn't shower.  They

10  would --

11      Q.   Did they give you a sponge bath?

12      A.   Yeah, I would take a sponge.  They

13  wouldn't give it to me.  When I had to use the

14  bathroom, I would have to call the nurse.  And

15  the nurses said that I was -- they wasn't really

16  aware I was shackled.  They thought I was being

17  lazy.

18      Q.   Do you know why they thought that, they

19  would think that?

20      A.   I don't think they was aware that

21  why -- why I think that, because I felt --

22      Q.   If you know.

23      MR. MORISSEY:  Objection.  You don't know

24  what the nurses thought.

55

1       THE WITNESS:  Right.  Okay.

2  BY MR. SMITH:

3       Q.   I asked her if she knew.

4       A.   No, I didn't know.

5       Q.   After your attorney told you.  That's

6  okay.  That's fine.

7                Any family visit you?

8       A.   No visitors.

9       Q.   Not allowed?

10       A.   They wasn't allowed.  My baby daddy

11  tried -- my father of the baby tried to visit me

12  but he was stopped.  Wasn't no phone calls

13  allowed.

14       Q.   And the baby's in the room with you?

15       A.   Yeah.

16       Q.   And you stayed there until --

17       A.   The 5th.  I did also have a surgery

18  while I was there.  I received a tubal ligation

19  too.

20       Q.   What's that?

21       A.   That's where the tubes are closed up so

22  you wouldn't have no more babies.  And I was

23  shackled during that procedure, too.  And I was

24  also --

56

1        Q.   Let's stop there.  I wasn't aware of

2    that.

3             You were then taken to the OR then

4    for that procedure?

5        A.   Yeah.  I was taken to OR.

6        Q.   When was that done?

7        A.   Like the 4th.

8        Q.   And tell me about that.  How did that --

9    how was that arranged for you?

10       A.   I was taken off the shackles and put on

11   the bed and then shackled again and rolled to ER.

12   OR.

13       Q.   They take you from your bed where you're

14   shackled?

15       A.   Uh-huh.

16       Q.   When I say you're shackled, I think we

17   can agree that it's always in either the

18   left -- the one wrist or the right wrist or

19   you're in the blue box, right?

20       A.   Either or.  Either or.  Yes, I agree

21   with that.

22       Q.   Don't want to keep on having to ask you

23   every minute of the day the position of the

24   shackle.

57

1              So you are then taken on the

2     gurney?

3         A.   Yes.

4         Q.   And shackled again?

5         A.   And I'm shackled again.  And I go to the

6     ER.

7         Q.   Who took you from your room, hospital

8     room, to the operating room?

9         A.   The sheriff and a nurse.

10        Q.   A nurse?

11        A.   Yes.

12        Q.   What sheriff was that?

13        A.    I'm not sure of her name but it's like

14    Patterson or Peterson.  Officer Patterson or

15    Peterson.  She is accompanied by another officer,

16    Officer Moday.  Monee.  I'm wheeled there and

17    I'm --

18        Q.   What time of day is that?

19        A.   Afternoon.  I'm not sure of the time.

20    But it's afternoon.

21        Q.   Let's go back, because this took me by

22    surprise.

23              Did you make that decision -- was

24    that already arranged for you to have the surgery

58

1    done?

2         A.    Yes, that was arranged.

3         Q.    This was something you worked out in the

4    MOMS program that after you deliver --

5         A.    I worked it out with the -- my ob-gyne

6    to -- when I had the baby that I have my tubes

7    tied.  So it's a procedure that has to be

8    approved like maybe 30 days before I had a baby.

9    So like my eighth month, seventh month.

10        Q.    Okay.  That's good enough.  Okay.

11                   Now, so then tell me what you

12   remember about the operating room, the OR.

13        A.    Okay.  Prior to going to that, the

14   anesthesiologist came out and said that I

15   couldn't come into the operating room with the

16   shackles on because of the magnetic force in the

17   light.  And that he also stated to the officers

18   that he didn't want the shackles on because I

19   would be under anesthesia and I wouldn't be able

20   to move anywhere and there's no purpose for that.

21                   So she said she was following

22   orders.  And he said, well, he didn't want them

23   on because it was a risk.  So they called

24   captains and they came up with a soft shackle.

59

1        Q.    What is that, a soft shackle?

2        A.    It's made of cloth.

3        Q.    Okay.  I know what you mean.

4        A.    So I stayed in the hallway about four

5    hours until they found what they needed to find.

6    Okay.  So I end up going in surgery -- finally

7    going surgery with soft shackles.  I come out to

8    the recovery.  When I wake up I'm in the recovery

9    room and I'm shackled.  Now I got on the regular

10   shackles.

11       Q.    By the time you woke up you had the

12   regular metal shackles?

13       A.    Right.

14       Q.    And how were you shackled, to the --

15       A.    I was shackled to the bed railing.

16       Q.    Bed railing?

17       A.    Yes, to the bed railing.

18       Q.    Was it one leg and one arm or did you

19   have both arms?

20       A.    Yeah.

21       Q.    Which one?

22       A.    It was one leg and one arm.

23       Q.    Okay.  And how long were you in recovery

24   room for?

60

1        A.    I don't know.  I just woke up in there.

2        Q.    Okay.  And then when did you return to

3    your regular room, was it that day or the next

4    day?

5        A.    That day.

6        Q.    That day.

7        A.    Uh-huh.

8        Q.    Do you know what time of day it was?

9        A.    Uh-uh.

10        Q.    Was it nighttime?

11        A.    Could have been.  Could have been.

12        Q.    Could have been?

13        A.    Could have been.  Like I said, it was a

14    long day in the hallway and --

15        Q.    I agree.

16              And when you got back to your room,

17    you were shackled again?

18        A.    Yes, returned to the bed, shackled.

19        Q.    Who was the correctional officer?

20        A.    I'm not sure.

21        Q.    Following morning, how long did you

22    stay?

23        A.    Following morning I'd say about 8:00 the

24    next day.

61

1      Q.   On the 5th?

2      A.   Yeah, on the 5th, I stayed until maybe

3   about 3:00'ish.

4      Q.   Were you shackled the whole time?

5      A.   Yeah.  Haymarket staff came and then I

6   was released.

7      Q.   Well, let's talk about that with the

8   Haymarket then.

9                Was it the same lady?  Was it

10  Michelle?

11     A.   No, no, it was a lady named Delores that

12  came and got me.

13     Q.   And she comes up to your room; is that

14  true?

15     A.   Yeah, she came up to my room and said

16  that she was here to get me and she said that she

17  was making sure everything was prepared for me to

18  be released with a doctor, the baby was being

19  released.  And I guess the officer got the okay

20  to release me and she unshackled me.

21     Q.   Discharge summary instructions?

22     A.   Yeah, instructions.  Typical discharge

23  papers.  And the officer left and I prepared

24  myself to go with my baby.  And I went back to

62

1    the MOMS program.

2        Q.   How did you get -- what transportation

3    did you go --

4        A.   I left in the Haymarket staff van.

5        Q.   A van?

6        A.   Yes.

7        Q.   Who was with you in the van?

8        A.   Me.

9        Q.   You were driving the van?

10       A.   And Ms. Delores.  Delores was driving

11   the van.

12       Q.   And the baby?

13       A.   And the baby.

14       MR. SMITH:  Do you want to take a break for

15   a couple of seconds?

16       MR. MORISSEY:  Sure.

17                         (Recess.)

18   BY MR. SMITH:

19       Q.   Back on the record.

20            We left off at I believe you were

21   going -- you were transported and back at MOMS.

22   Okay.

23       A.   Yes.

24       Q.   And then you said you stayed there until

63

1    approximately September?

2         A.    The 23rd.

3         Q.    The 23rd.  Okay.  And where did you go

4    after that?

5         A.    Oh, I was given the opportunity --

6         Q.    Let me back up.

7               Did you have any more -- any

8    problems during the period when you returned to

9    MOMS to when you left MOMS?  So it would be from

10   May 5th until September.

11        A.    What you mean by problems, that I had to

12   go back to the hospital or --

13        Q.    No, like disciplinary problems or

14   anything, were you written up, or any problems

15   with the staff, those general type of problems,

16   fighting or anything.

17        A.    No, just depression, postpartum

18   depression, standard stuff.

19               I talked about the situation with

20   my therapist and stuff like that.

21        Q.    What situation?

22        A.    That I -- what I had just experienced.

23        Q.    Did you have to go back -- did you seek

24   any type of medical treatment for the shackling

64

1    that happened to you?

2         A.   No, I didn't seek no medical treatment,

3    like -- I would like to ask you like did I think

4    I needed some help from that?

5         Q.   No.  Let me ask you this.  We'll get to

6    that.

7                   As far as being shackled, which you

8    testified to during that period of time, did you

9    receive any type of physical injury as a result

10   of it?

11        A.   No, no cuts or bruises or nothing like

12   that, no.

13        Q.   Never saw anybody that had to go back to

14   Cermak or anything?

15        A.   No.

16        Q.   Now, you testified that you had

17   depression, correct?

18        A.   Yeah.

19        Q.   And did you have depression before this?

20        A.   Yes, I did.

21        Q.   Did you take medication for your

22   depression?

23        A.   Yes, I did.

24        Q.   What did you take?

65

1      A.    Zoloft.

2      Q.    Zoloft?

3      A.    Yes.

4      Q.    And you indicated that when you got back

5  to MOMS, that you talked to a therapist?

6      A.    My regular therapist, regular meeting,

7  yeah.

8      Q.    Who was your therapist?

9      A.    At Haymarket her name is Patty Fazio.

10     Q.    Is that the only therapist that you had?

11     A.    Yes.  Pertaining to my mental, you know.

12     Q.    Patty Fazio?

13     A.    Fazio.  F-A-Z-I-O.

14     Q.    And did you see her prior to going to

15  Stroger Hospital?

16     A.    Oh, yes.  On a weekly basis.

17     Q.    Did you get to see her more often after

18  you returned from Stroger?

19     A.    No.  It wasn't in her schedule to see me

20  more often.

21     Q.    Okay.  How long have you been on Zoloft?

22     A.    I was on Zoloft -- I've been diagnosed

23  with depression like maybe since 2000.

24     Q.    You've been on it for like nine years?

66

1     A.   No, I haven't been on it.  I wouldn't

2   take the medication at first.

3     Q.   You would go off and on?

4     A.   Right, yeah.

5     Q.   Running out?

6     A.   No, I haven't had it.

7     Q.   Is there a reason why not?

8     A.    I'm being prescribed -- what I'm trying

9   to say, I'm being assessed for a diagnosis for my

10  Zoloft.  I'm just getting out, so I'm into a Mile

11  Square, Mount Sinai Mental Health program, so I'm

12  assessed as we speak.  And my therapist there is

13  Mr. Kelly.

14    Q.   Did you go back to the county

15  jail -- did you go back to the compound division

16  three or division four or did you get shipped

17  right from MOMS to Dwight?

18    A.    No, I went to division -- I mean I left

19  MOMS program to another program called Sheriff

20  Furlough.

21    Q.   Where is that at?

22    A.    That's -- the program itself is in Cook

23  County Jail but you can go home.  So I went home.

24  I went home and then I would go to Sheriff

67

1    Furlough program every day from 8:00 to 3:00.

2         Q.    With your baby?

3         A.    No, not with my baby, just with me.   I

4    just had to show up.   No kids was allowed in

5    County Jail.

6         Q.    All right.   You'd show up back at --

7         A.    County.

8         Q.    Where?

9         A.    I think it's five, division five.   You

10   go to division five.

11        Q.    Did you stay in that County Sheriff

12   Furlough program until you were shipped to the

13   IDOC?

14        A.    Until the disposition of my case.

15        Q.    What was the -- what happened to your

16   case?

17        A.    I was --

18        Q.    Did you plead guilty?

19        A.    I pled guilty to a theft.

20        Q.    Okay.

21        A.    Three years.   Three years.

22        Q.    So then did you continue to see any

23   mental health professionals when you went to the

24   IDOC?

68

1      A.    Yeah, when I went to Dwight, yes.   I

2   ended up seeing him like a week before I got out.

3   I let him know through my intake that I was on

4   medication coming into the Department of

5   Corrections.   Illinois Department of Corrections.

6      Q.    Did you -- where is the intake for the

7   females?   Did you go right to Dwight?

8      A.    Yes.

9      Q.    Dwight -- go right from the County to

10   Dwight?

11      A.    Yes, sir.

12      Q.    Did you tell the intake personnel at

13   Dwight about the shackling experience you had?

14      A.    No.

15      Q.    No?

16      A.    No.

17      Q.    Did you speak to anybody in Dwight, any

18   medical personnel about the shackling experience?

19      A.    No, sir.

20      Q.    When you got out -- when did you get out

21   from Dwight?

22      A.    January 27, '09.

23      Q.    Have you since spoken to anybody, any

24   medical professional about your shackling

69

1    experience?

2        A.   Yes, I talked to the therapist that I'm

3    trying -- where I'm at now, Mile Square.

4        Q.   Where are you at?

5        A.   Mile Square, the place that I go for my

6    therapist now.

7        Q.   What is that?  Who runs that?  The

8    state?

9        A.   I suppose so.

10       Q.   Mile Square?

11       A.   Mile Square.  It's a subsidy of Mount

12   Sinai Hospital, so...

13       MR. SMITH:  Do you know anything about this,

14   the program, Tom?

15       MR. MORISSEY:  I'm not being deposed.

16       MR. SMITH:  Off the record.

17                          (Discussion off the

18                          record.)

19       THE WITNESS:  So I just start seeing him

20   last week.  Because I need my medication and I

21   haven't had it since I've been released from

22   Dwight.  They didn't send it with me or anything.

23   BY MR. SMITH:

24       Q.   Well, as we sit here today, how do you

70

1    feel about the shackling experience?

2        A.    I feel outraged.

3        Q.    Why is that?

4        A.    Because I felt like I had my baby in

5    captivity.

6        Q.    In captivity?

7        A.    Uh-huh.  And I'm mad at myself, you

8    know.

9        Q.    You're what?

10       A.    I'm upset with myself about it.

11       Q.    Why are you upset at yourself?

12       A.    Because I felt like it's something that

13   she didn't have to go through.  It could have

14   been avoided, if I made the right decision and

15   not getting arrested, you know, not committing a

16   crime.

17       Q.    Okay.  All right.

18              Was this the first time you had a

19   one of your babies in while being incarcerated?

20       A.    No.  The first child I ever had

21   incarcerated was Marvellis, my 19-year old.

22       Q.    Where was that at?

23       A.    Dwight Correctional Center.

24       Q.    How many times -- let me show you this.

1    I'm not doing this to embarrass you.  I want you

2    to look at this Illinois Department of

3    Corrections.  It doesn't have all your arrests.

4    Some of the smaller misdemeanors and stuff we're

5    not concerned about, they're not on here.  But

6    looking at it with your lawyer, is there anything

7    you disagree with?

8        A.   Pertaining to this?

9        Q.   Pertaining to those charges and

10   sentences and dates.

11       A.   No, sir.

12       Q.   Do you agree with everything?

13       A.   Basically, yeah.

14       MR. SMITH:  I'm going to strike the Ms.

15   Jackson Exhibit No. 1, which was the

16   identification card.  I'm not going to be using

17   it as an exhibit.  And I will mark this Exhibit

18   No. 2.

19                          (WHEREUPON, said document

20                           was marked as Jackson

21                           Exhibit No. 2 for

22                           Identification.)

23   BY MR. SMITH:

24       Q.   I'm going to show you what has been

72

1     previously marked as Jackson Exhibit No. 1 and

2     carefully read over this complaint and when

3     you're finished with it I'll ask you some

4     questions.

5          MR. MORISSEY:   Off the record.

6                              (Discussion off the

7                              record.)

8     BY MR. SMITH:

9          Q.   Back on the record.

10                    You've read this document?

11         A.   Yes.

12         Q.   Is everything true and accurate to the

13    best of your belief?

14         A.   To the best of my belief.

15         MR. MORISSEY:   Objection.   She doesn't have

16    personal knowledge of certain, about the other

17    one --

18         MR. SMITH:   That's why I said to the best of

19    her ability.

20    BY MR. SMITH:

21         Q.   If you had an opportunity to change

22    anything in the complaint, would you do it?

23         A.   Would I do it?   No.   I wouldn't change

24    it.

73

1      Q.   If there is anything to add to the

2   complaint, would you do it?

3      A.   The --

4      MR. MORISSEY:  I'm going to object.  You're

5   asking a non-lawyer whether or not she would add

6   any additional thing to a complaint, and she's

7   not equipped to draft the complaint.  That's why

8   she has counsel to do it.  But you can answer the

9   questions to the best of your ability.

10      THE WITNESS:  When I talked about the

11   surgery part of it, the surgery.

12   BY MR. SMITH:

13      Q.   Okay.

14      A.   That's about it.  But other than that,

15   no.

16      Q.   Do you know Catherine Zaborowski?

17      A.   I've seen her.  I mean we was there

18   together for a period of time.

19      Q.   Have you --

20      A.   I was gone by the time she delivered.

21      Q.   Okay.  Have you and Catherine Zaborowski

22   ever talked about this case?

23      A.   No, we didn't talk about the case.  We

24   just talked about...

74

1        Q.    The shackling?

2        A.    The shackling experience.   The

3    experience.

4        Q.    The experience?

5        A.    Yeah, the experience.

6        Q.    She told you about her being shackled?

7        A.    Yes.

8        Q.    And you told her about you being

9    shackled?

10       A.    Yes.

11       Q.    Is there anybody else that you told, any

12   other inmates that you told, any other people

13   that you told that you were shackled?

14       A.    I didn't have to tell nobody.   It was a

15   procedure that was being done, but -- at Stroger.

16   Let me say this.   My prenatal care was at Mount

17   Sinai and my delivery was at Stroger.   And

18   earlier part of the question, we was given a --

19   we didn't have a choice which hospital, we only

20   had two hospitals we would go to, Stroger and

21   Mount Sinai.   But if it's called by ambulance, it

22   was up to the ambulance which one.

23       Q.    I know.   But my question was, did you

24   physically talk to any other inmates about your

75

1      shackling experience other than Catherine

2      Zaborowski?

3           A.    Yeah, I talked in groups.

4           Q.    How many people would you say you talked

5      to?

6           A.    I expressed my feelings in group to the

7      16 women that was housed there.

8           Q.    You told everybody at MOMS?

9           A.    My experience, what I went through,

10     yeah.

11          Q.    How did you come in contact with

12     Mr. Morrissey?

13          A.    I called him.

14          Q.    You called him?

15          A.    Uh-huh.  I called him on the phone.  And

16     I --

17          Q.    Were you referred to him by somebody?

18          A.    No.  I had kind of knew of him -- things

19     on I seen on the jailhouse -- it was a lawsuit he

20     had and it was posted all over the jailhouse

21     about being strip searched.  So I got his name

22     off --

23          Q.    No sheriff officer told you?

24          A.    No, no staff member, no.  I just called

76

1    411.

2        MR. SMITH:  Thank you.

3        MR. MORISSEY:  You're done.  No further

4    questions.

5        MR. SMITH:  Waive?

6        MR. MORISSEY:  She waives signature.

7            AND FURTHER DEPONENT SAYETH NAUGHT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

77

1    STATE OF ILLINOIS )
                       )   SS:
2    COUNTY OF C O O K )

3        I, MAUREEN A. WOODMAN, Certified Shorthand

4    Reporter and Notary Public in and for the County

5    of Cook and State of Illinois, do hereby certify

6    that SIMONE JACKSON was first duly sworn to

7    testify the whole truth and that the above

8    deposition was recorded stenographically by me,

9    and was reduced to typewriting under my personal

10   direction.

11       I further certify that the said deposition

12   was taken at the time and place specified.

13       I further certify that I am not a relative

14   nor employee or attorney nor counsel of any of

15   the parties, nor a relative or employee of such

16   attorney nor counsel nor financially interested

17   directly nor indirectly in this action.

18        In witness whereof, I have hereunto set my

19   hand and affixed my seal of office at Chicago,

20   Illinois, this     day of

21   A.D., 2009.

22

23                        MAUREEN A. WOODMAN, C.S.R.

24                        License No.  084-002740

**Exhibit 3**

## Members of the Putative Class Identified as of 9/14/0



| # | Name | | # | Name |
|---|------|---|---|------|
| 1 | Melissa | | 43 | Kawana |
| 2 | Sharonda | | 44 | Elaine |
| 3 | Jamille | | 45 | Charone |
| 4 | Kiedra | | 46 | Joy |
| 5 | Tomeika | | 47 | Latiana A. |
| 6 | Wendy | | 48 | Jassica |
| 7 | Lucretia | | 49 | Christine |
| 8 | Charlene | | | |
| 9 | Verna | | | |
| 10 | Mariane | | | |
| 11 | Victoria | | | |
| 12 | Jamie | | | |
| 13 | Jennifer | | | |
| 14 | Candice | | | |
| 15 | Jennifer | | | |
| 16 | Cora | | | |
| 17 | Nicole | | | |
| 18 | Jasmine | | | |
| 19 | Latrice | | | |
| 20 | Ida | | | |
| 21 | Denae | | | |
| 22 | Shareka | | | |
| 23 | Lawanda | | | |
| 24 | Eric | | | |
| 25 | Deborah | | | |
| 26 | Veronica | | | |
| 27 | Tammy | | | |
| 28 | Felicia U | | | |
| 29 | Kimberly | | | |
| 30 | Brittany | | | |
| 31 | Laura A. | | | |
| 32 | Ashley | | | |
| 33 | Londie | | | |
| 34 | Towana | | | |
| 35 | Stephanie | | | |
| 36 | Angela | | | |
| 37 | Anastasia | | | |
| 38 | Denise | | | |
| 39 | Teresa | | | |
| 40 | Sheena J. | | | |
| 41 | Martha | | | |
| 42 | Anna | | | |

**Exhibit 4**



## Archives  Opinion

**Return to your last page**

Archive for Thursday, June 25, 2009

# Handcuffing pregnant inmates

June 25, 2009

## Handcuffing pregnant inmates

This is in response to "Suit: Inmate shackled in labor; Woman was incarcerated days before hospital delivery" (News, June 12).

Attorneys Thomas Morrissey and Kenneth Flaxman allege that the jail's policy for handcuffing pregnant inmates while they are treated at outside hospitals violates state law.

Nothing could be further from the truth.

In fact, the jail's written policy specifically cites the statute in question and orders correctional officers to not handcuff pregnant inmates while they are being transported to the hospital and while they are delivering their babies.

Anytime a detainee is taken outside the jail for medical treatment, he or she becomes an immediate escape risk.

That is why we are permitted by law to cuff pregnant inmates to their hospital beds if they are not in labor and after child birth.

Many female inmates have successfully escaped custody while receiving medical treatment (including child birth) at hospitals outside of Cook County Jail.

The policy is in place to protect both the hospital staff and the female inmates.

In fact, not long ago, a female inmate who was hospitalized for surgery died while jumping from a hospital window at the in an escape attempt while she was recovering from the operation.

Further, it should be mentioned that the sheriff's office has operated a program called MOM's that has allowed hundreds of pregnant inmates who are charged with non-violent crimes to receive therapeutic pre- and post-natal care while in custody.

The program includes substance abuse counseling and mental-health treatment for pregnant inmates, and it allows them to remain with their babies after birth in a secure setting outside the jail walls.


*– Thomas J. Dart, sheriff of Cook County, Chicago*

---

**Related articles**

Plaintiffs' Exhibit 4                                    Page 1

**Exhibit 5**

1
       IN THE UNITED STATES DISTRICT COURT
2
         NORTHERN DISTRICT OF ILLINOIS
            EASTERN DIVISION
3

4
CATHERINE ZABOROWSKI and    )
SIMONE JACKSON,          )
5
individually and on behalf  )
of a class,             )
6
                    )
        Plaintiffs,     )
7
                    )
    vs.            )  No. 08 C 6946
8
                    )
SHERIFF OF COOK COUNTY and  )
9
COOK COUNTY, ILLINOIS,    )
                    )
10
        Defendants.     )

11

12

13

14
        The deposition of GARY HICKERSON,

15
called for examination, taken pursuant to

16
notice and pursuant to the Federal Rules of

17
Civil Procedure for the United States District

18
Courts pertaining to the taking of depositions,

19
taken before Kathleen P. Lipinski, Certified

20
Shorthand Reporter and Notary Public, at 500

21
Daley Center Chicago, Illinois, commencing at

22
10:15 o'clock a.m. on the 9th day of July,

23
A.D., 2009.

24

          TOOMEY REPORTING (312) 853-0648

```
 1    APPEARANCES:

 2         Mr. Thomas G. Morrissey
           (Thomas Morrissey, Ltd.)
 3         10249 South Western Avenue
           Chicago, Illinois 60643
 4         Phone:  (773) 233-7900

 5             On behalf of the Plaintiffs;

 6
           Mr. Ronald Weidhuner
 7         (State's Attorney of Cook County, Illinois
           Civil Actions Bureau)
 8         500 Daley Center
           69 West Washington
 9         Chicago, Illinois 60602
           Phone:  (312) 603-5527
10
               On behalf of the Defendant.
11

12

13

14    ALSO PRESENT:  Lindsey Scarpino,
                      Lindsey Shapiro, John Braves.
15

16

17

18

19

20

21

22

23

24
```

TOOMEY REPORTING (312) 853-0648

1                          I N D E X

2    WITNESS                                        PAGE

3    GARY HICKERSON

4          Direct Examination by Mr. Morrissey      04

5          Cross-Examination by Mr. Weidhuner       53

6          Redirect Examination by Mr. Morrissey    56

7

8

9

10

11

12

13                        E X H I B I T S

14   HICKERSON DEPOSITION EXHIBIT                   PAGE

15         No. 1                                    10

16         No. 2                                    10

17         No. 3                                    16

18         No. 4                                    29

19

20

21

22

23

24


                TOOMEY REPORTING (312) 853-0648

```
 1                        (WHEREUPON, documents marked

 2                        Hickerson Deposition Exhibit

 3                        Nos. 1-5, for identification.)

 4                        (WHEREUPON, the witness was

 5                        duly sworn.)

 6              MR. MORRISSEY:  This is a discovery

 7      deposition pursuant to Rule 30(b)(6) in regards

 8      to the practices and procedures of the Sheriff

 9      of Cook County in regards to restraining and/or

10      shackling women that are pregnant and are

11      brought to a hospital.

12              The preliminary question is, Ron, are

13      you producing Superintendent Hickerson pursuant

14      to the Rule 30(b)(6) --

15              MR. WEIDHUNER:  Yes.

16      WHEREUPON:

17                   GARY HICKERSON,

18      called as a witness herein, having been first

19      duly sworn, was examined and testified as

20      follows:

21                   DIRECT EXAMINATION

22      BY MR. MORRISSEY:

23         Q.   Superintendent, you've been deposed

24      before in other matters, I'm sure, correct?
```

TOOMEY REPORTING (312) 853-0648

1      A.    Yes, sir.

2      Q.    Will you please state your full name

3    for the record?

4      A.    Gary Hickerson.

5      Q.    You're currently superintendent of

6    what division?

7      A.    Administration.

8      Q.    Your direct supervisor is who?

9      A.    Director Brown, Director Danny Brown.

10      Q.    For what period of time have you been

11    the Superintendent of Administration?

12      A.    Mid May of 2009 until present.

13      Q.    You were recently deposed in a case

14    called Streeter vs. Sheriff of Cook County,

15    correct?

16      A.    Yes, sir.

17      Q.    Have you had an opportunity to review

18    your answers in that deposition?

19      A.    No, sir.

20      Q.    Would your answers be the same today

21    as they were then in regards to your various

22    titles and positions with the Cook County

23    Sheriff?

24      A.    Yes, sir.


TOOMEY REPORTING (312) 853-0648

1      Q.     Briefly since January of 2006 until

2   the present, can you tell me the various

3   positions you've held with the Sheriff of Cook

4   County?

5      A.     January of 2006, I was superintendent

6   in Division 5.  In 2007, I was superintendent

7   of Division 4 and that was until mid August

8   of -- I'm sorry, 2006 of 5, 2007 of 4.  I know

9   I moved to External Ops in August of 2008.

10      Q.     Prior to being Superintendent of

11   External Operations in August of 2008 -- And I

12   have to keep my voice up because we have this

13   horrible HV -- heating and ventilation system

14   in this room.

15            Prior to August of 2008, what was your

16   previous position with the Sheriff?

17      A.     Prior to August?

18      Q.     Prior to August of 2008.

19      A.     Prior to August of 2008, I was a

20   superintendent in Division 4.

21      Q.     Prior to August of 2008, had you ever

22   worked in External Operations as an employee of

23   the Sheriff?

24      A.     Yes.  It was referred to as

TOOMEY REPORTING (312) 853-0648

1    External -- It was referred to as Chief

2    Security at that time.

3        Q.    When did you work in Chief Security?

4        A.    As an officer in 1983 to 1986, as a

5    sergeant from 1987 until 1991, and a short

6    period for a few months after that as a

7    lieutenant in 1991.

8        Q.    Would it be correct, then, to say that

9    since 1991 up until August of 2008, you had not

10   had any either supervisory responsibilities or

11   officers that were assigned to hospital units

12   or you didn't work in hospital units?

13       A.    That's correct.

14       Q.    For how long were you the

15   Superintendent of External Operations?

16       A.    Nine months.

17       Q.    When did you leave External

18   Operations?

19       A.    Mid May of 2009.

20       Q.    What is External Operations?

21       A.    It's the area that -- It's the

22   division that handles all the perimeter

23   security of the Cook County Jail as well as all

24   the outlying hospital security for inmates that

TOOMEY REPORTING (312) 853-0648

1    are hospitalized, I should say.

2        Q.    Does External Operations also have

3    officers that are assigned to transport inmates

4    from the jail complex to outlying hospitals?

5        A.    Yes.

6        Q.    During the time you were the

7    superintendent, how many officers were assigned

8    the duty of transportation of inmates from the

9    jail to outlying hospitals?

10       A.    We assign four officers per shift to

11   handle that detail and occasionally more

12   depending on how many inmates would actually

13   get ill at the jail at that time.

14       Q.    Are there any vehicles under the

15   control of External Operations that are used to

16   transport detainees from the jail to hospital

17   complexes?

18       A.    Yes.

19       Q.    What types of vehicles are used?

20       A.    Depending on the medical needs, we do

21   have handicapped vehicles.  If the doctor

22   allows, we use the squad cars.

23       Q.    What types of handicap vehicles are

24   under the jurisdiction of External Operations?

TOOMEY REPORTING (312) 853-0648

1     A.    There are two that I know of that are

2   assigned that we use when an inmate is in a

3   wheelchair that we have to use for handicap.

4     Q.    Are those ambulances or vans?

5     A.    The ambulances are not driven by us.

6   They are in the control of Cermak.  We put an

7   officer in there before transporting, but we do

8   not drive that vehicle.  It's Cermak's

9   vehicles.

10     Q.    The other vehicles that are used to

11  transport inmates, what are they?

12     A.    Squad cars.

13     Q.    You said squad cars and you also have

14  two handicap vans?

15     A.    Yes, sir, two handicap vans.

16     Q.    And there are ambulances that Cermak

17  has, correct?

18     A.    Correct.

19     Q.    Are there any general orders or

20  divisional procedures that are given to

21  officers that transport inmates from the jail

22  to hospital facilities?

23     A.    Yes.

24     Q.    What are those written orders?

TOOMEY REPORTING (312) 853-0648

1      A.      There is a hospital and policy

2   procedure.  I'm not sure of the number, but we

3   have hospital policy and procedures in our SOPs

4   that all officers are given.

5      Q.      Showing you what has been marked as

6   Exhibit 1, it's a document that's dated

7   effective date July 25, 2006, and it's a

8   nine-page document.  I'd ask you to take a look

9   at that document for a moment.

10                      (WHEREUPON, witness viewing

11                       document.)

12   BY THE WITNESS:

13      A.      Okay.

14   BY MR. MORRISSEY:

15      Q.      Is this the document you're referring

16   to?

17      A.      Yes, sir.

18      Q.      Are there any other documents that

19   you're aware of?

20      A.      No, sir.  This was changed when I was

21   a superintendent.

22      Q.      I'm showing you what has been marked

23   as Plaintiff's Exhibit Number 2 with an

24   effective date of 2008.  It's an eight-page

TOOMEY REPORTING (312) 853-0648

1    document.  It says it's related to General

2    Order 9.44.  I'd ask you to take a look at

3    that.

4           Is that the document you're referring

5    to as updating the Exhibit 1 document?

6    A.    Yes, sir.

7    Q.    In regards to correctional officers

8    and supervisors that are responsible for

9    guarding inmates that are hospitalized, are

10   there any other written general orders or

11   divisional procedures that you're aware of that

12   were applicable during the period of time from

13   December of 2006 to the present?

14   A.    No, sir.

15   Q.    When you came in to External

16   Operations in August of 2008, who was the

17   superintendent that immediately preceded you?

18   A.    Superintendent Michael Holmes.

19   Q.    In August of 2008, was there a

20   procedure -- a practice and a written procedure

21   in regards to shackling all detainees that were

22   housed outside the Cook County Department of

23   Corrections complex?

24   A.    Yes, sir.

TOOMEY REPORTING (312) 853-0648

1      Q.      What was the written policy and

2      practice in regards to -- Strike that.

3              In August of 2008, were all detainees

4      that were housed outside of the Cook County

5      Department complex classified as high-risk

6      inmates?

7      A.      Yes, sir.

8      Q.      As a superintendent of the External

9      Operations, what is a high-risk inmate?

10     A.      The definition that we're using is any

11     inmate outside of the compound is considered a

12     high-risk inmate.

13     Q.      Would an elderly inmate that is over

14     70 years old be considered a high-risk inmate

15     if they were hospitalized?

16     A.      According to this definition, yes,

17     sir.

18     Q.      As far as the practice when you were

19     Superintendent of External Operations, would a

20     70-year-old inmate be considered a high-risk

21     inmate?

22     A.      Yes, sir.

23     Q.      If a person was in a -- was a

24     paraplegic and was hospitalized and a detainee

TOOMEY REPORTING (312) 853-0648

```
 1      at the Cook County Department of Corrections,

 2      would that detainee who was a paraplegic who

 3      was housed at Stroger be considered a high-risk

 4      inmate?

 5          A.    Yes, sir.

 6          Q.    If a person had open heart surgery and

 7      was a detainee of the Sheriff, if that person

 8      was hospitalized at Stroger Hospital, would

 9      that person be considered a high-risk inmate?

10          A.    Yes, sir.

11          Q.    Now, if a person had open heart

12      surgery and was a detainee of the Sheriff and

13      was hospitalized at Cook County -- at Stroger

14      Hospital, would that person be shackled?

15              MR. WEIDHUNER:  I'm going to object

16      because time frame is too general.  Are we

17      talking during the operation, postop, or

18      exactly when in regards to this?  Three months

19      ago, or what?

20      BY MR. MORRISSEY:

21          Q.    Assuming that a person was a detainee

22      of the Sheriff and within 48 hours after the

23      surgery was placed in the hospital room, would

24      that person be considered a high-risk inmate?
```

TOOMEY REPORTING (312) 853-0648

Plaintiffs' Exhibit 5

1     A.     Yes, sir.

2     Q.     And would that person necessarily be

3     shackled?

4     A.     That would depend on the doctor's

5     orders, sir.

6     Q.     Assuming that there were no specific

7     doctor's orders, under the practice of the

8     Sheriff, would that person who had received

9     open heart surgery 48 hours before be

10    considered a high-risk inmate and be shackled?

11    A.     Yes, sir.

12    Q.     When a person under the practice of

13    the Sheriff was shackled in a hospital room,

14    describe what the shackling included.

15    A.     The shackling included the shackles

16    were attached to the bedframe and attached to

17    the leg, if we did it on the left side, then

18    the cuff would be cuffed on the right side of

19    their hand.

20    Q.     If a detainee was housed -- Strike

21    that.

22           If a detainee of the Sheriff was

23    paralyzed and was hospitalized at Stroger

24    Hospital, would that -- and assuming that there

TOOMEY REPORTING (312) 853-0648

1    was no specific doctor's order, would that

2    person be shackled pursuant to the Sheriff's

3    practice and policy?

4        A.    Yes, sir.

5        Q.    When you came in to the External

6    Operations in August of 2008, did you review

7    the divisional procedure?

8        A.    Yes, sir.

9        Q.    After you reviewed the divisional

10   procedure which is in front of you as

11   Exhibit 1, did you find it was necessary to

12   make any changes to that divisional --

13       A.    Yes, sir.

14       Q.    After reviewing it, what concerns did

15   you have about the divisional procedure which

16   is marked Exhibit 1?

17       A.    The -- Some of the wording.  We

18   decided to change some of the wording to spell

19   out exactly what we were doing.  It wasn't the

20   actual policy itself, just some of the wording

21   in the policy itself of how we were handling

22   it.

23       Q.    In regards to the written policy which

24   was in effect in August of 2008, did you make

TOOMEY REPORTING (312) 853-0648

1  any changes in regards to women that were

2  detainees of the Sheriff that were brought to

3  the hospital when they were pregnant?

4  A.  We did change some of the verbiage.

5  Q.  Specifically what changes were made in

6  regards to women that were brought to the -- to

7  a hospital while pregnant?

8  A.  I might stand corrected.  It doesn't

9  look like we changed anything in the verbiage.

10  Q.  So the written policy in regards to

11  women that leave the Cook County Jail complex

12  and go to a hospital while pregnant was not

13  changed by you after you became Executive

14  Director -- I'm sorry, after you became

15  Superintendent of External Operations?

16  A.  That's correct.

17  Q.  Were there any other written

18  directives or general orders that were changed

19  by you after becoming External Operations

20  superintendent in regards to pregnant women

21  that are hospitalized?

22  A.  No, sir.

23  Q.  Turning to Exhibit 3, if you will, for

24  a moment, it's an External Operations daily

TOOMEY REPORTING (312) 853-0648

1      detainee hospitalization checklist for a woman

2      by the name of Simone Jackson dated 5/2/08.  Do

3      you have that document in front of you?

4          A.    No, I do not.

5                        (WHEREUPON, document

6                        tendered.)

7      BY MR. MORRISSEY:

8          Q.    Take a moment to look at that

9      document.  It's actually a two-page document.

10                        (WHEREUPON, witness viewing

11                        document.)

12     BY THE WITNESS:

13         A.    Okay.

14     BY MR. MORRISSEY:

15         Q.    In regards to Exhibit 3, Exhibit 3, is

16     that a form used by your correctional officers

17     that are assigned to External Operations?

18         A.    Yes, sir.

19         Q.    Was this form in existence at the time

20     that you were superintendent?

21         A.    Yes, sir.

22         Q.    And was this form -- Strike that.

23                What is the purpose of a form which is

24     titled "External Operations Daily Detainee

TOOMEY REPORTING (312) 853-0648

1    Hospitalization Checklist"?  What is the

2    purpose of it?

3        A.    It is an informational sheet for the

4    supervisors to check to see if there's any

5    pertinent information day to day as to what

6    happened with the patient, or the inmate I

7    should say.

8        Q.    What information is contained on the

9    form?

10       A.    The officer that's assigned there

11   signs the sheet.  The sergeant that is making

12   rounds signs the sheet.  Any lunch relief

13   officers would sign the sheet.  Any notations

14   for doctors' orders or requests would have

15   that, as well.

16       Q.    Does the form also indicate whether or

17   not the prisoner was shackled during the course

18   of the day?

19       A.    Yes.

20       Q.    Why does this form indicate when a

21   prisoner/detainee is handcuffed or the

22   handcuffs are removed?

23       A.    Why?

24       Q.    Yes.


                 TOOMEY REPORTING (312) 853-0648

1      A.     That's part of our protocol.  If

2   you're going to remove restraints, we need to

3   document it and notify your supervisor.

4      Q.     It would be correct, then, to say that

5   the protocol or practice of the Sheriff was for

6   the guards to have the hospitalized inmate

7   shackled?

8      A.     Correct.

9      Q.     At all times, correct?

10     A.     Correct.

11     Q.     And by shackling, what do you mean?

12     A.     Shackling the leg to the bedframe and

13  the hand to the other part of the bedframe.

14     Q.     So for purposes of this deposition,

15  when I state "shackling," you understand what I

16  mean as far as a hospitalized detainee,

17  correct?

18     A.     Yes, sir.

19     Q.     And is it correct that this standard

20  form is used to note when, if at all, the

21  shackles are removed by the guards during the

22  course of a day, correct?

23     A.     Yes, sir.

24     Q.     And it's the obligation of the guard

TOOMEY REPORTING (312) 853-0648

1    under the protocol or practice to make a record

2    if the shackles are removed from a hospitalized

3    detainee, correct?

4        A.    Yes, sir.

5        Q.    And if there is no notation on the

6    form, the assumption would be that the detainee

7    was shackled during that period of time,

8    correct?

9        A.    Yes.

10        Q.    During what parts -- Strike that.

11            Under what circumstances would a guard

12    that was assigned to monitor or watch a

13    hospitalized detainee remove the shackles

14    during the course of a day?

15        A.    If they were allowed to go to the

16    bathroom, they would remove the shackles from

17    the bedframe and then re-shackle both legs and

18    allow them to go to the bathroom; if they were

19    being moved for a test; if a doctor requested

20    it.

21            But before any of this happens, they

22    must notify the supervisor on duty unless it's

23    an emergency situation.  And they would then

24    notify them via radio that they had an

TOOMEY REPORTING (312) 853-0648

1    emergency.

2         Q.    Would it be correct to state that the

3    practice of the Sheriff was before any shackle

4    was removed from a hospitalized detainee that

5    the guard that was watching the detainee would

6    have to seek the approval of a supervisor?

7         A.    Other than life-threatening.

8         Q.    By "life-threatening," what do you

9    mean?

10        A.    A doctor said the cuffs or shackles

11   have to come off or this person is going to

12   die.  That would be life-threatening.

13        Q.    What was and is the practice in

14   regards to assigning a correctional officer to

15   guard a hospitalized detainee?

16        A.    I don't understand the question.

17        Q.    The question is:  If a detainee was in

18   a hospital room, was there a practice and prior

19   to August of 2008, of having a guard assigned

20   to the room with the hospitalized detainee?

21        A.    Yes.

22        Q.    Would that correctional officer have a

23   gun?

24        A.    Yes, sir.


                 TOOMEY REPORTING (312) 853-0648

1       Q.      In addition, would the hospitalized

2    detainee under all circumstances be shackled?

3       A.      Yes, sir.

4       Q.      Now, you mentioned that in addition to

5    the correctional officer assigned to the room,

6    that there would be supervisors that also would

7    be responsible for monitoring hospitalized

8    detainees, correct?

9       A.      Yes, sir.

10       Q.      And the supervisor would also sign the

11    External Operations daily reports, correct?

12       A.      Yes, sir.

13       Q.      During the course of each shift, would

14    a supervisor have to come into the hospital

15    room where a detainee is housed to ensure that

16    the guard was performing his duty?

17       A.      Yes, sir.

18       Q.      And would that supervisor make a

19    notation or sign the External Operations log

20    which is indicated by Exhibit 3?

21       A.      Yes, sir.

22       Q.      Now, in addition to the form, is it

23    the practice of correctional officers to make

24    notes during those shifts?

TOOMEY REPORTING (312) 853-0648

1      A.    Yes, sir.

2      Q.    And are those notes kept in the

3    regular course of business by the Sheriff's

4    Office?

5      A.    Yes, sir.

6      Q.    Turning to page 2 of Exhibit 3, are

7    those notes made by the correctional officer

8    assigned to Simone Jackson on May 2nd, 2008?

9      A.    Yes, sir.

10     Q.    Do you know a Sergeant Roldan?

11     A.    Roldan, yes, sir.

12     Q.    Was Sergeant Roldan part of External

13   Operations?

14     A.    Yes, sir.

15     Q.    Is there a note on May 2nd, 2008, by

16   the correctional officer that he had contacted

17   Sergeant Roldan at 7:00 a.m. in the morning?

18     A.    Yes, sir.

19     Q.    And does it reflect that Ms. Jackson

20   was shackled and handcuffed?

21     A.    Yes, it does.

22     Q.    And was that pursuant to the practice

23   of the Sheriff?

24     A.    Yes, sir.


                TOOMEY REPORTING (312) 853-0648

1        Q.      And does it indicate that Ms. Jackson

2    is part of the MOMs program?

3        A.      Yes, it does.

4        Q.      And what is the Moms Program?

5        A.      The Moms Program, to the best of my

6    knowledge, is a program that allows the inmates

7    from Division 3 to go to the Haymarket and seek

8    counseling and skills while they're there.

9        Q.      Does the note also indicate that --

10   Strike that.

11            It's your understanding that people

12   that are assigned to the MOMs program from

13   Division 3 are either pregnant or have

14   delivered a child, correct?

15       A.      Yes.

16       Q.      Does this note at 7:00 a.m. in the

17   morning on May 2nd, 2008, indicate that the

18   patient, Ms. Jackson's water bag had broken --

19   water had broken?

20       A.      Yes, it does.

21       Q.      Now, as a Superintendent of External

22   Operations, looking at this note, would it

23   occur to you that Ms. Jackson was hospitalized

24   for the purpose of delivering a child?

TOOMEY REPORTING (312) 853-0648

1       A.      Yes.

2       Q.      Now, there is a notation at 5:00 p.m.

3   in the afternoon on May 2nd, 2008, correct?

4       A.      I'm sorry?

5       Q.      There is a notation on Exhibit 3 at

6   5:00 p.m. on May 2nd, 2008, correct?

7       A.      Yes.

8       Q.      Now, would that notation have been

9   made by the correctional officer that was

10  assigned to guard Ms. Simone Jackson?

11      A.      Yes.

12      Q.      And at that time that would have been

13  Officer Fleming?

14      A.      Yes.

15      Q.      So Officer Fleming would have made

16  that note in the normal course of business of

17  the Sheriff, correct?

18      A.      Yes, sir.

19      Q.      Do you know a Sergeant Johnson?

20      A.      Yes.

21      Q.      And does it reflect that

22  Sergeant Johnson would have been Officer

23  Pemberton's supervisor, correct -- I'm sorry,

24  Officer Fleming's supervisor?

TOOMEY REPORTING (312) 853-0648

1      A.      That is correct.

2      Q.      And again it reflects that Ms. Jackson

3  is in the MOMs program, correct?

4      A.      Correct.

5      Q.      And Sergeant Jackson is giving an

6  order that Ms. Jackson should be shackled and

7  handcuffed, correct?

8      A.      At 5:00 o'clock, yes, sir.

9      Q.      And that order by Sergeant Jackson --

10  Sergeant Johnson was following the practice and

11  procedure of the Sheriff's Office in regards to

12  shackling and handcuffing prisoners that were

13  hospitalized, correct?

14     A.      That is correct.

15     Q.      Now, there is another notation at 2014

16  which would be 8:14 in the evening, correct?

17     A.      Yes, sir.

18     Q.      And that notation is:  Patient is in

19  active labor.  Doctor issued for for shackles

20  to be removed.  Notified Sergeant Johnson.

21          That notation would have been made by

22  Officer Fleming, correct?

23     A.      Correct.

24     Q.      And that would be pursuant to the

TOOMEY REPORTING (312) 853-0648

1     standard practice and procedures of the Sheriff

2     again, correct?

3          A.    Correct.

4          Q.    Looking at the front side of

5     Exhibit 3, the form, there's no notation on

6     that form that the shackles, in fact, were

7     removed at 8:14, correct?

8          A.    Correct.

9          Q.    And there's no notation at 8:14 by

10    Officer Fleming that the shackles, in fact,

11    were removed at 8:14, correct?

12         A.    That is correct.

13         Q.    Is it the practice and procedure for a

14    correctional officer to notify his or her

15    supervisor that a doctor is asking for the

16    shackles to be removed?

17         A.    Correct.

18         Q.    Now, there is a notation at 12:30 a.m.

19    in the morning that the shackles were removed,

20    correct?

21         A.    It says "Cuffs were removed."

22         Q.    "Patient is in labor," correct?

23         A.    Correct.

24         Q.    At 11:00 p.m. there is a notation by

TOOMEY REPORTING (312) 853-0648

1    the officer on duty that "Patient is in labor.

2    Per the doctor no shackle order is present in

3    envelope."  What does "in envelope" mean?

4        A.    For each patient or each inmate there,

5    we keep an envelope that keeps this type of

6    paperwork and any other pertinent paperwork in

7    that envelope that is eventually going to go

8    back to External Operations to be filed, so

9    that order would have been in that envelope.

10       Q.    Let me clarify.  So for each

11   hospitalized patient, there is an envelope

12   maintained by the Sheriff's Office?

13       A.    An 8-by-11 manila envelope, yes.

14       Q.    Looking at this record, would it

15   appear to you that the shackle -- the handcuffs

16   were removed for the first time at 12:30 a.m.

17   on May 3rd, 2008?

18       A.    They were removed at that time.  Were

19   they removed earlier?  I couldn't say.  It's

20   not documented.

21       Q.    And there is a notation at the time

22   the baby was delivered at 12:40 a.m. on

23   May 3rd, 2008?

24       A.    That is correct.


                  TOOMEY REPORTING (312) 853-0648

```
 1        Q.    In May of 2008, for women that came to

 2    the jail -- came to the hospital from the jail

 3    who were pregnant, the standard practice of the

 4    Sheriff's Office was to shackle the woman once

 5    she reached the hospital room, correct?

 6        A.    Yes, sir.

 7        Q.    For a woman that was pregnant and was

 8    brought to a hospital for purposes of

 9    delivering a baby, the practice of the Sheriff

10    in May of 2008 was to keep the shackles on the

11    woman until the point that a medical doctor

12    ordered a correctional officer to remove the

13    shackles; is that correct?

14        A.    That's correct.

15        Q.    Looking at Exhibit 4 which is a

16    document for Simone Jackson, the External

17    Operations daily detainee hospitalization

18    checklist dated May 3, '08, is that again a

19    record that's kept in the normal course of

20    business?

21        A.    Yes, sir.

22        Q.    And it's a two-page document, isn't

23    it, Superintendent?

24        A.    Yes, sir.
```

TOOMEY REPORTING (312) 853-0648

1      Q.     And there's a notation made on the top

2      of the second page of 5/3/08, "Per Sergeant

3      Roldan, inmate is to remained cuffed and

4      shackled while handling her baby"; is that

5      correct?

6      A.     Yes, sir.

7      Q.     In May of 2008, for a woman that had

8      delivered a child at a hospital who was in

9      custody, was it the practice and the policy of

10     the Sheriff to handcuff and shackle the woman

11     while she was handling her baby?

12     A.     Yes, sir.

13     Q.     In May of 2008, was it the practice

14     and policy of the Sheriff of Cook County to

15     shackle a woman while she was breast-feeding

16     her newly-born child?

17     A.     Yes, sir.

18     Q.     There is a notation at 11:25 a.m. that

19     Officer McLean and Officer Pemberton are

20     transporting inmate to the fourth floor OR for

21     a medical procedure; is that correct?

22     A.     That is correct.

23     Q.     While a patient is being transported

24     to the operating room for a surgery in May of

TOOMEY REPORTING (312) 853-0648

```
 1     2008, was it the practice and policy to have

 2     that inmate shackled?

 3         A.    Yes.

 4         Q.    At 11:34 a.m. there is a notation on

 5     Exhibit 4, "Per Sergeant Roldan, restraints

 6     cannot be removed during surgery because inmate

 7     will not be completely sedated"; is that

 8     correct?  Do you see that notation?

 9         A.    Yes, sir.

10         Q.    Was it the practice and policy of the

11     Sheriff of Cook County to maintain restraints

12     on a woman or inmate during the course of

13     surgery if there was no order by a doctor?

14         A.     If an inmate is going to be completely

15     sedated, the shackles and the restraints would

16     come off completely.

17              If you're having a minor surgery

18     procedure which still means you're not

19     completely sedated, yes, we would leave the

20     shackles and cuffs on you unless the doctor

21     gives us an order.

22         Q.     In August of 2008 when you became

23     Superintendent of External Operations, did you

24     review the procedures involving shackling
```

TOOMEY REPORTING (312) 853-0648

1    pregnant women who are hospitalized while an

2    inmate of the Sheriff?

3    A.   Yes.

4    Q.   At whose direction did you review the

5    procedures in regards to shackling pregnant

6    women in August of 2008?

7    A.   My immediate director at the time was

8    Director Romero.

9    Q.   Did you have a conversation with

10    Director Romero when you took command of

11    External Operations?

12    A.   Yes.

13    Q.   Who was present during the

14    conversation?

15    A.   Just myself and him.

16    Q.   Do you recall what date that

17    conversation --

18    A.   No, sir, I don't.

19    Q.   Do you recall it was in the month of

20    August of 2008?

21    A.   It might have been September.  I went

22    on vacation as soon as I got there, so I didn't

23    really --

24    Q.   Are there any records in regards to

TOOMEY REPORTING (312) 853-0648

1    when you were on vacation in 2008?

2        A.    Yes.

3        Q.    But, to the best of your recollection,

4    you were on vacation in August?

5        A.    Yes, for just a week.

6        Q.    Within four to five weeks of becoming

7    the commander -- or the Superintendent of

8    External Operations, you recall having a

9    conversation with Romero in regards to

10   shackling of pregnant women?

11       A.    All the policies.  We sat down with

12   all the policies.

13       Q.    And Director Romero is one of the

14   assistant directors to the executive directors?

15       A.    Yes, sir.

16       Q.    And specifically in regard -- What

17   policies of External Operations did you discuss

18   with Director Romero?

19       A.    All of them.  The policy is to review

20   these once per year.

21       Q.    As a result of your conversations with

22   Director Romero, did you cause any of the

23   policies for External Operations to change?

24       A.    Minor changes in different policies.


TOOMEY REPORTING (312) 853-0648

1    I can't remember exactly which ones.  We

2    actually wrote some policies pertaining to

3    something other than the hospital with some of

4    the newer equipment we were using.

5        Q.    Were there any written changes in

6    regards to women that were pregnant and

7    hospitalized?

8        A.    Not by us.

9        Q.    Were there any written changes by

10   anybody within the Sheriff's Office after you

11   assumed command of External Operations?

12       A.    The Women's Justice Program.

13       Q.    Is the Women's Justice Program part of

14   the Sheriff's Office?

15       A.    Yes, sir.

16       Q.    Is there a woman by the name of

17   Ms. McDermott that is in charge of the Women's

18   Justice Department?

19       A.    Yes, sir.

20       Q.    After you became head of External

21   Operations, did you have any conversations with

22   Ms. McDermott in regards to pregnant women who

23   are hospitalized?

24       A.    No, I did not.


                TOOMEY REPORTING (312) 853-0648

1      Q.    Did Ms. McDermott make any changes

2   while you were head of External Operations in

3   regards to pregnant women that are

4   hospitalized?

5      A.    I'm not sure if she did.  I -- One of

6   her assistants might have.

7      Q.    What changes were made by either

8   Ms. McDermott or one of her subordinates in

9   regards to hospitalized pregnant women?

10      A.    They no longer had us sitting on the

11   females from the MOMs program.

12      Q.    Now, when you say "sitting," what do

13   you mean?

14      A.    We were no longer part of being

15   security for them.  "Us" being External

16   Operations.

17      Q.    Was that a decision made by -- Strike

18   that.

19            As the Superintendent of External

20   Operations, you have specific command and

21   responsibility for all inmates that are housed

22   outside of the jail compound, correct?

23      A.    Yes.

24      Q.    And the Women's Justice Department

TOOMEY REPORTING (312) 853-0648

```
 1     does not have responsibility in regards to

 2     providing security and custody of detainees

 3     that are housed off of the Cook County Jail

 4     compound, correct?

 5        A.    I'm not sure what their policies are

 6     now.  I don't know their policies, to be honest

 7     with you.

 8             And I need to strike the last

 9     statement because actually DCSI, I do believe,

10     sits on their own inmates at the hospital, as

11     well.

12        Q.    What is DCSI?

13        A.    Department of Community Supervision

14     and Intervention is the pre-release program,

15     the day reporting program, and the home

16     monitoring program; so I would not sit on their

17     inmates either.

18        Q.    But those are -- But you received an

19     order sometime after August of 2008 from the

20     Women's Justice Department that women that were

21     assigned to the MOMs program were not to be --

22     that External Operations was not to provide

23     security?

24        A.    That is correct.
```

TOOMEY REPORTING (312) 853-0648

1      Q.     Now, that was just specifically to

2    women that were part of the MOMs program,

3    correct?

4      A.     Correct.

5      Q.     So that you continued to have

6    responsibility over women that came from

7    Division 3 in the course of their pregnancy and

8    were hospitalized, correct?

9      A.     That is correct.

10     Q.     In regards to after August of 2008,

11   you stated that External Operations would no

12   longer provide security for women that were in

13   the MOMs program that were hospitalized for

14   purposes of delivering a child, correct?

15     A.     Correct.

16     Q.     Was there any other branch of the

17   Sheriff's Office that provided security for

18   women that were hospitalized after August of

19   2008 for the purposes of delivering a child?

20     A.     For the Women's Justice Program?

21     Q.     Do you understand my question?

22     A.     No.

23     Q.     In August of -- Sometime after August

24   of 2008, you're not sure specifically, correct?

TOOMEY REPORTING (312) 853-0648

1        A.      Correct.

2        Q.      You don't have an exact date.  It

3    could have been September or October of 2008

4    that External Operations no longer provided

5    security for women that were hospitalized from

6    the MOMs program?

7        A.      It was in October of '08.

8        Q.      So you're sure it was in October of

9    '08?

10       A.      Yes, sir.

11       Q.      After October of 2008, to your

12   knowledge, was any other division within the

13   Sheriff's Office responsible for providing

14   security for women from the MOMs program that

15   were hospitalized for the purposes of

16   delivering a child?

17       A.      I don't know.

18       Q.      Did you raise any concerns as the

19   External Operations superintendent in regards

20   to the security risk of not having a

21   correctional officer sitting at the bed of a

22   hospitalized female after 2008, that she may be

23   a flight risk?

24       A.      No, sir.


                    TOOMEY REPORTING (312) 853-0648

1    Q.    Was it your responsibility, to your

2    knowledge, as the External Operations chief, to

3    provide security for all detainees that are

4    housed outside of the Cook County Department

5    of Corrections?

6    A.    No, sir.

7    Q.    Did you raise any concerns after

8    October of 2008 that your unit, External

9    Operations, was not providing security for

10   these women from the MOMs program that were

11   hospitalized for the purposes of delivering a

12   child?

13   A.    No, sir.

14   Q.    Did you personally have any concerns

15   that women from the MOMs program that were

16   hospitalized for the purpose of delivering a

17   child were a flight risk?

18   A.    No, sir.

19   Q.    Did you personally believe that there

20   was a penological reason after October of 2008

21   to have these women shackled that were in the

22   MOMs program and were hospitalized for the

23   purpose of delivering a child?

24         MR. WEIDHUNER:   I'm going to object to

TOOMEY REPORTING (312) 853-0648

1    that question.  It calls for his particular,

2    what would you say, opinion.  And this 30(b)(6)

3    is not for his opinion but for the policies,

4    practices, and customs of the Sheriff.

5              MR. MORRISSEY:  Okay.

6    BY THE WITNESS:

7         A.    I didn't care.

8    BY MR. MORRISSEY:

9         Q.    In August of 2008 when you were --

10   Strike that.

11             After October of 2008 for women that

12   were assigned to the MOMs program and

13   hospitalized for the purposes of delivering a

14   child, was it your understanding that not only

15   a correctional officer is not assigned to the

16   room but also that the women were not shackled?

17        A.    After?

18        Q.    After October of 2008.

19             MR. WEIDHUNER:  You're talking about

20   the MOMs now?

21             MR. MORRISSEY:  Yes.  Let me shorten

22   the question.

23             MR. WEIDHUNER:  Okay.

24

TOOMEY REPORTING (312) 853-0648

1    BY MR. MORRISSEY:

2        Q.     After October of 2008 for women that

3    were assigned to the MOMs program that were

4    hospitalized for purposes of childbirth, were

5    they shackled?

6        A.     I don't know.

7        Q.     In August of 2008, what reason were

8    women that were assigned to the MOMs program,

9    what reason did you assign a guard to watch

10   women that were assigned to the MOMs program

11   that were hospitalized for the purpose of

12   delivering a child?

13       A.     They were -- We were instructed by the

14   receiving and/or records department that this

15   was our inmate.  "Ours" being the Department of

16   Corrections.  And when it's a Department of

17   Corrections inmate, we follow the procedures

18   that we have for a Department of Corrections

19   inmate.

20       Q.     Who instructed you from the RCDC that

21   a woman that was in the MOMs program in August

22   of 2008 who was hospitalized for the purpose of

23   delivering a child needed to be shackled?

24       A.     Whoever took that information.  We

TOOMEY REPORTING (312) 853-0648

1    have hospital takeovers all the time.  It

2    happens every day and we always get information

3    from a different records officer that this is

4    now our prisoner.  We are to send an officer on

5    that prisoner.

6        Q.    What type of log do you maintain in

7    regards to -- log from the -- concerning

8    information from the records office or the RCDC

9    that External Operations is to take over the

10   information for a hospitalized detainee?

11       A.    That information should be in the

12   External Operations shift commander's office in

13   a logbook.

14       Q.    Would it be correct to state that

15   after October of -- strike that -- that from

16   the time you became External Operations chief

17   in August of 2008 to the time you left, that

18   the procedures and practices in regards to

19   women that came from Division 3 to the hospital

20   who were brought to the hospital for purposes

21   of delivering a child remained the same?

22       A.    Correct.

23       Q.    During the time you were External

24   Operations superintendent from August of 2008

TOOMEY REPORTING (312) 853-0648

1   up to you said May of 2009?

2       A.    Yes, sir.

3       Q.    If a woman from Division 3 was brought

4   to a hospital for the purpose of childbirth, a

5   correctional officer would be assigned to her

6   room, correct?

7       A.    Correct.

8       Q.    And the correctional officer would

9   have a gun, correct?

10      A.    Yes.

11      Q.    The woman from Division 3 that is

12  pregnant and was brought to the hospital for

13  purposes of childbirth would be shackled in a

14  room, correct?

15      A.    Correct.

16      Q.    And her leg -- one leg would be

17  shackled to the bed, correct?

18      A.    Yes, sir.

19      Q.    And a hand would be shackled to the

20  bed?

21      A.    Cuffed to the bed.

22      Q.    Cuffed to the bed?

23      A.    Yes, sir.

24      Q.    The guard that's sitting in the room,

TOOMEY REPORTING (312) 853-0648

1     the armed guard that's sitting in the room,

2     under the practice and policy of the Sheriff

3     would be required to shackle the female to her

4     bed, correct?

5     A.    Yes.

6     Q.    The female who was pregnant and at the

7     hospital from Division 3 for purposes of giving

8     birth would remain shackled pursuant to the

9     practice of the Sheriff up until the point

10    there was a direction from a doctor, correct?

11    A.    Yes.

12    Q.    If and when a medical doctor

13    instructed the guard assigned to the hospital

14    room to remove the shackles, there would be a

15    practice of -- Strike that.  Let me shorten it.

16        MR. WEIDHUNER:  Why don't you, because

17    this has all been asked and answered, Tom.

18    BY MR. MORRISSEY:

19    Q.    For a woman that's in Division 3

20    that's hospitalized, the guard upon notice or

21    an order -- receiving an order from a doctor

22    would have to contact his or her supervisor in

23    regards to the doctor's order to remove the

24    shackles, correct?

TOOMEY REPORTING (312) 853-0648

1      A.     Yes.

2      Q.     Only after the guard received approval

3   from his or her supervisor would the guard then

4   remove the shackles from the woman in

5   Division 3 that is hospitalized for purposes of

6   delivering a child?

7      A.     Unless it was an emergency.

8      Q.     As the Rule 30(b)(6) designated

9   deponent, you're here to -- As the

10  Rule 30(b)(6) deponent, do you know whether or

11  not the procedures have changed at all since

12  you left External Operations in May of 2009

13  concerning the shackling of pregnant women from

14  Division 3 at the hospital?

15     A.     I don't know.

16     Q.     Currently who is the Superintendent of

17  External Operations?

18     A.     Thomas Snooks.

19     Q.     How do you spell his name?

20     A.     S-n-o-o-k-s.

21     Q.     Do you personally know how many women

22  from Division 3 gave birth to children during

23  the period from August of 2008 up to May of

24  2009?

TOOMEY REPORTING (312) 853-0648

1        A.    No, I do not.

2        Q.    Now, in regards to Division 3, when a

3    woman from Division 3 was transported to the

4    hospital to give birth to a child, officers

5    from External Operations would accompany the

6    woman, correct?

7        A.    Yes.

8        Q.    To your knowledge, normally would the

9    woman be transported in an ambulance, if she

10   was being transported from Division 3 to a

11   hospital for the purpose of giving birth to a

12   child?

13       A.    Yes.

14       Q.    How many correctional officers from

15   Division -- How many correctional officers from

16   External Operations would be assigned to

17   transport a woman from Division 3 when she was

18   being transported to the hospital to give birth

19   to a child?

20       A.    One officer in the ambulance,

21   two officers in a squad car following.

22       Q.    The practice and policy of the Sheriff

23   from August 2008 to the present in regards to

24   women from Division 3 that are transported to

TOOMEY REPORTING (312) 853-0648

1 the hospital for purposes of giving birth to a

2 child is to shackle the woman while she's being

3 transported?

4 A. Yes.

5 Q. In regards to women that are in

6 Division 3 that are transported to a hospital

7 for purposes of giving birth to a child, how

8 were they shackled in the ambulance?

9 A. To the bed that they're usually put on

10 and brought in.  They would be shackled to part

11 of the metal bed as well as cuffed, and that

12 was depending on the type of condition she was

13 in.  It would be up to the medical staff to

14 tell us what we can and can't do.

15 Q. In the absence of any direction from

16 the medical staff, the practice of shackling of

17 a woman from Division 3 to the hospital was

18 what?  How was --

19 A. They were shackled to the bed,

20 bedframe.  They were cuffed to the bedframe.

21 Q. When a woman from Division 3 is

22 transported to the hospital for purposes of

23 giving birth to a child, what type of

24 restraints are used once the female in

```
 1      childbirth arrives to the hospital?

 2      A.     The same.

 3      Q.     Can you tell me specifically?

 4      A.     Shackles and cuffs.

 5      Q.     In the emergency room?

 6      A.     Yes, sir.

 7      Q.     If the woman who was being trans- --

 8   who was transported from Division 3 for the

 9   purposes of giving birth to a child, to a

10   hospital, enters the emergency room, she is

11   shackled, correct?

12      A.     Yes, sir.

13      Q.     If that same woman is removed from the

14   emergency room and transferred to a labor and

15   delivery room, is it the practice of the

16   Sheriff to shackle the woman while she is

17   transported from the emergency room to the

18   labor and delivery room?

19      A.     If the doctor said she's in labor,

20   they're removed.  If the doctor does not tell

21   us that she's in labor, they remain on.

22      Q.     Just to clarify.  So unless the

23   medical doctor gives an order to the

24   correctional officers that the woman is in
```

TOOMEY REPORTING (312) 853-0648

1    labor, the normal practice and procedure for

2    the Sheriff is to maintain the shackles on a

3    woman when she's moved from the emergency room

4    to the labor and delivery room?

5    A.    Yes, sir.

6    Q.    Is it also the practice and policy

7    once the woman from Division 3 is placed in the

8    labor and delivery room to secure the woman to

9    the hospital bed with shackles?

10    A.    Yes.

11    Q.    And for a woman in Division 3 after

12    she is placed in the labor and delivery room,

13    the shackles remain on that woman up to the

14    point in which a doctor issues a written order

15    or oral order that the shackles should be

16    removed?

17    A.    Yes.

18    Q.    Once a doctor issues an order to

19    remove the shackles, the shackles remain on the

20    woman until the guard's supervisor authorizes

21    the removal of the shackles, correct?

22    A.    Yes.

23    Q.    And it's the practice and procedure of

24    the Sheriff that once a child is delivered,

TOOMEY REPORTING (312) 853-0648

1      that the shackles are re-placed on the woman?

2          A.     If we're able to, if there's no

3      medical reasons, yes.

4          Q.     And after the birth of a child, either

5      for a woman that was in the MOMs program or --

6      Well, strike that.

7                 After the birth of a child for a woman

8      that was previously housed in Division 3, it is

9      the practice and the policy to have the woman

10     shackled during all times when she was

11     hospitalized?

12         A.     Yes, sir.

13         Q.     And for a woman in Division 3

14     during -- after she delivers a child, the

15     shackles remain on the woman while she is

16     breast-feeding the child?

17         A.     Yes, sir.

18                MR. MORRISSEY:  May I have a moment.

19                      (Brief pause.)

20     BY MR. MORRISSEY:

21         Q.     During that time you were the External

22     Operations supervisor -- superintendent, did

23     you receive any notice of any woman that was

24     hospitalized for purposes of delivering a child

TOOMEY REPORTING (312) 853-0648

1     attempting to escape?

2        A.    No, sir.

3        Q.    During the time you were the External

4     Operations superintendent, did you receive any

5     notice or report that a woman that was assigned

6     to the MOMs program attempted to escape?

7        A.    No, sir.

8        Q.    Where are the External Operations

9     daily detainee hospitalization checklists kept?

10    Where are the records kept?

11       A.    They're in a supply room in the South

12    Campus of the Sheriff's Department.

13       Q.    Are those records kept under the

14    custody and control of the External Operations

15    Division?

16       A.    Yes, sir.

17       Q.    And that would be at 26th and

18    California?

19       A.    It's actually at about 31st and

20    California.

21       Q.    For what period of time, to your

22    knowledge, are those External Operations

23    checklist records maintained?

24       A.    I'm not sure how many years they go

TOOMEY REPORTING (312) 853-0648

1      back.  I really don't know.

2          Q.      When you were superintendent, did you

3      have access to those records?

4          A.      Yes.

5          Q.      And could you access the records for

6      the previous six months within a matter of a

7      day?

8          A.      It would take a couple officers a few

9      days to go through it.  They're boxed up in a

10     room down in the basement.

11         Q.      Are they boxed up on a daily basis?

12     Are they run consecutively for --

13         A.      Monthly basis.

14         Q.      So if I asked you to pull the -- or

15     have somebody from your department pull the

16     External Operations checklist for a specific

17     individual that was hospitalized in the year

18     2008, that record could be obtained in a matter

19     of days?

20             MR. WEIDHUNER:  I'm going to object at

21     this point.  This has nothing to do with what

22     we are here for.  Don't answer.  And if you

23     keep it up, we're going to terminate the dep.

24             MR. MORRISSEY:  I have nothing

                    TOOMEY REPORTING (312) 853-0648

1    further.

2              CROSS-EXAMINATION

3    BY MR. WEIDHUNER:

4        Q.    I'm going to ask you as to Exhibit

5    Number 2 which was the general order that was

6    effective October '08, page 3 of 8, D, "Labor

7    and Delivery Room."  Sentence Number 1:  In

8    accordance with Illinois Statute 730 ILCS

9    125/17.5 (Pregnant Female Prisoners) No

10   handcuffs, leg irons, or waist chains shall be

11   used on a female inmate (detainee) who is in

12   labor, this includes while being been

13   transported to the medical facility, what does

14   all that mean to you?

15       A.    That means to me that if a doctor told

16   me that the inmate was in labor, we would not

17   use any restraints whatsoever.

18       Q.    Now, we were talking a lot of times of

19   taking an inmate, a pregnant female from

20   Division 3, to the hospital to deliver this

21   baby.  Do you know, would External Ops go to

22   Division 3 to pick them up or Cermak to pick

23   them up?

24       A.    Cermak.

                TOOMEY REPORTING (312) 853-0648

1      Q.     Do you recall of any instance where

2      you had to actually go to Division 3 and pick

3      up an inmate from there?

4      A.     No, sir.

5      Q.     In regards to Exhibits 3 and 4, in

6      regards to the officer's notes, are these just

7      a summary of what happens or is this supposed

8      to be word for word what an officer did on his

9      shift?

10     A.     It is a summary of what happened.

11     Q.     So when a doctor says take off the

12     cuffs and your officer calls his supervisor but

13     yet it doesn't say the cuffs were removed, can

14     we assume that the cuffs were removed or the

15     shackles were removed?

16            MR. MORRISSEY:  I'm going to object.

17     I don't know if he has any personal knowledge.

18     BY MR. WEIDHUNER:

19     Q.     If you know from your own personal

20     knowledge?

21     A.     That, I wouldn't know.

22     Q.     There was a note on Exhibit 4 of

23     5/3/08 of Simone Jackson at 11:34:  Per

24     Sergeant Roldan restraints cannot not be

TOOMEY REPORTING (312) 853-0648

1    removed during surgery because inmate will not

2    be completely sedated.

3            Do you remember saying yes to the --

4    A.    Yes.

5    Q.    At 11:40 hours, per sergeant Roldan

6    after receiving an okay, soft restraints can be

7    used.  Metal restraints can be taken off after

8    soft restraints are in place.  Arms and legs,

9    initials R.M.

10   A.    Yes, sir.

11   Q.    Who is R.M.?

12   A.    I don't know.  It could have been the

13   officer that was actually on duty.  I'm

14   assuming it was R. McLean.

15   Q.    Do you know how to spell McLean's

16   name?

17   A.    It might be McLean or McClendon.  I'm

18   looking -- It's a very poor -- I do believe it

19   is Officer McClendon.

20   Q.    And that's looking at the 11:25 hours

21   entry?

22   A.    Yes.  It's a poor signature, but it is

23   McClendon.  We do have a McClendon in that

24   office.

TOOMEY REPORTING (312) 853-0648

1      Q.    So in a nutshell, I think we can sum

2  up the policy as keep them shackled and cuffed

3  unless told by a doctor to remove them?

4      A.    Yes, sir.

5           MR. WEIDHUNER:  Nothing else.

6           MR. MORRISSEY:  I have just a few

7  brief follow-ups.

8                REDIRECT EXAMINATION

9  BY MR. MORRISSEY:

10     Q.    Now, women that are assigned to

11  Division 3, to your knowledge, have some type

12  of medical need, correct?

13     A.    No.

14     Q.    If you know?

15     A.    No, they do not.

16     Q.    Cermak is part of Division 8, correct?

17     A.    Yes, sir.

18     Q.    And Division 8 includes Division 3,

19  correct?

20     A.    No.  They are close but they're not

21  the same buildings.

22     Q.    No, I'm not saying physically, but the

23  same superintendent from the Sheriff's Office

24  that's is in charge of Division 8 is also in


                TOOMEY REPORTING (312) 853-0648

1    charge of Division 3?

2        A.    That is correct.

3        Q.    And when I asked you those series of

4    questions about women that go to the hospital

5    from Division 3, you understood that I meant

6    that they either went physically from

7    Division 3 or from Cermak Hospital to a

8    hospital facility delivering a child, correct?

9        A.    All females would leave from Cermak,

10   yes.

11       Q.    So all women that were pregnant

12   generally would leave from Cermak when they

13   were going to the hospital for purposes of

14   delivering a child, correct?

15       A.    Yes, sir.

16       Q.    So my question just briefly is:  When

17   a woman was taken from Cermak and formally

18   assigned to Division 3 and transported by

19   External Operations, she would have been

20   shackled during transport by officers from

21   External Operations, correct?

22       A.    Yes, sir.

23       Q.    And the same would be true that once

24   she got to the hospital, Stroger or Mount

TOOMEY REPORTING (312) 853-0648

1    Sinai, that women that came from Cermak; i.e.,

2    Division 3, were shackled in the emergency

3    room, correct?

4    A.   Yes.

5    Q.   And the same would be true that if a

6    woman was assigned in Division 3 that came from

7    Cermak to the hospital and later was

8    transported to the labor and delivery room, she

9    would have remained shackled, correct?

10    A.   Yes.

11    Q.   And that a woman from Division 3 who

12    left the jail from Cermak would remain shackled

13    while she was hospitalized until the Sheriff's

14    Office received an order from a medical doctor

15    that the shackles should be removed?

16    A.   Correct.

17    MR. MORRISSEY:  I have nothing

18    further.

19    MR. WEIDHUNER:  Nothing else.

20    MR. MORRISSEY:  Thanks a lot.

21    THE COURT REPORTER:  Signature?

22    MR. MORRISSEY:  Don, signature?

23    MR. WEIDHUNER:  Do you want to waive

24    your signature?  The only thing we can change

TOOMEY REPORTING (312) 853-0648

1     is waive spellings and typos.

2           THE WITNESS:  I'll waive it.

3           MR. MORRISSEY:  Show signature waived.

4               (WHEREUPON, at 11:50 a.m. the

5               deposition was completed and

6               the witness was excused.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS )
                        )  SS:
2    COUNTY OF C O O K )

3         I, KATHLEEN P. LIPINSKI, a Notary

4    Public within and for the County of Cook, State

5    of Illinois, and a Certified Shorthand Reporter

6    of said state do hereby certify:

7         That previous to the commencement of

8    the examination of the witness, the witness was

9    duly sworn to testify the whole truth

10   concerning the matters herein;

11        That the foregoing deposition

12   transcript was reported stenographically by me,

13   was thereafter reduced to typewriting under my

14   personal direction, and constitutes a true

15   record of the testimony given and the

16   proceedings had;

17        That the said deposition was taken

18   before me at the time and place specified;

19        That the said deposition was adjourned

20   as stated herein;

21        That I am not a relative or employee

22   or attorney or counsel, nor a relative or

23   employee of such attorney or counsel for any of

24   the parties hereto, nor interested directly or


             TOOMEY REPORTING (312) 853-0648

1       indirectly in the outcome of this action.

2                IN WITNESS WHEREOF, I do hereunto set

3       my hand and affix my seal of office at Chicago,

4       Illinois, this 10th day of July, 2009.

5

6

7

8

9

10      _____

11              KATHLEEN P. LIPINSKI, CSR

12

13

14

15

16

17

18      CSR 084-003808

19

20

21

22

23

24

TOOMEY REPORTING (312) 853-0648

**Exhibit 6**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT JACKSON, JOSEPH** | ) | |
| **McGRATH, and DERRELL SMITH** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No.  06 C 0493** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **SHERIFF OF COOK COUNTY, COOK** | ) | |
| **COUNTY, ILLINOIS and DIRECTOR,** | ) | |
| **CERMAK HEALTH SERVICES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Now before this court is the Motion to Certify Plaintiff Class filed by plaintiffs Robert

Jackson ("Jackson"), Joseph McGrath ("McGrath"), and Derrell Smith ("Smith") (collectively

"Plaintiffs") against Defendants Sheriff of Cook County ("Sheriff"), Cook County of Illinois

("Cook County"), and Director of Cermak Health Services ("Cermak") (collectively

"Defendants").  For the reasons set forth below, Plaintiffs' motion for class certification is

GRANTED.

## BACKGROUND[1]

The instant Plaintiffs were admitted to the Cook County Jail as pre-trial detainees at

varying dates,[2] where they were allegedly forced to undergo a screening test for sexually

---

[1]For the purposes of this motion, Plaintiff's well-pleaded allegations are taken as true.
*See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 179 (1974).

[2]Jackson was admitted on February 4, 2004, McGrath on December 27, 2005, and Smith
on July 20, 2004.

-1-

transmitted disease ("STD screening").  Though some details of their accounts vary, the general

process was the same in all cases.  Upon arriving at the jail, Plaintiffs signed medical release

forms and questionnaires as part of the admission procedure.  One of these forms contained a

"Consent for Treatment" decree, apparently signed by all three putative representatives, that read

as follows:

> I consent to a medical and mental health history and physical including
> screening for tuberculosis and sexually transmitted diseases as part of the
> intake process of the Cook County Jail....[signed by prisoner].

*See* Resp. to Cert. Mot. Ex. A at 18, Ex. B at 16, Ex. C at 17.  All admitted prisoners were lined

up to enter an examination room within the medical intake area.  Once inside, a medical

technician from Cermak Health Services asked the prisoners to lower their pants.  The technician

would then insert a cotton swab into the tip of each prisoner's penis, apparently in order to

collect a tissue sample for testing.[3]  At all times, jail deputies were nearby, though it is not

entirely clear where they were usually stationed with respect to the examination area.[4]

On January 27, 2006, Plaintiff Jackson filed a complaint alleging violation of his

constitutional rights under the Fourth and Fourteenth Amendments pursuant to 28 U.S.C. § 1983.

The Complaint was amended on January 31, 2006 to include additional Plaintiffs McGrath and

Smith, and corrected on February 1, 2006.  Plaintiffs in this case have now filed a motion for

class certification.  The putative plaintiff class consists of "[a]ll male prisoners at the Cook

County Jail who, on and after January 27, 2004, was [sic] subjected to the non-consensual

---

[3]The particulars of this particular point in the process vary, as some accounts claim that:
the swabbing was done over a garbage can; the technician failed to change his glove before
administering the test to subsequent prisoners; and that either the prisoner held his own penis
during the procedure or his penis was held by the technician.

[4]*See, e.g.*, Smith Dep. at 51 (placing the guard in the doorway of the room).

insertion of a swab into this penis as part of his admission to the jail." Cert. Mot. at 1. In support of their motion to certify the class, Plaintiffs have submitted fourteen (14) "Sworn Declarations" from men who had been admitted into the Cook County Jail.[5] *See* Cert. Mot., Ex. 1. These declarations rely upon roughly identical text to state their support of the class and the declarant's potential membership in it:[6]

> The undersigned, under penalties of perjury, certifies that the following statement are [sic] true:
>
> 1-2.    [summary of individual's biographical information, including name, date of admission, CIMIS number, and age at the time]
>
> 3.    On admission to the Cook County Jail, I was subjected to a procedure which I understand to be known as the insertion of a urethral swab into my penis.
>
> 4.    I did not consent to this procedure [and tried to refuse].
>
> 5.    I would not have agreed to undergo this procedure if I had been given a choice.
>
> 6.    The procedure was painful and an embarrassing intrusion into a private part of my body.
>
> 7.    I was in pain for [___] day(s) after the procedure.
>
> 8.    The person who performed the procedure held my penis with his hand while inserting the swab.

*Id.*

---

[5] These declarations were made by: Kamal J. Davis, Troy O. Hampton, Lawrence A. Howard, Crasseros Jackson, Jerome Johnson, Thomas Kelly, Sylvester Kimbrew, Larry E. Lawson, Kevin McDuffie, Calvin K. Odisho, Vincent D. Papaccio, Leonard Pitman, Michael Rodriguez, and John O. Williams.

[6] Bracketed language indicates wording that varied from one declaration to another, or which was absent from one or more of the declations.

Plaintiffs' Exhibit 6      Page 3

## LEGAL BACKGROUND

The federal Rules of Civil Procedure provide the federal district courts with broad

discretion to determine whether certification of a class-action lawsuit is appropriate.  *Keele v.*

*Wexler*, 149 F.3d 589 (7th Cir. 1998).  When evaluating a motion for class certification, the court

accepts as true all well-pleaded allegations made in support of certification.  *Eisen v. Carlisle &*

*Jacquelin*, 417 U.S. 156, 179 (1974); *Hardin v. Harshberger*, 814 F.Supp. 703, 706 (N.D.Ill.

1993).  The party seeking class certification bears the burden of showing that the requirements

for the class certification have been met.  *Carlisle*, 417 U.S. at 179; *see also Patterson v. Gen.*

*Motors Corp.*, 631 F.2d 476, 480 (7th Cir.1980), cert. denied, 451 U.S. 914 (1981).    Failure to

establish any one of the requirements precludes class certification. *Retired Chicago Police Ass'n*

*v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993).

Rule 23 of the Federal Rules of Civil Procedure governs the requirements of class

certification. Under that rule, deciding a motion for certification requires a two-step analysis.

First, the named plaintiff must satisfy the four threshold pre-requisites of Rule 23(a): (1)

numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Second, the

action must qualify under one of the three subsections of Rule 23(b); in this instance, the

Plaintiffs seek to qualify under 23(b)(3), meaning they must establish that questions common to

all members of the class predominate and that a class action would be the most effective

approach to resolving the matter.  In order to determine whether or not these criteria have been

met, it is not appropriate to examine the substantive merits of the case itself.  *Eisen v. Carlisle &*

*Jacquelin*, 417 U.S. 156, 177 (1974) (finding that the court deciding certification has no

"authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether

-4-

it may be maintained as a class action"). Nonetheless, it is necessary to "make a 'preliminary inquiry...that has as its focus not the substantive strenth or weakness of the plaintiffs' claims but rather the merits of those allegations that bear on the suitability of a case for class treatment under Rule 23(a) and (b).'" *Rahim v. Sheahan*, 2001 WL 1263493 at *10 (N.D.Ill. Oct. 19, 2001) (quoting Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001)).

## ANALYSIS

Because the Plaintiff have met all of the prerequisites of 23(a), as well as the criteria of 23(b)(3), their motion for class certification is GRANTED.

### *Numerosity*

Rule 23(a)(1) is satisfied if "the class is so numerous that joinder of all members is impracticable." This places a positive burden on the party seeking to certify the class to show that there are enough class members that it would not make sense to bring them all into court. Plaintiffs are not required to specify the exact number of class members. *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978). An approximation of the proposed class size can be based on common-sense assumptions and estimates. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (D. Ill. 1996). However, failure to provide an estimate, or means for making such an estimate, can prove fatal to a certification motion. *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (holding that plaintiffs "cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity") (citing Valentino v. Howlett, 528 F.2d 975, 978 (7th Cir. 1976)). While there is no set minimum number of plaintiffs required for class certification, Courts have generally recognized that joinder is impracticable where a class contains more than 40 members. *Johnson v. Rohr-Ville Motors, Inc.*, 189 F.R.D.

-5-

363, 368 (D. Ill. 1999) (citing Swanson v. Am. Consumer Indus., Inc., 415 F.2d 1326, 1333 (7th Cir. 1969).

Defendants are correct that Plaintiffs have not given this Court a definite idea of how many members its putative class will contain.  At present, it is only clear from the record that seventeen current or former prisoners have a potential claim against Defendants; the three named Plaintiffs and the additional fourteen declarants.[7]  While the definiteness of the total number of class members is a factor to consider in weighing considerations for or against certification, in this instance it is nonetheless clear that the putative class will be sufficiently large.  As Plaintiffs previously stated, the alleged "invasive procedure has been applied to more than one thousand persons from January 27, 2004 to the present."  Cert. Mot. at at 1.  The class will likely expand to include nearly all prisoners admitted into the Cook County Jail within the Plaintiffs' proposed temporal range.  Though somewhat variable due to prisoners who opt out, or unusual cases in which the roughly standardized procedures were not applied, it is clear that this putative class is sufficiently numerous for determining that certification would be more efficient than resolution through joinder or multiple legal actions.[8]

---

[7]Defendants maintain that because the supporting declarations use boilerplate language their veracity as personalized accounts is suspect and they should not be given significant weight.  However, repeated language does not prove that the experience was not common to all of these declarants, and there was in fact some effort to individualize the declarations, e.g., the medical technician's approach, or the number of days of pain following the procedure, differed from one account to another.

[8] Plaintiffs' fourteen declarations were collected by contacting only three days' worth of prisoners admitted into the Cook County Jail.  Cert. Mot. at 2-4; Resp. to Cert. Mot. at 5.  Even if class membership were limited to prisoners who sign such a declaration, Plaintiffs have thus far gained an average of $4\frac{2}{3}$ additional members for every considered day of admission into the jail.  The proposed definition of the class, which would cover all prisoners admitted since January 27, 2004, would cover hundreds of days, and would therefore provide the requisite

Plaintiffs' Exhibit 6

Defendant maintains that a mailing was sent to all prisoners currently held in the Cook County Jail system.  Plaintiffs admit that this is true.  Reply in Supp. of Cert. Mot. at 4 . Defendant also argues that Plaintiffs have had adequate time to seek out declarants regarding the typicality of the allegations and have only had limited success in their efforts.  Resp. to Cert. Mot. at 5.  However, Plaintiffs failure to more definitely determine the ultimate size of the class, despite their time and effort, is not terminal.  As stated above, this class action will likely include a large majority of prisoners who have had the screening process applied to them, and a sufficiently high number of class members to warrant the greater efficiency of the class action process.  Because enough information has been provided to make this determination, Plaintiffs have relied on more than mere "conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity."  *See Marcial*, 880 F.2d at 957.  Rather, they have provided adequate information from which a large, if indefinite, number of class members can be discerned.

*Commonality/Typicality*[9]

Rule 23(a)(2) calls for the "existence of at least one issue of fact or law common to all class members."  *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 622 (D. Ill. 1989).  "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)," *id.*, and under the rule the existence of some factual variation among class members will not defeat a class action, *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992).

---

numerosity.

[9]These two criteria are often analyzed together, *see Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992), as this Court now does.

-7-

Plaintiffs assert that there are several common questions of fact or law, namely:

> Is the procedure undertaken without consent?  And, if so, is consent required by the Fourth and/or Fourteenth Amendments?
>
> Does the Procedure violate rights secured by the Fourth and/or Fourteenth Amendments?
>
> Is the manner in which the procedure is performed reasonably calculated to spread disease and, if so, is this a violation of rights secured by the Fourth and/or Fourteenth Amendments?

Pl.'s Cert. Mot. at 4-5.  While there are some factual discrepancies among members of the putative plaintiff class, there are nonetheless common issues of fact and law to justify class certification.

Defendants rely too much on select factual determinations that might bary on a case-by-case basis, and which in some way might affect the screening process for individual putative class members.  Rather than seeking to establish that the prisoner consent was valid in some instances and invalid in others, Plaintiffs maintain that, *as a rule*, the manner in which the screening process is conducted precludes valid consent: "Plaintiffs intend to show in their impending motion for summary judgment that the totality of circumstances at the receiving unit makes it impossible for anyone to give a valid consent to the insertion of the urethral swab."  Pl.'s Reply in Supp. of Class Cert. at 11.  This framing of the issue effectively shifts the debate toward questions that are resolvable without delving into an individualized analysis of minor factual discrepancies.  *See, e.g.,  Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 955 (7th Cir. 2006) (upholding class certification despite member differences because the answers to the distinguishing question – the presence or absence of a firm offer – were not dispositive of the ultimate legal determinations).

-8-

Similarly, the class definition satisfies the demands of Rule 23(a)(3), which requires that the claims of the class representatives be typical of those of other class members. A typical claim arises "from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc*., 713 F.2d 225, 232 (7th Cir. 1983). Further, "similarity of legal theory may control even in the face of different facts." *Id.* Here, the underlying factual basis was the same for all prisoners admitted to the Cook County jail; they were all admitted and screened, and a variety of different factors may or may not have combined to invalidate the boilerplate consent that they gave. The legal argument that comes out of this is that the prisoners' constitutional rights under the Fourth and/or Fourteenth Amendments were violated. Despite minor difference in how the underlying process was executed, this indeed suffices to establish that all prisoners that underwent this screening share a common nucleus of facts, and that the Plaintiffs' legal theory would carry over to any of them.

<u>*Representativeness*</u>

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class." This inquiry is generally broken into two component parts: (1) whether Plaintiff's counsel possesses the sufficient qualifications and experience to litigate a class action lawsuit in federal court; and (2) whether Plaintiff has interests that are antagonistic to or in conflict with those of other class members.

Defendant has not challenged the general adequacy of counsel in this case, and this Court sees no reason to doubt that it is adequate. Defendant does raise a question about the techniques used by Plaintiffs' counsel in finding their clients in this instance. Resp. to Cert. Mot. at 4.

-9-

However, this is unavailing – whether or not Plaintiffs were fully aware of their constitutional protections before they were approached by Mr. Flaxman and Mr. Morrissey has little to do with counsel's ability to zealously advocate for the entire class from this point forward.

In addition, there is nothing to indicate that the Plaintiffs' interests will be "antagonistic to those of the rest of the class."  While Defendants make a great deal out of the Second Circuit's choice to consider Plaintiffs' credibility of individuals, Resp. to Cert. Mot. at 8-9, they have not advanced evidence of dishonesty that would make this Court question their ability to stand as class representatives.  Defendants' suggestion that McGrath's status as an "admitted heroin addict" should make his credibility "highly suspect" is not convincing, *see* Resp. to Cert. Mot. at 9,  particularly where class membership is made up entirely of prisoners, many of whom have a history of criminality and/or drug abuse.

### *Predominance of Common Questions*

Rule 23(b)(3), which provides the grounds for Plaintiffs' motion, requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997).  "The matters pertinent to the finding [under Rule 23(b)(3)] include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).  In considering these

-10-

requirements, "the court must review the substantive elements of plaintiffs' cause of action, the proof necessary for the various elements and the manageability of the trial on these isuses." *Rodriguez v. Ford Motor Credit Co.*, 2002 WL 655679 at *4 (N.D. Ill. Apr. 18, 2002) (citing Simer, 661 F.2d at 672)).  "Where liability determinations are both individual and fact-intensive, class certification under Rule 23(b)(3) is improper."  *Oshawa*, 225 F.R.D. at 584 (citing Rodriguez, 2002 WL 655679 at *4)).

The "predominant" question is whether or not Defendants unconstitutionally performed the screening process without achieving valid consent from the prisoners.  Largely because of the manner in which Plaintiff has framed this question – as a categorical determination that applies to all individuals subjected to that process – there is no reason to think that minor factual discrepancies will counterbalance the importance of this overarching issue.  The most difficult and all-encompassing question of consent, and Defendants' alleged nefarious intent, can be decided and applied to all potential members.  These questions will predominate, addressing far weightier factual and legal issues than minor individual deviations from the standard jail practices in question.

The second part of 23(b)(1)(3) requires "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  It is true that individualized factfinding with respect to each putative class member can undermine the potential benefits of class action status.  *See Fisher v. Britol-Myers Squibb Co.*, 181 F.R.D. 365, 373 (N.D. Ill. 1998) (finding that there is little efficiency when court would need to engage in"extensive individualized proceedings regardless of whether we certify a class"); *Crato v. Estate of Kassel*, 63 F.R.D. 18 (S.D.N.Y. 1974) (finding certification of plaintiff class, or subgroups of a plaintiff

-11-

class, inappropriate in case of fraud because each member would be required to testify on the representations that were made to them).  However, in this instance the factual determination required in every given instance would be a relatively straightforward one; if the Plaintiffs successfully establish that the screening process was necessarily non-consensual, determining membership would be a simple matter of deciding who went through that process.  Any additional factual analysis of individual circumstances would be limited, as stated above.

Even if it were necessary to conduct a mini-hearing to establish that each of the individual putative class members was indeed subject to the practices outlined in Plaintiffs' allegations, which should not be the case, this would still be more efficiently done if this court is first able to categorically address the alleged unconstitutional process itself.  To rehear this same question for each prisoner defies logic, and the case therefore demands the efficiency of scale that Rule 23 provides.  As the matter is framed by Plaintiffs, membership in the class will be determined by whether or not a given prisoner underwent the STD screening.  This is well within the realm of reasonable membership determinations that courts of this circuit have found appropriate in the past.

This outcome is supported by the application of another, implicit requirement that this circuit has read into the explicit criteria of Rule 23; that the definition of the proposed class be "adequately defined and clearly ascertainable."  *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981).  If Plaintiffs were in fact arguing that *some* of the prisoners admitted into the Cook County Jail had consented, the margins of that class would be subjective and difficult to determine without a thorough factual analysis of each prisoner's experience.  If that were the case, Plaintiffs would fail to meet the implicit criterion adopted by the Seventh Circuit.  *Id.*  However where, as here,

-12-

the Plaintiffs maintain that the process itself is constitutionally suspect, they have presented an issue that can and should be addressed categorically with respect to all similarly-situated prisoners.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **December 14, 2006**

-13-

# CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Patrick S. Smith, ASA, 500 Daley Center, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

/s/ Kenneth N. Flaxman

_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)