IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Catherine Zaborowski and )
Simone Jackson, individually and )
on behalf of a class, )
         )
                    *Plaintiffs*, )     No. 08 CV 6946
         -vs- )
                              )
Sheriff of Cook County and Cook )    *(Judge St. Eve)*
County, Illinois, )
         )
                    *Defendants*. )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR CLASS CERTIFICATION

Plaintiffs file this memorandum pursuant to the Court's order of order of April 7, 2010 in support of their amended motion for class certification.

### I.    Introduction

It its order of December 9, 2009 denying plaintiffs' initial request for class certification, the Court concluded that the proposed class satisfied the numerosity, typicality, and commonality requirements of Rule 23(a). (Order, Dec. 9, 2009, 3-4.) The Court recognized that plaintiffs were represented by "qualified counsel" (Order, Dec. 9, 2009, 4), but held that the named plaintiffs could not adequately represent the class because of "their request to reserve individual damages claims for subsequent law-

suits." (Order, Dec. 9, 2009, 5.) Similarly, the Court held that the class *"as proposed"* (Order, Dec. 9, 2009 at 5, emphasis added), did not satisfy Rule 23(b)(3) because "any efficiencies gained from consolidating the question of the Sheriff's liability do not outweigh the fact that 49 separate plaintiffs may file subsequent damages lawsuits based on the same common facts." (Order, Dec. 9, 2009 at 6.)

Plaintiffs now propose a different class. Plaintiffs do not seek to limit the class to liability, but request that the case be maintained as a class action pursuant to Rule 23(b)(3) to adjudicate liability *and* damages for all class members. Plaintiffs demonstrate below that the Court should grant their amended motion for class certification.

## II.   Plaintiffs' "Right to Have a Class Certified"

Rule 23 of the Federal Rules of Civil Procedure permits a litigant to "bring his [or her] claim as a class if he [or she] wishes." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 1438 (2010). Upon showing that the case satisfies the requirements of Rule 23, "the Federal Rules of Civil Procedure give the proposed class representative the right to have a class certified." *United States Parole Commission v. Geraghty*, 445 U.S. 388, 403 (1980). While Rule 23(b) begins that "[a] class action *may* be maintained if Rule 23(a) is satisfied," the permissive *"may"*

refers to the plaintiff, rather than to the court: "The discretion suggested by Rule 23's 'may' is discretion residing in the plaintiff." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S.Ct. at 1438. Rule 23 "empowers a federal court 'to certify a class in each and every case' where the Rule's criteria are met." *Id.* Moreover, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.* at 1437. Plaintiffs show below that their amended motion for class certification satisfies each criteria of Rule 23(a) and Rule 23(b)(3).

## III.   Facts

Each year, more than 30 women give birth while in the custody of the Sheriff of Cook County.

In 1998, the Sheriff adopted a policy mandating that all pregnant women in his custody be shackled during labor and during recovery following labor. The Sheriff's shackling policy requires a Deputy Sheriff to bind one leg and one arm of the pregnant detainee to her hospital bed. The policy also requires an armed Deputy Sheriff to remain with the pregnant detainee during labor and delivery.

The Court summarized the facts of each of the named plaintiffs in its order of December 9, 2009 at 1-2:

In their Amended Complaint, Plaintiffs allege that Zaborowski entered the Cook County Jail on June 3, 2008 and that Jackson entered the Jail on November 23, 2007. (R. 13-1, Amend. Compl. ¶ 4.) At the time they entered the Cook County Jail, both Zaborowski and Jackson were pregnant. (*Id.* ¶ 5.) Plaintiffs further allege that they were transferred from the Cook County Jail to the Sheriff's "MOM's" program, which is an off-site, residential treatment program run by the Haymarket Center. (*Id.* ¶ 6.)

Zaborowski went into labor on August 29, 2008, and her counselor from the Haymarket Center transported her to Stroger Hospital. (*Id.* ¶ 7.) Following her arrival at Stroger Hospital, and in accordance with Defendant's policy, deputy sheriffs shackled Zaborowski's hand and foot to the hospital bed. (*Id.* ¶ 8.) Zaborowski remained shackled hand and foot to the hospital bed for about eleven hours while she was in labor. (*Id.* ¶ 9.) An armed deputy sheriff remained in the hospital room during that time. (*Id.*) Immediately before giving birth, the attending physician requested that the deputy sheriff unshackle Zaborowski's foot. (*Id.* ¶ 10.) The deputy sheriff complied with the doctor's request and Zaborowski was shackled to the bed by one arm when she delivered her child on August 30, 2008. (*Id.*) Plaintiffs further allege that in accordance with the Sheriff's policy, the deputy sheriff then re-shackled Zaborowski's foot about an hour after she gave birth. (*Id.* ¶ 11.) Zaborowski remained at Stroger Hospital until the evening of the next day, September 1, 2008. (*Id.* ¶ 12.) During this time period, Zaborowski was shackled hand and foot to the hospital bed and was not permitted to use the toilet or to get up from the bed to walk. (*Id.*)

After Jackson went into labor on May 3, 2008, her counselor from the Haymarket Center took her to Stroger Hospital. (*Id.* ¶ 13.) Following her arrival at Stroger Hospital, and in accordance with the Sheriff's policies, deputy sheriffs shackled Jackson's hand and foot to the hospital bed. (*Id.* ¶ 14.) Jackson remained shackled hand and foot while she was in labor and during birth. (*Id.* ¶ 15.) An armed deputy sheriff remained in the hospital room while she was in labor and delivered her child. (*Id.*) Jackson remained at Stroger Hospital for approx-

imately four days during which Jackson was shackled hand and foot to the hospital bed and was not permitted to use the toilet or to get up from the bed to walk per the Sheriff's policies. (*Id.* ¶ 16.)

In *May v. Sheahan*, 226 F.3d 876 (7th Cir. 2000), this Court held that the Sheriff's policy requiring that all hospital detainees be shackled to their beds was "plainly excessive" as applied to an AIDS patient. *Id.* at 884. The Court reaffirmed this holding in *Hart v. Sheahan*, 396 F.3d 887 (7th Cir. 2005), where it cited M*ay* for the proposition that "the use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *Id.* at 892. The question presented in this case is whether the use of bodily restraints on a pregnant woman during labor, delivery, or recovery following delivery is "rationally related to a legitimate non-punitive government purpose." As set out below, this question should be decided in one fell swoop in a Rule 23(b)(3) class action.

## IV. The Proposed Class Continues to Satisfy the Numerosity, Typicality, and Commonality Requirements of Rule 23(a)

Plaintiffs supported their initial class motion with a list identifying 49 members of the putative class. (Order, Dec. 9, 2009, 3.) Five of those

women have since filed individual cases.[1] Plaintiffs have identified an additional 15 members of the putative class, identified in Exhibit 1. In accordance with the principles the Court applied in its order of December 9, 2009, the proposed class therefore continues to satisfy the numerosity requirement of Rule 23(a).

Nothing has changed pertaining to the commonality and typicality requirements of Rule 23(a) since entry of the Court's order of December 9, 2009. For the reasons set out by the Court in its order of December 9, 2009 at 3-4, the proposed class continues to satisfy the commonality and typicality requirements of Rule 23(a).

### V. The Amended Request for Class Certification Eliminates any Conflicts between the Named Plaintiffs and the Class

The Court concluded in its order of December 9, 2009 that the named plaintiffs "do not adequately protect the interests of the putative class members due to their request to reserve individual damage claims for subsequent lawsuits." (Order, Dec. 9, 2009, 5.) Plaintiffs do not make any such request in their amended class motion.

The adequate representation requirement of Rule 23(a)(4) "serves to uncover conflicts of interests between named parties and the class they

---

[1] *Farrar v. Dart*, 10-cv-00333; *Fletcher v. Dart*, 10-cv-00139; *Lee v. Dart*, 09 CV 789; *Smith v. Dart*, 09-cv-7791; *Vitirriti v. Dart*, 09-cv-7792.

seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997). As this Court stated in *Silversman v. Motorola, Inc.*, 259 F.R.D. 163 (N.D.Ill. 2009), "[t]o establish that they will fairly and adequately protect the interests of the class, class representatives must show that: (1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them." *Id.* at 173. The proposed class satisfies each of these requirements.

The named plaintiffs seek damages on the same theory asserted on behalf of the proposed class. Each of the named plaintiffs therefore "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 978, 985, quoting *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 403 (1977). "In short, there are no inconsistencies between [the named plaintiffs' claim] and the class members' claims." *Harris v. Best Buy Co., Inc.*, 254 F.R.D. 82, 88 (N.D.Ill. 2008). The named plaintiffs therefore satisfy the first two prongs of the adequacy of representation requirement.

The named plaintiffs also satisfy the third prong of the adequacy requirement: the Court observed in its order of December 9, 2009 that "[i]t is undisputed that Plaintiffs' counsel is qualified." (Order, Dec. 9, 2009, 4.)

Thus, as in *Harris v. Best Buy Co., Inc., supra*, the Court should conclude that plaintiffs have "fulfilled the adequacy requirement of Rule 23(a)(4) because [their] claim is not antagonistic to the proposed class' claims, [they have an] interest in the outcome of the case, and [their] counsel is experienced and competent." 254 F.R.D. at 88.

## VI.   The Revised Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) permits a case to proceed as a class action when

> (3) [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy. The matters pertinent to the finding include:
>
> > (A)  the interest of members of the class in individually controlling the prosecution or defense of separate actions;
> >
> > (B)  the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
> >
> > (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
> >
> > (D)  the difficulties likely to be encountered in the management of a class action.

### 1. Predominance

"When determining if a plaintiff has met the predominance requirement, district courts look beyond the pleadings to determine whether the

plaintiff's claims are subject to class-wide proof by common evidence." *Siegel v. Shell Oil Co.*, No. 06-35, N.D.Ill, Feb. 23, 2009, at 5, attached as Exhibit 2. In this case, adjudicating the legality of the Sheriff's alleged shackling policy will not require any individual determinations.

Plaintiffs allege that defendant Sheriff requires that all pregnant women in his custody be shackled during labor and during recovery following labor. (Amended Complaint, ¶17.) The Sheriff admitted at a Rule 30(b)(6) deposition that when a pregnant female detainee comes to a hospital for childbirth, she will go through labor with one leg shackled to the hospital bed and one of her hands cuffed to the bed.[2] (Exhibit 3 at 7-9, Hickerson Deposition 43:11-45:7.) Plaintiffs' theory of the case is that this shackling is unconstitutional under *May v. Sheahan*, 226 F.3d 876 (7th Cir. 2000).

Plaintiffs will thus "offer proof on a class-wide basis." *Hyderi v. Washington Mutual Bank, FA*, 235 F.R.D. 390, 398 (N.D.Ill. 2006). As the district court concluded in *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607 (W.D.Wis. 2003), "the case law suggests that when the class is challenging a uniform policy, the validity of that policy predominates over in-

---

[2] The Rule 30(b)(6) witness did not know if any changes had been made in shackling women assigned to the "MOM's" program. Exhibit 3 at 5, Hickerson Deposition 41:6.

dividual issues and class certification is appropriate." *Id.* at 620. Accordingly, the amended class satisfies the predominance requirement of Rule 23(b)(3).

### 2. Superiority

Plaintiffs' counsel originally believed that an individual proceeding of some sort would be required to determine the amount of damages for each woman aggrieved by the shackling policy. On this basis, counsel proposed that the case be maintained as a class limited to liability.

Plaintiffs' counsel are now attorneys of record in nine cases challenging the shackling policy.[3] Counsel have interviewed and been retained by other woman aggrieved by the challenged policy and have concluded that, unless a plaintiff can show that the shackling caused harm to the child, the damages in each case will be established by testimony from the shackling victim of the shock, panic, depression, shame, rage, and humiliation caused by being shackled during labor, delivery, or recovery following delivery.[4] Once the common liability question is determined, damages for each class-member could be resolved through a series of multiple-plaintiff trials, as in

---

[3] In addition to this case and the five cases enumerated in note 1 above, counsel are attorneys of record in *Embrey v. Sheriff*, 09 CV 3470, *Morales v. Sheriff*, 09 CV 3546, and *Bryant v. Sheriff*, 09 CV 1546.

[4] No claim of injury to the child has come to light in our interviews of women aggrieved by the Sheriff's shackling policy.

*Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986) (seven to ten plaintiffs), or (as is more likely), through settlement.

Resolving all issues in one case "makes good sense," *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003), and is superior to litigating liability and damages in forty or more individual cases.

## VII.   Conclusion

For the reasons above stated, the Court should order that this case be maintained as a class action on behalf of:

> All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery.

Respectfully submitted,


/s/   <u>Kenneth N. Flaxman</u>
Kenneth N. Flaxman
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200

Thomas G. Morrissey.
10249 S Western Ave
Chicago, Illinois 60643
(773) 233-7900

*Attorneys for Plaintiffs*

**Exhibit 1**

## Members of the Putative Class Identified after September 14, 2009

1     ■■■■ Teri

2     ■■■■ Lynn L.

3     ■■■■ Kimberly

4     ■■■■ Lisa

5     ■■■■ Nedra

6     ■■■ Sheri

7     ■■■ Crystal

8     ■■■ Jenice N.

9     ■■■■ Regina

10     ■■■ Ana

11     ■■■ Sheila

12     ■■■ Brandy

13     ■■■■ Monique

14     ■■■ Sheryl

15     ■■■ Deana

**Exhibit 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SIEGEL on behalf of himself, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SHELL OIL COMPANY, a Delaware corporation, BP CORPORATION NORTH AMERICA, INC., an Indiana corporation, CITGO PETROLEUM CORPORATION, a Delaware corporation, MARATHON OIL COMPANY, an Ohio corporation, and EXXON MOBIL CORPORATION, a New Jersey corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    No. 06 C 0035<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

In his Amended Class Action Complaint, Plaintiff Michael Siegel alleges that Defendants

Shell Oil Company, BP Corporation North America, Inc., Citgo Petroleum Corporation,

Marathon Oil Company, and Exxon Mobil Corporation are liable under the Illinois Consumer

Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et. seq.*, for deceptive

and unfair practices (Counts I and II).  Siegel also brings a common law unjust enrichment claim

based on both tort and quasi-contract (Count III) and a common law civil conspiracy claim

(Count IV).  On September 23, 2008, the Court, in its discretion, denied Siegel's Amended

Motion for Class Certification involving Siegel's proposed nationwide classes.  (R. 308-1,

Mem., Op., & Order.)  Before the Court is Siegel's Second Amended Motion for Class

Certification pursuant to Federal Rule of Civil Procedure 23.  For the following reasons, the

Court, in its discretion, denies Siegel's motion.  Further, the Court denies Defendants' Motion to Exclude Plaintiff's Expert Testimony as moot.

## BACKGROUND

In his Amended Class Action Complaint, Siegel alleges that "Defendants possess oligopolistic power and have possessed oligopolistic power throughout the entire class period, i.e., 2000 to the date of judgment, in the crude, refined and gasoline industry ("gas industry"), and have used this power in concert with their co-conspirators to illegally and artificially restrain trade and increase the price of gasoline to consumers by controlling their inventory, production, exports, limiting supply, restricting purchase, zone pricing, falsely advertising the scarceness of gasoline and excessive mark up between gasoline and crude prices."  (R. 77-1, Amend. Compl. ¶ 1.)  In the present motion for class certification, Siegel maintains that Defendants manipulated the nation's supply of gasoline resulting in Siegel and the proposed class being damaged through paying Defendants' inflated prices for gasoline.  (R. 332-1, Pl.'s Second Amend. Mot. Class Cert., ¶ 1.)  Siegel further contends that Defendants omitted material information, engaged in unfair practices, and that Defendants were unjustly enriched to the detriment of Siegel and the proposed class as a result of this conduct.  (*Id.*)  Siegel seeks certification of the following class: "All purchasers who made retail purchases of any Defendants' branded gasoline in Illinois during the period from and including December 2, 2000, through and including September 5, 2008."  (*Id.* ¶ 2.)

## LEGAL STANDARD

"[T]he primary purposes of the class-action mechanism" are "judicial economy and efficiency."  *Andrews v. Chevy Chase Bank,* 545 F.3d 570, 577 (7th Cir. 2008); *see also*

2

*Thorogood v. Sears, Roebuck & Co.,* 547 F.3d 742, 744 (7th Cir. 2008) ("The class action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated."). To that end, Federal Rule of Civil Procedure 23(a) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). Failure to meet any of these Rule 23(a) requirements precludes class certification. *See Arreola v. Godinez,* 546 F.3d 788, 797 (7th Cir. 2008).

In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b). *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Arreola,* 546 F.3d at 794. Here, Siegel requests certification of the proposed class pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *see also Amchem Prods.*, 521 U.S. at 615-16. Under Rule 23(b)(3), if "a few class members' injuries prove to be substantial, they may opt out and litigate independently." *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006).

The party seeking class certification has the burden of establishing that certification is

3

proper.  *See Oshana,* 472 F.3d at 513.  In determining whether a party has carried that burden, a

court need not accept all of the complaint's allegations as true.  *See Szabo v. Bridgeport Mach.,*

*Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).  Rather, in deciding whether to certify a class, the Court

"should make whatever factual and legal inquiries [that] are necessary under Rule 23."  *Id.* at

676; *see also General Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d

740 (1982) (courts may "probe behind the pleadings before coming to rest on the certification

question").  Finally, district courts have broad discretion in determining motions for class

certification.  *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 345, 99 S.Ct. 2326, 2334, 60 L.Ed.2d

931 (1979); *Payton v. County of Carroll,* 473 F.3d 845, 847 (7th Cir. 2007).

## ANALYSIS

The Court turns to Rule 23(b)(3) because it is dispositive.[1]  Under Rule 23(b)(3), the

Court must determine whether (1) the questions of fact or law common to the class members

predominate over questions affecting only the individual class members, and (2) a class action is

superior to other available methods of adjudicating plaintiffs' claims.  *See Amchem Prods.,* 521

U.S. at 615; *Andrews*, 545 F.3d at 577.

## I.    Predominance

Here, Defendants maintain that Siegel cannot establish – through common proof – that

Defendants' conduct proximately caused harm to each member of the putative class, and thus

---

[1]  In their response brief, Defendants do not challenge the numerosity requirement or that
there is a common nucleus of operative facts as required under Rule 23(a), and thus any such
arguments are waived.  *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of
discussion in briefs amounts to abandonment of claim).  Meanwhile, Defendants' bare-boned
adequacy argument is waived.  *See White Eagle Coop. Ass'n v. Conner,* 553 F.3d 467, 476 n.6
(7th Cir. 2009) (perfunctory and undeveloped arguments are waived).

4

Siegel has failed in his burden of establishing that class treatment is appropriate under Rule 23(b)(3).  The Court agrees.  When determining if a plaintiff has met the predominance requirement, district courts look beyond the pleadings to determine whether the plaintiff's claims are subject to class-wide proof by common evidence.  *See Thorogood,* 547 F.3d at 747-48; *Andrews*, 545 F.3d at 577; *Pastor v. State Farm Mut. Auto. Ins. Co.,* 487 F.3d 1042, 1046-47 (7th Cir. 2007); *Hewitt v. Joyce Beverages of Wis., Inc.,* 721 F.2d 625, 628-29 (7th Cir. 1983). In other words, "predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Hyderi v. Washington Mut. Bank, FA,* 235 F.R.D. 390, 398 (N.D. Ill. 2006).

In Counts I and II of his Amended Class Action Complaint, Siegel brings claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et. seq.*, for deceptive and unfair practices.  In the present motion, Siegel characterizes his deceptive practices claim as a "material omissions" claim and his unfair practices claim as an "unfair conduct" claim.  Nevertheless, the elements of a claim under the ICFA are:  (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.  *See Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 417, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002); *Galvan v. Northwestern Mem'l Hosp.,* 382 Ill.App.3d 259, 264, 888 N.E.2d 529, 535, 321 Ill.Dec. 10, 16 (Ill.App. Ct. 2008). Moreover, "a private cause of action under ICFA requires a showing of proximate causation." *Oshana,* 472 F.3d at 514-15; *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 200, 835 N.E.2d 801, 861, 296 Ill.Dec. 448, 508 (2005) ("Proximate causation is an element of all private

5

causes of action under the Act.").

An Illinois deceptive practices case similar to the present matter involving the advertising of gasoline is instructive. *See Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002). In *Oliveira,* the Supreme Court of Illinois analyzed whether a defendant's gasoline advertisements omitted material facts or were false and misleading under the ICFA and concluded that to establish the proximate cause for deceptive advertising, the plaintiff must show that he was somehow deceived. *See Oliveira,* 201 Ill.2d at 139-40, 155; *see also Shannon v. Boise Cascade Corp.,* 208 Ill.2d 517, 525, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004) ("deceptive advertising cannot be the proximate cause of damages under the Act unless it actually deceives the plaintiff."). As the Seventh Circuit has explained in the context of deceptive practices claims, "a damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception." *Oshana,* 472 F.3d at 513-14.

Likewise, to establish a common law claim of unjust enrichment – as alleged in Count III of Siegel's Amended Class Action Complaint – a plaintiff must prove deception by the defendant. *See Oshana,* 472 F.3d at 515; *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 943 (7th Cir. 2001) ("in the absence of any deception on the part of the defendants, the requisite violation of 'fundamental principles of justice, equity, and good conscience' is not present.") (citation omitted); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (1989); *see, e.g., In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* No. MDL 1703, 2007 WL 4287511, at *9 (N.D. Ill. Dec. 4, 2007).

Here, Siegel's own deposition testimony demonstrates that establishing causation for his ICFA deceptive and unfair practice claims would require the Court to make individual inquiries

6

into the putative class members' reactions to Defendants' alleged unfair and deceptive conduct. Specifically, at his deposition Siegel stated that no one believed in the gas industry's advertising that explained their profits were not exorbitant and that he, himself, did not personally believe them.  (R. 358-1, Defs.' Ex. 1, Siegel Dep., at 170-71.)  Siegel further testified that he did not believe the Defendants' statements with respect to disparities between the price of gasoline and the price of crude oil.  (*Id.* at 271.)  Moreover, Siegel admitted that – although he claims that Defendants' advertising of the price at the gas pump failed to inform consumers that the price was not a fair market price – convenience was his number one factor in purchasing gasoline.  (*Id.* at 21, 168.)

Siegel's testimony that Defendants' advertising did not deceive him and that he purchased gasoline based on other considerations – such as convenience – not only undermines the typicality requirement under Rule 23(a),[2] but also illustrates the difficulty in certifying a class of "millions of individuals throughout Illinois during the relevant time period,"[3] who may or may not have been deceived by Defendants' conduct and who may or may not have relied on Defendants' deceptive or unfair practice in purchasing gasoline.  In general, the Court would be required to make individual determinations concerning the circumstances surrounding each individual's gasoline purchases to discern whether Defendants conduct proximately caused plaintiff's injuries.  As to Siegel's deceptive practices and unjust enrichment claims, for

---

[2] As the Seventh Circuit teaches, "[e]ven though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.'" *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) (citations and internal quotations omitted).

[3] *See* R. 333-1, Pl.'s Mem. in Support, at 7.

7

example, the Court would need to determine whether Defendants deceived each putative class member and whether the individual plaintiff was damaged by the deception.  *See In re Sears,* 2007 WL 4287511, at \*9 ("it will be necessary to show that each class member purchased the tool and paid the price as a result of defendant's deception."); *see also Barbara's Sales, Inc. v. Intel Corp.,* 227 Ill.2d 45, 76, 316 Ill.Dec. 522, 879 N.E.2d 910 (2007) ("Under *Oliveira* and its progeny, plaintiffs must prove that each and every consumer who seeks redress actually saw and was deceived by the statements in question.").  As the Seventh Circuit instructs, "when a separate evidentiary hearing is required for each class member's claim, the aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment."  *Pastor,* 487 F.3d at 1047; *see, e.g., Thorogood,* 547 F.3d at 746-48.  Such is the case here.  *See, e.g., Clark v. Experian Info., Inc.,* 233 F.R.D. 508, 512 (N.D. Ill. 2005) (The nature of the plaintiffs' [ICFA] claims require an individualize person-by-person evaluation of what the potential class members viewed on the defendants' website, the potential class member's understanding of and reliance on this information, and what damages, if any, resulted.").  In sum, unlike class actions where a defendant's conduct is standardized and the class plaintiffs' individual reactions to the defendant's conduct are unnecessary in determining liability, *see Murray v. GMAC Mortgage, Corp.,* 434 F.3d 948, 955 (7th Cir. 2006), Siegel's proposed class requires the Court to determine how each plaintiff reacted to Defendants' alleged unfair and deceptive conduct.

Accordingly, Siegel has failed in his burden of establishing that common evidence can be used to prove that each class member relied on Defendants' unfair or deceptive conduct when purchasing gasoline at an allegedly elevated price.  Because individual fact issues predominate over common fact issues, the Court denies Siegel's motion for class certification as to his ICFA

8

claims as alleged in Counts I and II of the Amended Class Action Complaint, as well as Siegel's

unjust enrichment claim in Count III.  *See Thorogood,* 547 F.3d at 747-48.

   In Count IV of his Amended Class Action Complaint, Siegel alleges a common law civil

conspiracy claim.  As the Court previously explained when denying Defendants' Rule 12(c)

motion for judgment on the pleadings, a civil conspiracy claim is not a stand-alone tort.  (R. 228-

1, 1/2/08 Minute Order, at 5.)  Instead, the "function of a conspiracy claim is to extend tort

liability from the active wrongdoer to wrongdoers who may have only planned, assisted or

encouraged the active wrongdoer."  *Redelmann v. Claire Sprayway, Inc.,* 375 Ill.App.3d 912,

923, 314 Ill.Dec. 320, 874 N.E.2d 230 (2007).  Put differently, "civil conspiracy is not an

independent tort but must be premised on the commission of an underlying independent wrong."

*De Bouse v. Bayer AG,* 385 Ill.App.3d 812, 829, 324 Ill.Dec. 806, 896 N.E.2d 882 (2008).  In

fact, in his original class action brief, Siegel admitted that a common law civil conspiracy claim

requires an underlying tort.  (R. 291-1, Pl.'s Class Cert. Mem., at 32.)  Because Siegel has failed

to establish the Rule 23(b)(3) predominance requirement for the underlying tort and quasi-

contract claims, Siegel cannot establish predominance for his civil conspiracy claim.

## II.   Superiority

   Finally, the Court turns to whether a class action is superior to other methods for the

adjudication of the proposed class' claims.  *See Szabo,* 249 F.3d at 676.  In short, the difficulties

in managing the plaintiff-specific issues in the proposed class work against Siegel establishing

the superiority requirement under Rule 23(b)(3).  *See Eisen v. Carlisle & Jacquelin,* 417 U.S.

156, 164, 94 S.Ct. 2140 (1974) (manageability considerations encompass "range of practical

problems that may render the class action format inappropriate for a particular suit."); *see also*

9

Fed.R.Civ.P. 23(b)(3)(D).  As the Seventh Circuit explains, although "the need for individual damages determinations does not, in and of itself, require denial of his motion for certification," *see Arreola*, 546 F.3d at 801, "if the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims."  *Andrews*, 545 F.3d at 577.  Accordingly, Siegel has failed in his burden of establishing the superiority requirement under Rule 23(b)(3).

## CONCLUSION

For these reasons, the Court denies Plaintiff's Second Amended Motion For Class Certification pursuant to Federal Rule of Civil Procedure 23 and denies Defendants' Motion to Exclude Plaintiff's Expert as moot.

Dated: February 23, 2009

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**

10

**Exhibit 3**

1
        IN THE UNITED STATES DISTRICT COURT
2
          NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION
3

4    CATHERINE ZABOROWSKI and   )
      SIMONE JACKSON,         )
5    individually and on behalf  )
      of a class,           )
6                        )
            Plaintiffs,    )
7                        )
         vs.           )  No. 08 C 6946
8                        )
    SHERIFF OF COOK COUNTY and  )
9    COOK COUNTY, ILLINOIS,     )
                        )
10         Defendants.     )

11

12

13

14         The deposition of GARY HICKERSON,

15   called for examination, taken pursuant to

16   notice and pursuant to the Federal Rules of

17   Civil Procedure for the United States District

18   Courts pertaining to the taking of depositions,

19   taken before Kathleen P. Lipinski, Certified

20   Shorthand Reporter and Notary Public, at 500

21   Daley Center Chicago, Illinois, commencing at

22   10:15 o'clock a.m. on the 9th day of July,

23   A.D., 2009.

24

             TOOMEY REPORTING (312) 853-0648

```
 1    APPEARANCES:

 2         Mr. Thomas G. Morrissey
           (Thomas Morrissey, Ltd.)
 3         10249 South Western Avenue
           Chicago, Illinois 60643
 4         Phone:  (773) 233-7900

 5             On behalf of the Plaintiffs;

 6
           Mr. Ronald Weidhuner
 7         (State's Attorney of Cook County, Illinois
           Civil Actions Bureau)
 8         500 Daley Center
           69 West Washington
 9         Chicago, Illinois 60602
           Phone:  (312) 603-5527
10
               On behalf of the Defendant.
11

12

13

14    ALSO PRESENT:  Lindsey Scarpino,
                      Lindsey Shapiro, John Braves.
15

16

17

18

19

20

21

22

23

24
```

TOOMEY REPORTING (312) 853-0648

3

```
 1                    I N D E X

 2     WITNESS                                    PAGE

 3     GARY HICKERSON

 4          Direct Examination by Mr. Morrissey     04

 5          Cross-Examination by Mr. Weidhuner       53

 6          Redirect Examination by Mr. Morrissey   56

 7

 8

 9

10

11

12

13                  E X H I B I T S

14     HICKERSON DEPOSITION EXHIBIT               PAGE

15          No. 1                                 10

16          No. 2                                 10

17          No. 3                                 16

18          No. 4                                 29

19

20

21

22

23

24
```

TOOMEY REPORTING (312) 853-0648

4

```
 1                    (WHEREUPON, documents marked

 2                    Hickerson Deposition Exhibit

 3                    Nos. 1-5, for identification.)

 4                    (WHEREUPON, the witness was

 5                    duly sworn.)

 6          MR. MORRISSEY:  This is a discovery

 7   deposition pursuant to Rule 30(b)(6) in regards

 8   to the practices and procedures of the Sheriff

 9   of Cook County in regards to restraining and/or

10   shackling women that are pregnant and are

11   brought to a hospital.

12          The preliminary question is, Ron, are

13   you producing Superintendent Hickerson pursuant

14   to the Rule 30(b)(6) --

15          MR. WEIDHUNER:  Yes.

16   WHEREUPON:

17                    GARY HICKERSON,

18   called as a witness herein, having been first

19   duly sworn, was examined and testified as

20   follows:

21                    DIRECT EXAMINATION

22   BY MR. MORRISSEY:

23      Q.    Superintendent, you've been deposed

24   before in other matters, I'm sure, correct?
```

TOOMEY REPORTING (312) 853-0648

```
 1    BY MR. MORRISSEY:

 2        Q.     After October of 2008 for women that

 3    were assigned to the MOMs program that were

 4    hospitalized for purposes of childbirth, were

 5    they shackled?

 6        A.     I don't know.

 7        Q.     In August of 2008, what reason were

 8    women that were assigned to the MOMs program,

 9    what reason did you assign a guard to watch

10    women that were assigned to the MOMs program

11    that were hospitalized for the purpose of

12    delivering a child?

13        A.     They were -- We were instructed by the

14    receiving and/or records department that this

15    was our inmate.  "Ours" being the Department of

16    Corrections.  And when it's a Department of

17    Corrections inmate, we follow the procedures

18    that we have for a Department of Corrections

19    inmate.

20        Q.     Who instructed you from the RCDC that

21    a woman that was in the MOMs program in August

22    of 2008 who was hospitalized for the purpose of

23    delivering a child needed to be shackled?

24        A.     Whoever took that information.  We
```

TOOMEY REPORTING (312) 853-0648

1    have hospital takeovers all the time.  It

2    happens every day and we always get information

3    from a different records officer that this is

4    now our prisoner.  We are to send an officer on

5    that prisoner.

6        Q.    What type of log do you maintain in

7    regards to -- log from the -- concerning

8    information from the records office or the RCDC

9    that External Operations is to take over the

10   information for a hospitalized detainee?

11       A.    That information should be in the

12   External Operations shift commander's office in

13   a logbook.

14       Q.    Would it be correct to state that

15   after October of -- strike that -- that from

16   the time you became External Operations chief

17   in August of 2008 to the time you left, that

18   the procedures and practices in regards to

19   women that came from Division 3 to the hospital

20   who were brought to the hospital for purposes

21   of delivering a child remained the same?

22       A.    Correct.

23       Q.    During the time you were External

24   Operations superintendent from August of 2008

TOOMEY REPORTING (312) 853-0648

1    up to you said May of 2009?

2    A.    Yes, sir.

3    Q.    If a woman from Division 3 was brought

4    to a hospital for the purpose of childbirth, a

5    correctional officer would be assigned to her

6    room, correct?

7    A.    Correct.

8    Q.    And the correctional officer would

9    have a gun, correct?

10   A.    Yes.

11   Q.    The woman from Division 3 that is

12   pregnant and was brought to the hospital for

13   purposes of childbirth would be shackled in a

14   room, correct?

15   A.    Correct.

16   Q.    And her leg -- one leg would be

17   shackled to the bed, correct?

18   A.    Yes, sir.

19   Q.    And a hand would be shackled to the

20   bed?

21   A.    Cuffed to the bed.

22   Q.    Cuffed to the bed?

23   A.    Yes, sir.

24   Q.    The guard that's sitting in the room,

TOOMEY REPORTING (312) 853-0648

1  the armed guard that's sitting in the room,

2  under the practice and policy of the Sheriff

3  would be required to shackle the female to her

4  bed, correct?

5   A.  Yes.

6   Q.  The female who was pregnant and at the

7  hospital from Division 3 for purposes of giving

8  birth would remain shackled pursuant to the

9  practice of the Sheriff up until the point

10  there was a direction from a doctor, correct?

11   A.  Yes.

12   Q.  If and when a medical doctor

13  instructed the guard assigned to the hospital

14  room to remove the shackles, there would be a

15  practice of -- Strike that.  Let me shorten it.

16    MR. WEIDHUNER:  Why don't you, because

17  this has all been asked and answered, Tom.

18  BY MR. MORRISSEY:

19   Q.  For a woman that's in Division 3

20  that's hospitalized, the guard upon notice or

21  an order -- receiving an order from a doctor

22  would have to contact his or her supervisor in

23  regards to the doctor's order to remove the

24  shackles, correct?

Plaintiffs' Exhibit 3   

1      A.    Yes.

2      Q.    Only after the guard received approval

3   from his or her supervisor would the guard then

4   remove the shackles from the woman in

5   Division 3 that is hospitalized for purposes of

6   delivering a child?

7      A.    Unless it was an emergency.

8      Q.    As the Rule 30(b)(6) designated

9   deponent, you're here to -- As the

10   Rule 30(b)(6) deponent, do you know whether or

11   not the procedures have changed at all since

12   you left External Operations in May of 2009

13   concerning the shackling of pregnant women from

14   Division 3 at the hospital?

15      A.    I don't know.

16      Q.    Currently who is the Superintendent of

17   External Operations?

18      A.    Thomas Snooks.

19      Q.    How do you spell his name?

20      A.    S-n-o-o-k-s.

21      Q.    Do you personally know how many women

22   from Division 3 gave birth to children during

23   the period from August of 2008 up to May of

24   2009?

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system Smith, ASA, 500, Daley Center, Chicago, IL 60602, and I hereby cerwhich will send notification of such filing to the following:  Patrick S. tify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/ Kenneth N. Flaxman

_____

Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)

*an attorney for plaintiffs*