IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Catherine Zaborowski and Simone Jackson, individually and on behalf of a class, et al. | ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | No. 08 CV 6946 |
| -*vs*- | ) ) | |
| Sheriff of Cook County and Cook County, Illinois | ) ) ) | *(Judge St. Eve)* |
| *Defendants.* | ) | |

## PLAINTIFFS' RULE 56.1 STATEMENT

Plaintiffs submit the following as their statement of material facts as to which there is no genuine issue and that entitle the plaintiff class to judgment as a matter of law on liability.

1. Pursuant to the Court's order of June 22, 2010, this case is proceeding as a class action under Rule 23(b)(3) for: "All women in the custody of defendant Sheriff on and after December 4, 2006 who have been or who will be shackled during labor, delivery, or recovery following delivery."

2. Defendants are the Sheriff of Cook County and Cook County, Illinois.

(a) In 1999, the State of Illinois adopted a statute relating to pregnant female prisoners that applied, *inter alia*, to the Sheriff of Cook County. 55 ILCS 5/3-15003.6 (b) The statute was adopted by a unanimous vote in the Illinois House and in the Illinois Senate. (Exhibits 5, 6.)

3. The Sheriff of Cook County has applied four written policies during the course of this litigation:

  a. EO-32, Hospital Policy and Procedure, effective July 23, 2006 (Exhibit 3)

  b. Policy 32, Hospital Policy and Procedure, Effective October 2008 (Exhibit 4)

  c. Sheriff's Order 11.5.30.0, Security Special Situations: Pregnant Arrestees / Detainees / Inmates, Effective April 5, 2010 (Exhibit 5)

  d. Sheriff's Order 11.5.30.1, Security Special Situations: Pregnant Arrestees / Detainees / Inmates, Effective February 14, 2011 (Exhibit 6)

### I. APPLICATION OF SHACKLING POLICIES AND PRACTICES TO THE PLAINTIFF CLASS

4. (a) Plaintiff Simone Jackson entered the Cook County Jail on November 1, 2007. (Exhibit 7, Jackson Dep. 12:4-7.) (b) Jackson, who was then three months pregnant (Exhibit 7, Jackson Dep. 13:6-7), left the Jail

for the MOMS program on November 21, 2007. (Exhibit 7, Jackson Dep. 13:15-18.)

    5.    (a) The MOMS Program is a 16-bed unit located at the Haymarket Center. (Exhibit 8, Black Dep. 9:1-15.) (b) It is a therapeutic community where pregnant and post-partum women receive mental and physical health and substance abuse treatment and support services. (Exhibit 8, Black Dep. 9:8-24, 10:1-9; Exhibit 9, McDermott Deposition 9:8-19.) (c) Women in the MOM's Program are not dangerous. (Exhibit 8, Dep. Black 13, 14; Exhibit 9, McDermott 10, 28) (d) Nor are women in the MOMS program likely to be a flight risk. (Exhibit 9, McDermott Dep. 28:16-18.)

    6.    Pregnant prisoners at the Cook County Jail may be eligible for placement in the MOMS program, but will remain in the Jail because the MOMS Program is full. (Exhibit 8, Black Dep. 51:13-20; Exhibit 9, McDermott Dep. 16:1-9.)

    7.    Prisoners assigned to the MOMS program wear an electronic monitoring device. (Exhibit 7, Jackson Dep. 20:15-17.)

    8.    (a) A woman in the MOMS program is not restrained in any manner when she leaves the program to travel to a court appearance. (Exhibit 8, Black Dep. 19:9-19.) (b) Nor is a woman in the MOMS program

restrained in any way when the leaves the program for a doctor's appointment. *Id.* (c) Finally, women in the MOMS program are not restrained in any way when labor begins and the woman travels to a hospital for childbirth. (Exhibit 8, Black Dep. 23:1-7; Exhibit 9, McDermott Dep. 17:19-23.)

## II. SHACKLING ENROUTE TO THE HOSPITAL

9. (a) Jackson went into labor in the early morning hours of May 3, 2008. (Exhibit 7, Jackson Dep. 24:16-18; 28:24-29:5.) (b) MOMS staff called an ambulance (Exhibit 7, Jackson Dep. 28:5), which transported Jackson and a staff person (Exhibit 7, Jackson Dep. 31:11-12) to Stroger Hospital. (Exhibit 7, Jackson Dep. 30:8-10.)

10. In accordance with the Sheriff's policies (Exhibit 10, Holmes Dep 79:1-13), Jackson was neither handcuffed nor shackled on her trip to the hospital. (Exhibit 7, Jackson Dep. 31:13-18; Exhibit 11 at 9, Answer to Amended Complaint, par. 23.)

11. Until April 5, 2010, a female prisoner assigned to the Jail who went into labor woman would have been handcuffed and shackled by leg irons while being transported to the hospital. (Exhibit 12, Hickerson Dep. 46:22-47:4; Exhibit 10, Holmes Dep. 65:14-17.) This procedure was applied to plaintiff Sheena Richardson. (Exhibit 13, Richardson Declaration, ¶7.)

12. The shackled prisoner would be accompanied by one officer in the ambulance, and two other officers following in a squad car. (Exhibit 12, Hickerson Dep. 46:14-21.)

13. The officers accompanying the pregnant woman to the hospital would have been informed that the woman was in labor. (Exhibit 14, Richardson Dep. 75:12-18.)

### III. SHACKLING AT THE HOSPITAL

14. (a) Jackson was admitted to Stroger Hospital at 5:25 a.m. on May 3, 2008. (Exhibit 15 at 2.) (b) The MOMS staff person stayed with Jackson for about three hours (Exhibit 7, Jackson Dep. 34:20-21), until a Deputy Sheriff arrived. (Exhibit 7, Jackson Dep. 33:9-14.) (c) About 40 minutes thereafter, another Deputy Sheriff required that Jackson be shackled and handcuffed to the bed. (Exhibit 7, Jackson Dep. 36:22-37:23.)

15. Jackson was shackled and handcuffed in accordance with the Sheriff's policy: Until October 14, 2008, defendants required that all women would be shackled to the hospital bed by using leg irons and handcuffs upon entering the labor and delivery room. (Exhibit 9, McDermott Dep. 20:8-21.)

16. (a) Jackson described the shackles "like being tied down." (Jackson Dep. 39:3-4.) (b) She was in pain and wanted to move, but could

not. (Exhibit 7, Jackson Dep. 39:1-3.) (c) The shackles prevented Jackson from leaving the bed to use the toilet. (Exhibit 7, Jackson Dep. 39:10-18.)

17. (a) Sheena Richardson was also shackled in the labor and delivery room: Richardson was admitted to Stroger Hospital on September 15, 2008 and was moved to a labor and delivery room that day at 9:00 p.m. (Exhibit 16 at 1.) (b) Richardson remained shackled until 11:00 a.m. on September 16th, when she was allowed to shower. (Exhibit 16 at 3.) (c) The shackles were replaced at 11:30 a.m. (Exhibit 16 at 3.) (d) Richardson remained shackled until 9:30 p.m. on September 16, 2008, when restraints were removed for 30 minutes to allow the birth of her child. (Exhibit 16 at 2.)

### IV. REMOVAL OF SHACKLES REQUIRES MEDICAL REQUEST AND APPROVAL OF A SUPERVISOR

18. At 8:13 p.m. on May 2, 2008, a physician asked the Deputy Sheriff to remove the shackles from Jackson's right foot. (Exhibit 15 at 2.)

19. The Sheriff's policies required that the Deputy obtain a supervisor's approval before removing shackles. (Exhibit 12, Hickerson Dep. 21:2-7.)

20. It took more than four hours for the Deputy to obtain this authorization (Exhibit 12, Hickerson Dep. 26:15-27:23; Exhibit 17 at 2), and

the shackles remained on until 12:30 a.m. (Exhibit 17 at 2; Exhibit 12, Hickerson Dep. 27:18-23.)

21. Jackson gave birth at 12:41 a.m. on May 3, 2008. (Exhibit 15 at 3.)

22. The Sheriff's policies mandated the shackling of women in labor: Until October 14, 2008, the Sheriff required that all prisoners in labor (including those from the MOM'S program), be shackled until a physician declared that the baby was about to emerge from the birth canal. (Exhibit 18, Snooks Dep, 33:3-6; Exhibit 10, Holmes Dep. 96:2-11.)

23. (a) Starting on October 14, 2008, the Sheriff allowed an exception to mandatory shackling for women who came to the hospital from the MOM'S program. (Exhibit 12, Hickerson Dep. 36:18-24.) (b) Mandatory shackling continued, however, for pregnant women who came to the hospital from the Jail. (Exhibit 12, Hickerson Dep. 42:14-22.) Jackson gave birth before the Sheriff revised his shackling policy and she was shackled during more than 12 hours of labor. (Exhibit 17 at 1-2.)

24. (a) In April of 2010, the Sheriff abandoned mandatory pre-delivery shackling for any female prisoner who had been "brought to the hospital for the purpose of delivering her baby." (Exhibit 5 at 2, Sheriff's

Order 11.5.30.0, Section V(C).) (b) The written policy, however, did not prohibit postpartum shackling. (Exhibit 5.)

### V. POST DELIVERY SHACKLING

25. (a) The Sheriff's post-delivery shackling policy was applied to Jackson, who was re-shackled after the birth of her child. (Exhibit 7, Jackson Dep. 51:3-4; 52:1-11; 53:16-54:1) (b) Jackson remained shackled during most of her stay in the hospital. (Exhibit 7, Jackson Dep. 51:3-4; 52:1-11; 53:16-54:1.)

26. The need for correctional supervisor to approve a doctor's request to remove shackles is shown in the Sheriff's records concerning the shackling of Sheena Richardson:

    a. Richardson gave birth on September 16, 2008 and she was allowed to ambulate on September 17, 2008. (Exhibit 16 at 4.)

    b. The shackles were replaced the next day, September 18, 2008. (Exhibit 16 at 5-6.) Richardson's doctor unsuccessfully requested that the shackles be removed (Exhibit 19):

> Pt.'s infant is in the NICU. She has never seen her baby since delivery. I am trying my very best to get this pt. to see her infant, and also to ambulate for 15 minutes every 4 hours. I have spoken

with the guard, who stated that I had to speak with her lieutenant. I have now spoken with the lieutenant twice, and he has faxed our orders to his superintendant. I am awaiting the response. If both of the above do not happen, I will contact administration.

c. The officer documented the disposition of the physician's request as follows (Exhibit 16 at 6):

A doctor's order is here requesting that the inmate be allowed to ambulate by walking to the bathroom. R/O notified Lt. Villaneuva and he denied the request but stated that he would fax it over for approval as well.

d. Richardson remained shackled until she was discharged from the hospital on September 18, 2008. (Exhibit 16 at 8.) Once again, Richardson's physician had required that Richardson "be allowed to walk." *Id.* This request was rejected at 10:10 a.m., but was granted by a lieutenant at 12:25 p.m. *Id.*

27. The Sheriff abandoned post-delivery shackling in February of 2011, when the sheriff adopted a new rule that prohibits the shackling of "postpartum subjects" while they remain in the hospital. (Exhibit 6 at 6, Sheriff's Order 11.5.30.1, Section VII(D)(2)(a).)

## VI.  SHACKLING ON RETURN FROM THE HOSPITAL

28.  (a) Jackson was released from the hospital on May 5, 2008. (Exhibit 7, Jackson Dep. 61:1-3.) (b) After a correctional officer unshackled her (Exhibit 7, Jackson Dep. 61:20), Jackson, accompanied by a MOMS counselor, returned to the MOMS program. *Id.*

29.  Jackson would have been handcuffed and shackled after leaving the hospital if, like Sheena Richardson, she was returning to the Jail. (Exhibit 13, Richardson Declaration ¶14.)

30.  The Sheriff dropped his rule requiring the shackling of new mothers on their return to the Jail in the February, 2011 policy, which limits restraints to "handcuffs in front of the body" for a "postpartum subject" who is returning to the jail. (Exhibit 6 at 6, Sheriff's Order 11.5.30.1, Section VII(D)(2)(b).)

## VII. SHACKLING A WOMAN IN LABOR IS UNHEALTHY, INHUMANE, AND INCREASES PAIN

31.  Dr. Stamatia Richardson has worked with women's health issues at the Cook County Jail for 17 years (Exhibit 16, Richardson 8:19-23) and is the sole physician assigned by defendants to the pre-natal clinic at the Jail. (Exhibit 16, Richardson 12:3-8.)

32.  Dr. Richardson stated without reservation when deposed in this case that "[n]o pregnant woman should be shackled for prolonged

-10-

periods, or at all during labor, for obvious humane reasons, but also because the hypercoagulable state of pregnant women may result in clotting abnormalities, including pulmonary embolism." (Exhibit 16, Richardson 39:13-15.)

33. Dr. Richardson also stated without qualification that allowing a woman in labor to get up and ambulate is important "[t]o alleviate pain," (Exhibit 16, Richardson 65:20-21), as well as to "help progress labor itself." (Exhibit 16, Richardson Dep. 66:3-4.)

### VIII. ESCAPE RISK AND HUMAN DIGNITY

34. Defendants contend that, until February of 2011, shackling was justified by the "security risk of physical harm to the public, the hospital employees and the correctional staff." (Exhibit 20 at 1, 5, 9, Revised Answers to Contention Interrogatories 2, 6, 12.)

35. "[I]t's kind of ludicrous, as you say, to think that the woman in labor is going to jump off the bed and run out of the hospital." (Remarks of Representative Black , House Debate at 135, Exhibit 1 at 2)

36. The Department of Corrections in 8 states have adopted regulations prohibiting the use of shackles during labor, delivery, and in recovery after delivery.

a. Alabama Department of Corrections, Standard Operating Procedures 9-14, January 11, 2008, (5) "Pregnant Inmates will not be handcuffed, nor will leg irons be placed on the inmate at any time regardless of her custody. Once the inmate has delivered the infant child she will be handcuffed to the front for travel from the hospital to the institution or to another hospital if necessary. Leg irons will be use to secure the inmate to the bed by cuffing one leg to the bed after delivery for security purposes." (Exhibit 21.)

b. Arkansas Administrative Directive 04-08, May 1, 2004, Section II: "Women in labor often experience sudden pain during contractions, need to support their abdomens, during movement, and are easily thrown off-balance due to the pronounced shift in weight. There it is important that they be able to shift their posture to ease pain and work with the contraction. They also need to support their abdomens to cushion bumps in transportation and facilitate changes in posture and position. They need their legs and hands free when

standing to maintain balance and to catch themselves without falling on their abdomens whenever they are required to walk." Section III(E)(8): "All restraints will be removed when the inmate is in the labor and delivery room or when anesthesia is initiated. At that point medical restraints may be ordered by the attending physician should they be seen as medically indicated." (Exhibit 22.)

c. Delaware Policy I-01.2 (V), March 10, 2011: "Restraining a pregnant woman may pose an undue health risk to the woman and her unborn fetus. This is especially critical during labor, delivery, and postpartum recovery after delivery. Restraints on a pregnant woman can interfere with the medical staff's ability to appropriately assist in childbirth or to conduct sudden emergency procedures." (a) "Restraint of pregnant inmates during labor and delivery should not be used. The application of restraints during all other pre-and postpartum periods should be restricted as

much as possible and, when used, done so with consultation from medical staff." (Exhibit 23.)

d. Michigan Department of Corrections, Operating Procedure 03.04.100B, Pregnant and Postpartum Prisoners, June 24, 2010 "whenever a pregnant prisoner is in active labor and is being transported to the hospital. No other forms of restraint may be used except on a Level IV prisoner as authorized by the Warden. At the hospital, the prisoner's handcuffs shall be removed and no other form of restraint may be used during labor and delivery except on a Level IV prisoner as authorized by the Warden." (Exhibit 24.)

e. Rhode Island, Addendum to DOC Policy #9.12-3, February 1, 2010, "Leg restraints may only be used on a pregnant inmate per order of the Shift Commander or above when there are compelling grounds to believe that the inmate presents an immediate and serious threat of harm to herself, staff or others or is determined to be substantial flight risk and cannot be reasonably contained by other means." Section F:

"Upon entering Labor, Delivery and Recovery Room, all restraints will be removed unless the innate attempts to escape at the hospital or the inmate engages in violent behavior at the hospital which presents a danger of injury." (Exhibit 25.)

f. South Dakota Women's Prison, Operational Memorandum 4.3.D.6 (January 10, 2011) (Exhibit 26):

    i. Restraints for Pregnant Inmates:

        1. A. Restraints should not be used when compelling medical reasons dictate, including when a pregnant prisoner is in labor, is delivering her baby, or is in immediate post-delivery recuperation, unless the individual presents an immediate, serious harm to self, staff or others, or there are reasonable grounds to believe the pregnant prisoner presents an immediate and credible risk of escape that cannot be reasonably contained through other methods.

      2. B. Pregnant Prisoners: If a pregnant prisoner is restrained, the restraints used must be the least restrictive necessary to ensure safety and security. Any restraints used must not physically constrict the direct area of the pregnancy.

  g. Wisconsin, Division of Adult Institutions Policy 306.00.02 (July 13, 2006) "Pregnant inmates who are in active labor or brought to a medical facility for the purpose of delivery of a child will not be restrained unless a security reason exists during (1) Transportation, (2) Delivery of the child, (3) Recovery at the hospital." (Exhibit 27.)

## IX. GROUNDLESS CLAIMS OF ESCAPES

37. In response to a contention interrogatory, the Sheriff identified three instances in which "female detainees attempted escape while being treated at various Cook County Hospitals: Latanya Burks (post-delivery), approximately June 1997, Mt. Sinai Hospital; Joyce Nathan, approximately May 1998, Cook County Hospital; and Lawanda Warren, approximately

February 2006, Loretto Hospital. Investigation continues." (Answer to Contention Interrogatory 13, Exhibit 20 at 11.)

    38. Contemporaneous newspaper reports show:

        a. Latanya Burks escapes "during an officer's absence after giving birth." (Exhibit 30.)

        b. Joyce Nathan fell to her death from a window at Cook County Hospital because "[a]t least one Cook County corrections officer failed to follow proper procedures." (Exhibit 31.)

        c. Lawanda Warren because an officer "made a mistake." (Exhibit 32.)

/s/ Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC No. 830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604
(312) 427-3200

Thomas G. Morrissey, Ltd.
10249 S. Western Ave.
Chicago, IL. 60643
(773) 233-7900
*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Michael Gallagher, ASA, 500 Daley Center, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/ Kenneth N. Flaxman

_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)